# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SHIRLEY J. WALKER,

       Plaintiff,

vs.                                                                    No. CIV 17-0991 JB\SCY

GREGORY J. SPINA, VALLEY
EXPRESS, INC., and GREAT WEST
CASUALTY COMPANY,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages, filed August 30, 2018 (Doc. 73)("MSJ"). The Court held a hearing on the MSJ on November 21, 2018. The primary issue is whether the Court should grant summary judgment dismissing Plaintiff Shirley Walker's claims against Defendants Gregory J. Spina and Valley Express, Inc. for punitive damages, because Walker cannot show that Spina acted with the requisite culpability when his commercial truck sideswiped Walker's automobile. In the Plaintiff Shirley J. Walker's Response to Defendnts' [sic] Motion for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages ¶ 1, at 1, filed September 6, 2018 (Doc. 76)("MSJ Response"), Walker abandoned her request for punitive damages from Valley Express, so the Court will not address this claim. The Court will grant the Defendants' request for summary judgment on Walker's punitive damages claim against Spina, because Walker has not demonstrated a genuine issue of fact whether Spina acted willfully, wantonly, maliciously, recklessly, oppressively, or fraudulently. See Clay v. Ferrellgas, Inc., 1994-NMSC-080, ¶ 12, 881 P.2d 11, 14.

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' undisputed material facts in the MSJ and the MSJ Response.

On July 23, 2015, see MSJ ¶ 1, at 2 (asserting this fact)(citing generally First Amended Complaint for Personal Injuries and Damages, filed August 28, 2018 (Doc. 68)("Amended Complaint")),[1] Spina's commercial truck collided with Walker's automobile at a traffic light; Spina sideswiped Walker's automobile and a vehicle next to it as Spina ran the red light and crossed into the intersection before reaching a stop, see MSJ Response ¶ 2, at 2 (asserting these facts)(citing generally Affidavit of Shirley Walker (executed September 5, 2018), filed September 6, 2018 (Doc. 76)("Walker Aff.")).[2] Before the accident, Spina was traveling at around thirty to

---

[1]Walker offers a blanket assertion that she "disputes the facts noted in the section marked 'Statement of Undisputed Material Facts' in the Defendants Motion, as noted per her Affidavit hereto attached and Marked 'Exhibit 1.'" MSJ Response ¶ 2, at 2 (citing generally Affidavit of Shirley Walker (executed September 5, 2018), filed September 6, 2018 (Doc. 76)). The Walker Aff., however, describes the accident, see MSJ Response ¶ 2, at 1; Walker Aff. ¶ 4, at 1, and the Defendants cite Walker's Amended Complaint for the accident's date, see MSJ ¶ 1, at 2. Moreover, nothing in the record disputes the alleged undisputed fact that the accident occurred on July 23, 2015. The Court, accordingly, deems that the parties do not dispute the accident's date.

[2]The Court draws the text's brief description of the accident from the Walker Aff. Neither the Defendants in their MSJ nor Walker in her MSJ Response describe the accident. Walker, however, incorporates the Walker Aff. in her MSJ Response when she notes that she "disputes the facts noted in the section marked 'Statement of Undisputed Material Facts' in the Defendants Motion, as noted per her Affidavit hereto attached and Marked 'Exhibit 1,'" MSJ Response ¶ 2, at 1 (citing generally Walker Aff.), and, in the Walker Aff., Walker describes the accident, see Walker Aff. ¶ 4, at 1; id. ¶ 9, at 2.
According to the Defendants, Walker does not base her Walker Aff. on personal knowledge, and the Court should deem the evidence inadmissible. See Reply in Support of their Motion for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages at 1, filed September 20, 2018 (Doc. 84)("MSJ Reply"). The Court declines to deem the entire Walker Aff. inadmissible, because portions of the Walker Aff. are based on Walker's personal knowledge. The

Court, nevertheless, agrees with the Defendants that portions of the Walker Aff. do not reflect Walker's personal knowledge. To the extent that the Walker Aff. relies on personal knowledge, the Court deems it admissible evidence.

"Generally Rule 56(e)'s requirements of personal knowledge and competence to testify may be inferred if it is clear from the context of the affidavit that the affiant is testifying from personal knowledge." Gonzales v. City of Albuquerque, 849 F. Supp. 2d 1123, 1179 (D.N.M. 2011)(Browning, J.)(citing Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990), aff'd, 701 F.3d 1267 (10th Cir. 2012)). See Parrish v. Roosevelt Cty. Bd. of Cty. Comm'rs, No. CIV 15-0703 JB/GBF, 2017 WL 5178242, at *1 (D.N.M. March 13, 2017)(Browning, J.)(classifying an affidavit on "the ways in which Roosevelt County generally operates or . . . information contained in Parrish's personnel file" as based on personal knowledge, because "Hamilton, as the Roosevelt County Manager, is intimately acquainted with Roosevelt County's operations and employee classifications, as well as with Parrish's personnel file"); Gonzales v. City of Albuquerque, 849 F. Supp. 2d 1123, 1139 n.10 (D.N.M. 2011)(Browning, J.)("Because Gonzales does not have personal knowledge of the reason for her termination, and because her affidavit sets forth only her belief as to the reason of her termination, the Court finds that her statements in her affidavit do not create a genuine issue of material fact."), aff'd, 701 F.3d 1267 (10th Cir. 2012); Coffey v. United States, Nos. CIV 08-0588 JB/LFG, CIV 09-0028 JB/LFG, 2011 WL 6013611, at *5 n.33 (D.N.M. Nov. 28, 2011)(Browning, J.)(deeming an affidavit including "a variety of observations and interactions with Crutcher" based on personal knowledge), aff'd sub nom., Coffey v. McKinley Cty., 504 F. App'x 715 (10th Cir. 2012); Mata v. Anderson, 685 F. Supp. 2d 1223, 1237 n.2 (D.N.M. 2010)(Browning, J.)("[T]he Court will not . . . give weight to the assertions that the letter from Internal Affairs discouraged others or silenced others; such evidence is inadmissible because it appears to be speculation rather than based on personal knowledge."), aff'd, 635 F.3d 1250 (10th Cir. 2011); Advanced Optics Elecs., Inc. v. Robins, 769 F. Supp. 2d 1285, 1315 n.10 (D.N.M. 2010)(Browning, J.)("Because the Court has entered default holding A. Robins liable for participating in a conspiracy that involved the sales of Biomoda's shares, it is reasonable to infer that A. Robins had personal knowledge of the amount the Defendants received for the transfer of the shares."); Barber v. Lovelace Sandia Health Sys., 409 F. Supp. 2d 1313, 1342 (D.N.M. 2005)(Browning, J.)(disregarding an affidavit stating a party's beliefs rather than firsthand knowledge).

"It is reasonable to infer" that Walker relayed significant portions of the Walker Aff. based on her personal knowledge. Advanced Optics Elecs., Inc. v. Robins, 769 F. Supp. 2d at 1315. The Walker Aff., like the affidavits in Coffey v. United States, Parrish v. Roosevelt County Board of County Commissioners, and Advanced Optics Electronics, Inc. v. Robins, focuses on events that Walker experienced and information to which Walker had access. Walker could reasonably testify on personal knowledge whether Spina collided with her and on the collision's basic facts, including: (i) where her vehicle was located -- at the red light, see Walker Aff. ¶ 4, at 1; id. ¶ 7, at 2; (ii) the vehicle type Spina drove -- a truck, see Walker Aff. ¶ 4, at 1; (v) what preceded the collision -- Walker sitting at the red light and hearing no brakes from Spina, see Walker Aff. ¶ 4, at 1; id. ¶ 7, at 2; (iii) how the collision occurred -- by Spina driving between Walker's and the neighboring vehicle, see Walker Aff. ¶ 4, at 1; and (iv) what followed the collision -- with Spina

thirty-five miles per hour.  See MSJ ¶ 7, at 1 (asserting this fact)(citing generally Defendant

Gregory J. Spina's Answers and Responses to Plaintiff's Requests for Admission, First Set of

Interrogatories and Request for Production (undated), filed August 30, 2018 (Doc. 73-

1)("Interrogatories Answers")).[3]  After the accident, Spina told Walker that he thought she and the

---

running the red light, crossing the intersection in his truck, and later conversing with Walker,
see Walker Aff. ¶ 5, at 1, id. ¶ 6, at 1-2.  Although, as the Defendants indicate, Walker, in
paragraphs four and five, which describe the accident, references the Photographs, filed September
6, 2018 (Doc. 76), the Court declines, for this reason, to deem the paragraphs inadmissible.
Following an automobile accident, an individual would likely remember the events surrounding
the incident.  It is not unreasonable to infer that Walker, when she narrates the accident, bases her
narration on personal knowledge and cites the Photographs to support her story.  Walker's almost
complete reliance on the New Mexico State Police Report (dated July 24, 2015), filed September
6, 2018 (Doc. 76)("Police Report"), in paragraph three renders much of the paragraph
inadmissible, because she is not relying on her personal knowledge, but the Court deems
admissible Walker's admission that she "was in the vehicle accident."  Walker Aff. ¶ 3, at 1.
Walker certainly would have knowledge and remember whether she experienced an automobile
accident, and the Police Report is not integral to Walker asserting this fact.

Although the Defendants dispute the Walker Aff.'s admissibility, they do not deny that the
accident occurred.  The Defendants state the date that the accident occurred and cite to the
Amended Complaint.  See MSJ ¶ 1, at 2.  Further, they provide an "Introduction" stating: "This
case stems from an accident occurring on July 23, 2015, on U.S. Highway 84/285 which involved
Plaintiff and Gregory Spina."  MSJ at 1.  In neither the MSJ nor the MSJ Reply do the Defendants
proffer facts that dispute the Walker Aff.'s recital of the accident's underlying facts, and, the record
supports the recounting.  Accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ.
56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically
controverted.").

[3]Walker responds to the MSJ's alleged undisputed facts with the statement that she
"disputes the facts noted in the section marked 'Statement of Undisputed Material Facts' in the
Defendants Motion, as noted per her Affidavit hereto attached and Marked 'Exhibit 1.'"  MSJ
Response ¶ 2, at 1 (citing generally Walker Aff.).  In the MSJ Response, Walker, however, states
that "by his own admission [Spina] continued traveling at about 30 to 35 miles per hour" and cites
to the MSJ paragraph asserting the alleged undisputed fact in the text.  MSJ Response ¶ 2, at 1-2
(citing MSJ ¶7, at 2).  Accordingly, the Court concludes that Walker agrees with the alleged
undisputed fact asserted in the text and, thus, deems the fact undisputed.

other vehicle "were going to run the yellow light." Walker Aff. ¶ 6, at 1-2 (asserting this fact).[4]

Walker did not hear Spina apply his brakes. See Walker Aff. ¶ 7, at 2 (asserting this fact).[5] Walker

is now eighty-four years old. See Walker Aff. ¶ 2, at 1 (asserting these facts).[6]

## PROCEDURAL BACKGROUND

The Court recited this case's facts and early procedural history in its Memorandum Opinion

and Order at 2-3, No. CIV 17-0991 JB/SCY, 2018 WL 4100944, at *1, filed August 28, 2018

(Doc. 67)("MOO"). The Court incorporates that recitation here. The footnote associated with the

quoted text is also quoted in full from the MOO.

---

[4]As described supra note 2, the Court declines the Defendants' invitation to hold the Walker Aff. in its entirety inadmissible hearsay. The Court can reasonably infer that Walker would remember information that Spina conveyed to her after the collision and could, based on personal knowledge, recite such information. Statements by opposing parties are not hearsay, and so Spina's statements to Walker are admissible. See Fed. R. Evid. 801(2). The Defendants put forth no evidence contradicting that Spina made the statement in the alleged undisputed fact. Accordingly, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[5]As discussed supra note 2, to the extent that Walker relies on her personal knowledge, the Court does not deem the alleged facts in the Walker Aff. inadmissible hearsay. It is reasonable to infer that Walker could recite, without need for third-party sources or speculation, the accident's events, including whether she heard Spina's brakes. The Court, thus, concludes that the alleged undisputed fact in the text is admissible. Moreover, no evidence from the Defendants contradicts this alleged undisputed fact. Accordingly, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[6]As discussed supra note 2, where Walker relies on personal knowledge, the Court will not regard the alleged facts in the Walker Aff. as inadmissible hearsay. Walker bases her assertion about her age on her personal knowledge, and the Court, therefore, deems the information admissible. The Defendants include no evidence that contradicts this alleged undisputed fact in the text. Accordingly, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Walker sues Spina and Valley Express, asserting negligence,[7] and sues Defendant Dixon Insurance Company, asserting that she has a claim for benefits against it under the [New Mexico Financial Responsibility Act, N.M. Stat. Ann. §§ 66-5-201 to -239] and Raskob[v. Sanchez, 1998-NMSC-045, 970 P.2d 580] for injuries that Spina's negligence caused. See [Walker's Complaint for Personal Injuries and Damages (First Judicial District Court, County of Santa Fe, State of New Mexico), filed December 23, 2016, filed in federal court September 29, 2017 (Doc. 1-1)("Complaint")] ¶¶ 8-13, at 3-5. Spina and Valley Express removed the case to federal court on the basis of diversity jurisdiction. See Notice of Removal to the United States District Court for the District of New Mexico at 1, filed September 29, 2017 (Doc. 1)("Notice of Removal").

MOO at 2-3, 2018 WL 4100944, at *1. The Amended Complaint terminated Dixon Insurance Company as a Defendant and added, in its place, Great West Casualty Company. See Amended Complaint at 1.

### 1.      The MSJ.

The Defendants ask the Court to grant summary judgment dismissing Walker's claims for punitive damages. See MSJ at 1. The Defendants admit that the Court should apply "the substantive law of New Mexico." MSJ at 3. The Defendants aver that Walker cannot establish a claim for punitive damages against either Spina or Valley Express, because Walker cannot show that the Defendants' conduct "rises to the level of willful, wanton, malicious, reckless, oppressive, or fraudulent conduct" that New Mexico law requires for punitive damages. MSJ at 3-4. The Defendants further contend that, "in New Mexico, punitive damages are not imposed on an employer for the acts of an employee pursuant to respondeat superior"; rather, according to the Defendants, Walker must establish Valley Express' culpability. MSJ at 4-5. The Defendants note

---

[7]Although the Complaint does not make this claim explicit, Walker presumably sues Valley Express under respondeat superior.

MOO at 2, 2018 WL 4100944, at *1.

that Walker has produced no evidence showing Valley Express' culpability.  See MSJ at 5.

Further, according to the Defendants, Walker has not submitted any documentation or testimony

showing that Spina acted with the requisite culpability.  See MSJ at 5.  According to the

Defendants, Spina did not consume drugs or alcohol in the forty-eight hours before the accident,

and, when he saw Walker's automobile "stop suddenly for a traffic light," Spina attempted to stop

his truck.  MSJ at 5.

## 2. The MSJ Response.

Walker concedes that she will not seek punitive damages against Valley Express.  See MSJ

Response ¶ 1, at 1.  Walker avers that Spina continued traveling "at about 30 to 35 miles per hour"

through the traffic light.  MSJ Response ¶ 2, at 1.  According to Walker, she and the other vehicle

"did not 'suddenly stop,'" but had been sitting at the traffic light "for a period of time" before

Spina collided with them.  MSJ Response ¶ 2, at 2 (quoting MSJ at 5).  Further, Walker contends

that Spina applied his brakes only after crossing the intersection, and that Spina informed Walker

that he thought that she and the other driver would continue through the yellow light.  See MSJ

¶ 2, at 2.  Walker argues that Spina "acted willfully, wantonly, recklessly, consciously, indifferent

or with a culpable mental state," because he was driving over the speed limit or sped up to continue

through the yellow light, and never attempted to brake his truck.  MSJ Response ¶ 3, at 2 (citing

generally Walker Aff.).

In the Walker Aff., Walker describes the automobile accident, beginning "I was in the

vehicle accident as noted per the police report hereto attached and marked 'Exhibit A'."  Walker

Aff. ¶ 3, at 1.  She continues: "I was stopped at a red light when Mr. Gregory J. Spina, driving a

large commercial vehicle; attached and marked 'Exhibit B', drove his large truck between my

vehicle, attached and marked 'Exhibit C', and a van, attached and marked 'Exhibit D'." Walker

Aff. ¶ 4, at 1. According to Walker, "Mr. Spina ran the red light and crossed the intersection as

can be noted by the attached 'Exhibit E'." Walker Aff. ¶ 5, at 1. "After the accident," Walker

explains, "Mr. Spina informed me that he thought we were going to run the yellow light. Which

indicated to me that he saw my vehicle and the other vehicle he hit while we were stopped at the

light, and that he never considered slowing down, but accelerated his speed." Walker Aff. ¶ 6, at

1-2. According to Walker:

> My vehicle which I stopped for the red light, did not "suddenly stop" for
> the traffic light, and I didn't hear Spina apply his brakes as he went between my car
> and the other car that stopped for the red light. Also the photos produced by the
> Defendants in this case don't show any brake markings either before he entered the
> intersection, while he was in the intersection, or after he crossed the intersection.
> "Exhibit E" shows that Mr. Spina was traveling so fast that he stopped a
> considerable distance from the intersection after hitting two vehicles and running a
> red light.

Walker Aff. ¶ 7, at 2. Walker further states that:

> In light of the fact that Mr. Spina was driving a large commercial vehicle, he should
> not have prepared to run a yellow light, should have proceeded within the speed
> that was warranted with other vehicles on the roadway, and should have slowed
> down when he saw the yellow light, and then stopped at the red light, rather than
> running the red light.

Walker Aff. ¶ 8, at 2. "The conduct of Mr. Spina was very dangerous," argues Walker, "in that he

was traveling to [sic] fast, he never intended to stop for the red light, and that he finally ran the red

light and that he went through the intersection hitting two cars in the process with his semi-truck."

Walker Aff. ¶ 9, at 2. Walker summarizes that, because conflicting facts exist, the Court cannot

grant the Defendants' summary judgment motion. See MSJ Response at 2-3.

### 3.    **The MSJ Reply**.

The Defendants argue that Walker points only to the Walker Aff. to support her arguments, and that the Walker Aff., is "insufficient to show disputed facts." Defendants' Reply in Support of their Motion for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages at 1, filed September 20, 2018 (Doc. 84)("MSJ Reply"). The Defendants aver that the Walker Aff. is not based on personal knowledge and "does not set out facts that are admissible evidence." MSJ Reply at 1-2. The Defendants contend that the New Mexico State Police Report (dated July 24, 2015), filed September 6, 2018 (Doc. 76)("Police Report"), is inadmissible hearsay, and that, in the Walker Aff., Walker relies on Photographs, filed September 6, 2018 (Doc. 76), and speculation rather than her personal knowledge when she describes Spina's state of mind, brake marks, speed, and brake application. See MSJ Reply at 2. The Defendants argue that Spina provides information based on his personal knowledge and that Walker has not disputed this information. See MSJ Reply at 2. Finally, the Defendants reiterate that Walker cannot establish punitive damages against Valley Express through respondeat superior. See MSJ Response at 3.

### 4.    **The Hearing**.

The Court held a hearing on November 21, 2018. The Defendants reiterated their version of the events leading to the accident. See Draft Transcript of Hearing at 55:17-56:4 (taken November 21, 2018)(Beaulieu)("Tr.").[8] According to the Defendants, Walker has established no "admissible evidence," Tr. at 56:5 (Beaulieu), to contradict Spina's account, and Walker, the Defendants argued, has not established a question of fact whether Spina acted willfully, wantonly,

---

[8]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

recklessly, or maliciously. See Tr. at 56:4-9 (Beaulieu). The Defendants further contended that, under New Mexico law, punitive damages cannot be recovered against an employer under respondeat superior, and, according to the Defendants, Walker has not shown that Valley Express acted culpably. See Tr. at 56:19-57:4 (Beaulieu).

Walker responded by pointing to the Police Report:

> The police report indicates that two vehicles, a van and [Walker]'s car stopped at a red light. . . . What happens in this case is the speed limit is [35] miles per hour, but the problem is that the cars are stopped at a red light, so the speed is excessive[.] . . . [W]hat this semi[-]truck driver does is he doesn't, when he sees a yellow light he admits he sees a yellow light in that police statement, he doesn't get ready to stop as the statute requires. . . . [H]e indicates that he thinks that . . . the plaintiff and the other car are going to run the red light so he guns it . . . forward.

Tr. at 57:16-58:8 (A. A. Ayala). The Court queried how Walker planned to introduce the Police Report into evidence, see Tr. at 59:6-7 (Court), and Walker replied: "I can't get the police report into evidence," Tr. at 59:8-9, but indicated that she would introduce the officer's and other witnesses' testimony as to the facts contained in the Police Report, see Tr. at 59:11-14 (A. Ayala). The Court noted that such testimony would also not be admissible. See Tr. at 59:19-25 (Court).[9] To this comment, Walker responded by explaining that the Walker Aff. indicates: "[The] defendant told [Walker,] 'I thought you were going to run the yellow light[.']" Tr. at 60:1-2 (A. Ayala). New Mexico law, Walker noted, requires drivers to drive at a speed "to avoid colliding with a person, vehicle or other conveyance upon entering the highway." Tr. at 60:7-9 (A. Ayala)(quoting N.M. Stat. Ann. § 66-7-301(B)(1)). Accordingly, Spina, Walker concluded -- "notwithstanding,"

---

[9]Such testimony's admissibility depends on to what the witnesses testify. If the witnesses recite information provided in third parties' statements for the statements' truth, the testimony would be hearsay. See Fed. R. Evid. 801(c). The witnesses' own observations or the witnesses' recounting of statements from Spina or Walker as opposing party statements, see 801(d)(2), would not be hearsay.

Tr. at 60:10 (A. Ayala), that the Police Report says, and he said, "that he was driving the speed limit," Tr. at 60:11 (A. Ayala) -- Spina "wasn't when he entered that intersection," Tr. at 60:11-12 (A. Ayala). Further, Spina, Walker noted, "was cited for following too closely." Tr. at 60:13 (A. Ayala). Walker argued that New Mexico law states, when facing a yellow light, "[vehicular traffic] . . . is warned that the red signal will be exhibited immediately thereafter [and the vehicular traffic] shall not enter the intersection when the red signal is exhibited," Tr. at 61:2-6 (A. Ayala)(quoting N.M. Stat. Ann. § 66-7-105(B)(1)), and Spina "admitted he saw that [yellow] light to" Walker, Tr. at 61:7 (A. Ayala). According to Walker, seeing the yellow light and deciding to proceed anyway, see Tr. at 61:9-10, "is clear reckless driving, that warrants punitive damages alone," Tr. at 61:11-12 (A. Ayala). Further, Walker contended that Spina "admits and what my client states in the record is that he ran a red light," Tr. at 61:13-15 (A. Ayala), in violation of New Mexico law, Tr. at 61:15-19 (A. Ayala)(citing N.M. Stat. Ann. § 66-7-105(C)(1)). The Photographs, which an investigator at the accident took, Walker contended, show "no tire marks before the [intersection] showing that he tried to break [sic]." Tr. at 62:8-9 (A. Ayala). Walker averred that this corroborates her account. See Tr. at 62:13-17 (A. Ayala). Accordingly, Walker summarized, Spina acted with a culpable state of mind while "driving a very large semi[-truck]." Tr. at 62:24-25 (A. Ayala).

The Defendants responded, arguing that there "isn't any evidence that my client gunned it so to speak." Tr. at 65:1-2 (Beaulieu). The Defendants argued that Spina "has always indicated that he attempted to brake," Tr. at 66:3-4 (Beaulieu), and, according to the Defendants, "he did say when he realized that he was not going to be able to stop on time, rather than rear ending one vehicle immediately from behind[,] he decided to split the difference between the two vehicles,"

Tr. at 65:17-21 (Beaulieu). In response to Walker's arguments about the Photographs, the Defendants explained:

> What the photos show is that after he stopped in the middle of the intersection, rather than remaining in the middle of the intersection[,] he pulled up past the light to wait a minute[,] and so the record, Your Honor, doesn't show that he sped through, that he entirely ran the red light.

Tr. at 66:7-12 (Beaulieu). Further, according to the Defendants, the Police Report indicates neither that Spina "was speeding," Tr. at 66:22-23 (Beaulieu), nor that he "sped between the two vehicles," Tr. at 66:23-24 (Beaulieu).

Walker, in response, reiterated that Walker's conversation with Spina, which the physical evidence confirmed, shows that he gunned his truck through the yellow light. See Tr. at 68:14-22 (A. Ayala). Walker cited New Mexico law to argue that "where reasonable minds differ summary judgment is inappropriate," Tr. at 68:13-14 (A. Ayala), and that New Mexico law "does not favor summary judgments," Tr. at 73:22 (A. Ayala).

The Court indicated that it was "inclined to grant this motion." Tr. at 69:9-10 (Court).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, No. CIV 11-0757, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[10] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby"). In American Mechanical Solutions, LLC v. Northland Process Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. 184 F. Supp. 3d at 1075. The Court reasoned that the plaintiff could prove

---

[10]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court of the United States, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claims' proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided. See 184 F. Supp. 3d at 1067, 1073, 1075, 1079. Without the requisite evidence, the plaintiff, the Court determined, failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial." See 184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)(quoting Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d at 1241)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th

Cir. 1990); <u>Otteson v. United States</u>, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (internal quotation marks omitted)(quoting <u>Coleman v. Darden</u>, 595 F.2d, 533, 536 (10th Cir. 1979)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." <u>Colony Nat'l Ins. v. Omer</u>, No. CIV 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); <u>Argo v. Blue Cross & Blue Shield of Kan., Inc.</u>, 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" <u>Colony Nat'l Ins. v. Omer</u>, 2008 WL 2309005, at *1 (quoting <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988)).

Under rule 56(c)(4) of the Federal Rules of Civil Procedure, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). An affidavit is thus "inadmissible if 'the witness could not have actually perceived or observed that which he testifies to.'" <u>Argo v. Blue Cross & Blue Shield of Kan., Inc.</u>, 452 F.3d at 1200 (quoting <u>United States v. Sinclair</u>, 109 F.3d 1527, 1536 (10th Cir. 1997)). This standard arises from the Federal Rules of Evidence, which require a testifying witness to have personal knowledge of the matter. <u>See Argo v. Blue Cross & Blue Shield of Kan., Inc.</u>, 452 F.3d at 1200. In evaluating an affidavit under this standard, a court may consider

"the witness's own testimony" to determine whether there is "sufficient" evidence to support a finding of personal knowledge. Hansen v. PT Bank Negara Indon. (Persero), 706 F.3d 1244, 1250 (10th Cir. 2013). Rule 56(c)(4)'s personal knowledge requirement is construed in tandem with rule 602 of the Federal Rules of Evidence. See Bryant v. Farmers Ins. Exchange, 432 F.3d 1114, 1123 (10th Cir. 2005). Rule 602 reads: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

Fed. R. Evid. 602. Rule 602's advisory notes state:

> This rule does not govern the situation of a witness who testifies to a hearsay statement as such, if he has personal knowledge of the making of the statement. Rules 801 and 805 would be applicable. This would, however, prevent him from testifying to the subject matter of the hearsay statement, as he has no personal knowledge of it.

Fed. R. Evid. 602 (advisory committee's notes).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (citing Vitkus v. Beatrice Co., 11 F.3d at 1539; Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)). "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted)(citing First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968); Dombrowski

v. Eastland, 387 U.S. 82, 87 (1967)).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Fourth, the court cannot decide any issues of credibility.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States of America concluded that summary judgment is appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus[.] Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The United States Court of Appeals for the Tenth Circuit applied this doctrine in Thomson

v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott[ v. Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads v. Miller, 352 F. App'x 289

[, 291] (10th Cir. 2009) . . . [(unpublished),[11]] explained that the blatant contradictions of the

---

[11]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored.

record must be supported by more than other witnesses' testimony . . . ." Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(unpublished).

## LAW REGARDING DIVERSITY JURISDICTION

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[12] If the Court finds only an

_____

However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Rhoads v. Miller, Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006), Walker v. City of Okla. City, 203 F.3d 837, 2000 WL 135166 (10th Cir. Feb. 7, 2000), United States v. McElhiney, 85 F. App'x 112 (10th Cir. 2003), United States v. Jimenez, 275 F. App'x 433 (5th Cir. 2008), and United States v. McElhiney, 85 F. App'x 112 (10th Cir. 2003), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[12]In performing its Erie-mandated duty to predict what a state supreme court would do if

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will

consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by

the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court

decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that,

where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal

district court sitting in this district, is to predict what the Supreme Court of New Mexico would do

if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir.

2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt

to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance

---

faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court that Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

from decisions rendered by lower courts in the relevant state")).[13]  The Court may also rely on

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Tr. v. WPX Energy

---

[13]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . .  We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at

Prod., LLC, 27 F. Supp. 3d 1188, 1243 & n.30 (D.N.M. 2014)(Browning, J.).[14]  Ultimately, "the

Court's task is to predict what the state supreme court would do."  Wade v. EMCASCO Ins. Co.,

483 F.3d at 666.  Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted).

_____

465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A
James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions
of intermediate state appellate courts usually must be followed . . . [and] federal courts should give
some weight to state trial courts decisions."(emphasis and title case omitted)).

[14]In determining the proper weight to accord Tenth Circuit precedent interpreting New
Mexico law, the Court must balance the need for uniformity between federal court and state court
interpretations of state law with the need for uniformity among federal judges.  If the Court adheres
too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing
years, then parties litigating state-law claims will be subject to a different body of substantive law,
depending on whether they litigate in state court or federal court.  This result frustrates the purpose
of Erie, which held that federal courts must apply state court interpretations of state law, rather
than their own, in part so that parties achieve a consistent result regardless of the forum.  This
consideration pulls the Court toward according Tenth Circuit precedent less weight and according
state court decisions issued in the ensuing years more weight.  On the other hand, when the state
law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper
interpretation.  Otherwise, different federal judges within the same circuit -- or even the same
district, as district courts' decisions are not binding, even upon themselves -- would be free to
adopt differing interpretations of a state's law.  This consideration pulls the Court towards a
stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless
whether it accurately reflects state law -- at least provides consistency at the federal level, so long
as federal district judges are required to follow it.
   The Court must decide how to weigh Tenth Circuit case law against more-recent state court
decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth
Circuit precedent unless there is intervening case law directly on point from the state's highest
court, on one end; and independently interpreting the state law, regarding the Tenth Circuit
precedent as no more than persuasive authority, on the other.  In striking this balance, the Court
notes that it is generally more concerned about systemic inconsistency between the federal courts
and the state courts than it is about inconsistency among federal judges.  Judges, even those within
a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law
differently from one another; this inconsistency is part and parcel of a common-law judicial
system.  More importantly, litigants seeking to use forum selection to gain a substantive legal
advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district
judges in this and many federal districts; and, regardless, litigants cannot know for certain how a
given judge will interpret the state law, even if they could determine the identity of the judge pre-
filing or pre-removal.  All litigants know in advance is that whomever federal district judge they

are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state supreme court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state supreme court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908. See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or, the "so-called local-judge rule" in its analysis). The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time

the opinion is released, is *x*. Its holdings are descriptive and not prescriptive -- interpretive and not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

The purpose of <u>Erie</u> is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." <u>Moore's</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))). This statement may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, former United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, <u>see</u> <u>Abbott Labs. v. Granite State Ins. Co.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. <u>See</u> <u>Allstate Ins. Co. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the

"would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., 353 F.3d 866 (10th Cir. 2003), the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866. From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, then-United States Circuit Judge for the Tenth Circuit, limitation in Wankier v. Crown Equip. Corp. of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the

# LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." <u>United States v. Christy</u>, No. CR 10-1534

JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802).

Rule 801(c) of the Federal Rules of Evidence provides: "'Hearsay' means a statement that: **(1)** the

declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in

evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay

bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce

an exculpatory statement made at the time of his arrest without subjecting himself to cross-

examination." <u>United States v. Cunningham</u>, 194 F.3d 1186, 1199 (11th Cir. 1999). A statement

---

> rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." <u>Koch v. Koch Indus., Inc.</u>, 203 F.3d at 1231.

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In <u>Kokins v. Teleflex, Inc.</u>, 621 F.3d 1297 (10th Cir. 2010), the Tenth Circuit, quoting <u>Wankier v. Crown Equipment Corp.</u>, refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. <u>See Kokins v. Teleflex, Inc.</u>, 621 F.3d at 1297 ("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc.], 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in original)(quoting <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the <u>Erie</u> doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. <u>Moore's</u> lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." <u>Moore's</u> § 124.22[4] (citing <u>State Farm Mut. Auto. Ins. v. Travelers Indem. Co.</u>, 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of <u>Erie</u>.

that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay.").

Hearsay is generally unreliable and untrustworthy. See Chambers v. Mississippi, 410 U.S. 284, 288 (1973)(noting that hearsay is generally untrustworthy and lacks traditional indicia of reliability); United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)("Hearsay is generally inadmissible as evidence because it is considered unreliable." (citing Williamson v. United States, 512 U.S. 594, 598 (1994)); United States v. Console, 13 F.3d 641, 657-58 (3d. Cir. 1993)(stating hearsay is "inherently untrustworthy" because of the lack of an oath, presence in court, and cross examination (quoting United States v. Pelullo, 964, F.2d 193, 203 (3rd Cir. 1992)). Testimonial proof is necessarily based upon the human senses, which can be unreliable. See 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 802.02[1][b], at 802-5 (J. McLaughlin ed., 2d ed. 2017)("Weinstein's Federal Evidence"). The Anglo-American tradition uses three devices to illuminate inaccuracies in the testimonial proof: (i) the oath; (ii) personal presence at trial; (iii) and cross examination. See Weinstein's Federal Evidence § 802.02[2][a], at 802-5. It is difficult to evaluate the credibility of out-of-court statements when the three safeguards mentioned above are unavailable. See Weinstein's Federal Evidence § 802.02[3], at 802-6 to -7. Courts view hearsay evidence as unreliable because it is not subject to an oath, personal presence in court, or cross examination. See, e.g., United States v. Console, 13 F.3d at 657-58.

"Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. See, e.g., United States v. DeLeon, 316 F. Supp. 3d 1303, 1306 (D.N.M. 2018)(Browning, J.)(noting that a hearsay within hearsay issue remains after concluding that 803(8) provided an exception for law enforcement reports); Wood v. Millar, No. CIV 13-0923 RB/CG, 2015 WL 12661926, at *4 (D.N.M. Feb. 19, 2015)(Brack, J.)(noting that witness statements in police reports may be admissible under hearsay exclusions other than 803(8)).

1.     **Law Regarding Rule 801(d)(2)(A).**

An opposing party's statement is not hearsay. See Fed. R. Evid. 801(d)(2). Rule 801(d)(2) specifies as an exclusion from hearsay:

> **(2) *An Opposing Party's Statement.*** The statement is offered against an opposing party and:
>
> > **(A)** was made by the party in an individual or representative capacity;
> >
> > **(B)** is one the party manifested that it adopted or believed to be true;
> >
> > **(C)** was made by a person whom the party authorized to make a statement on the subject;
> >
> > **(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
> >
> > **(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.
>
> The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

Fed. R. Evid. 801(d)(2). "The admissibility of opposing-party statements 'is not based on reliability; rather, they are admitted as part of the adversary system'; they are admitted, in short, because the party said the words and should be stuck with them, regardless of their accuracy."

United States v. Ballou, 59 F. Supp. 3d 1038, 1074 (D.N.M. 2014)(Browning, J.)(quoting Stephen A. Saltzburg, et. al, Federal Rules of Evidence Manual § 801.02[b], at 801-13 (2011)).

"Rule 801(d)(2)(A) does not . . . permit such a statement to be used against anyone other than the party who made the statement, such as codefendants." United States v. DeLeon, 287 F. Supp. 3d 1187, 1256 (D.N.M. 2018)(Browning, J.)(citing United States v. Wolf, 839 F.2d 1387, 1393 & n.4 (10th Cir. 1988); Stephen A. Saltzburg, et al., Federal Rules of Evidence Manual § 801.02[6][c] (11th ed. 2017)). "The United States Court of Appeals for the Tenth Circuit has stated that proponents of such evidence 'need only show by a preponderance of the evidence that the opposing party had made the statement.'" United States v. Shirley, No. CR 15-1285 JB, 2016 WL 9021832, at *7 (D.N.M. Dec. 21, 2016)(Browning, J.)(citing United States v. Brinson, 772 F.3d 1314, 1320 (10th Cir. 2014)). Statements made during closing argument by an attorney would qualify as an admission by party opponent under rule 801(d)(2)(A). United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1121 n.11 (D.N.M. 2012)(Browning, J.)(citing United States v. McElhiney, 85 F. App'x 112, 115 (10th Cir. 2003)(unpublished)). The Court has determined that rule 806, which permits attacking hearsay statements with "any evidence that would be admissible for those purposes if the declarant had testified as a witness," Fed. R. Evid. 806, "does not apply to rule 801(d)(2)(A) statements," United States v. DeLeon, No. CR 15-4268 JB, 2018 WL 878121, at *2 n.1 (D.N.M. Feb. 12, 2018)(Browning, J.). "Party opponents can, however, impeach their own admissions, i.e., rule 801(d)(2)(A) statements, even though rule 806 does not apply. If a party opponent admission is relevant, then anything that impeaches such a statement is also relevant." United States v. DeLeon, 2018 WL 878121, at *2 n.2. See, e.g., Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 6632524, at *7 (D.N.M. Oct. 31, 2012)(Browning, J.)(characterizing

statement within medical records as opposing party statements but the medical records themselves, which the opposing party did not sign, as inadmissible hearsay).

**2.      Law Regarding Rules 803(8)(A)(ii) and (iii).**

"Police reports are generally excludable as hearsay." Dorato v. Smith, 108 F. Supp. 3d 1064, 1071 n.6 (D.N.M. 2015)(Browning, J.)(citing United States v. Jimenez, 275 F. App'x 433, 438 (5th Cir. 2008)(unpublished)). "In a civil case, police reports may be admissible as public records under rule 803(8)(A)(ii) of the Federal Rules of Evidence." Dorato v. Smith, 108 F. Supp. 3d at 1071 n.6 (citing Dortch v. Fowler, 588 F.3d 396, 402 (6th Cir. 2009); Foster v. Gen. Motors Corp., 20 F.3d 838, 839 (8th Cir. 1994)). Rule 803(8)(A)(ii) renders admissible "a record or statement of a public office" setting out "a matter observed while under a legal duty to report," although it excludes from the exception, "in a criminal case, a matter observed by law-enforcement personnel." Fed. R. Evid. 803(8)(A)(ii). "This exception, however, covers only information that the officer observed and recorded in the police report, and not information that the officer received from third parties." Dorato v. Smith, 108 F. Supp. 3d at 1071 n.6. "It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted but that statements made by third persons under no business duty to report may not." Dorato v. Smith, 108 F. Supp. 3d at 1071 n.6 (citing Walker v. City of Okla. City, 203 F.3d 837, 2000 WL 135166, at *8 (10th Cir. Feb. 7, 2000)(unpublished table opinion)). See Dorato v. Smith, 108 F. Supp. 3d at 1071 n.6 (refusing to admit information in a police report when the Court deemed unlikely "that the officer observed, first hand" a vehicle's registration information).

Similarly, under rule 803(8)(A)(iii), "[a] record or statement of a public office . . . [that] sets out . . . factual findings from a legally authorized investigation" is admissible "in a civil case"

if "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8). See, e.g., Upky v. Lindsey, No. CIV 13-0553 JB/GBW, 2015 WL 1918229, at *21 (D.N.M. April 7, 2015)(noting that "reports and decisions by New Mexico medical screening panels qualify as public records" for 803(8)); Coffey v. United States, No. CIV 08-0588 JB/LFG, 2011 WL 6013611, at *4 (D.N.M. Nov. 28, 2011)(Browning, J.)(deeming that an incident statement "may be a public record under rule 803(8)"), aff'd sub nom., Coffey v. McKinley Cty., 504 F. App'x 715 (10th Cir. 2012)(unpublished).

"'[C]ontrary to what is often assumed, the language of the Rule [803(8)(A)(iii)] does not state that 'factual findings' are admissible, but that 'reports . . .setting forth . . . factual findings' . . . are admissible.'" United States v. DeLeon, 316 F. Supp. 3d at 1306 (internal quotation marks omitted)(quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 164 (1988)). "Beech Aircraft Corp. v. Rainey . . . , found that factual findings in an official police report are admissible as an exception to the hearsay rule under Fed. R. Evid. 803(8)(C) [now rule 803(8)(A)(iii)]." Rhodes v. Curtis, No. CIV. 04-476-P, 2006 WL 1047021, at *2 (E.D. Okla. April 12, 2006)(Payne, J.)(citing Beech Aircraft Corp. v. Rainey, 488 U.S. at 161-62; Baker v. Elcona Homes Corp., 588 F.2d 551, 557-58 (6th Cir. 1978)). Under Rule 803(8)(A)(iii), "[p]olice reports have generally been excluded except to the extent to which they incorporate firsthand observations of the officer." Fed. R. Evid. 803, advisory committee's notes. See United States v. DeLeon, 316 F. Supp. 3d at 1306 (applying rule 803(8)(A)(iii), because "the enumerated list at the end of the Investigative Report is [a] set of factual findings" and "the Incident Report contains a factual finding -- specifically a finding that more investigation is needed"); Sanchez v. Cano-Marquez,

No. CIV 14-0926 MV/GBW, 2015 WL 13662863, at *4 (D.N.M. April 20, 2015)(Wormuth, M.J.)("The police report at issue here constitutes a record from a public office that sets forth factual findings from the officer's investigation of the parties' car accident, and is therefore admissible."), report and recommendation adopted, No. CIV 14-0926 MV/GBW, 2015 WL 13662864 (D.N.M. May 21, 2015)(Vazquez, J.); Wood v. Millar, 2015 WL 12661926, at *4 (admitting from a police report the officer's observations of "the positions of the vehicles, the damages to the vehicles, and the condition of the road surface"); Michell v. Thompson, No. CIV 12-0316 KBM/GBW, 2013 WL 12333985, at *3 (D.N.M. March 5, 2013)(Molzen, M.J.)("Deputy Thompson's Incident Report, noting the dispatch call, is also admissible as a public record.").

A court need not admit a report under 803(8) if "the opponent" shows "that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B).

> The Advisory Committee noted that the following factors could be of assistance in passing upon the admissibility of evaluative reports: the timeliness of the investigation; the special skill or experience of the investigator; whether a hearing was held and the level at which it was conducted; possible motivation problems suggested by Palmer v. Hoffman, 318 U.S. 109 . . . (1943) (report prepared by defendant for purposes of litigation not a business record). Fed. R. Evid. 803(8), 28 U.S.C.A. (1975) Notes of the Advisory Committee.

Denny v. Hutchinson Sales Corp., 649 F.2d 816, 821 (10th Cir. 1981). The Court has previously addressed reports' trustworthiness. See, e.g., United States v. DeLeon, 316 F. Supp. 3d at 1307 (deeming investigation and incident report untrustworthy when "[a]ll that the Court knows about the confidential human sources, whose statements form the basis for the reports, are that those individuals, presumably SNM members, were behind bars when they related information to law enforcement"); DeSantis v. Napolitano, No. CIV 08-1205 JB/KBM, 2010 WL 2292592, at *23

(D.N.M. May 26, 2010)(Browning, J.)(characterizing as untrustworthy agency decisions resulting from one-sided investigations without hearings or procedures developing factual records).

### 3. **Law Regarding Rule 803(6).**

Rule 803(6) provides an exception to the rule against hearsay statements for records of regularly conducted activity, often referred to as the business records exception:

> **(6) Records of a Regularly Conducted Activity.** A record of an act, event, condition, opinion, or diagnosis if:
>
> **(A)** the record was made at or near the time by -- or from information transmitted by -- someone with knowledge;
>
> **(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> **(C)** making the record was a regular practice of that activity;
>
> **(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> **(E)** the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). The Tenth Circuit has noted that "[t]he rationale behind this exception is that business records 'have a high degree of reliability because businesses have incentives to keep accurate records.'" United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008)(quoting United States v. Gwathney, 465 F.3d 1133, 1140 (10th Cir. 2006)). A business record prepared "in anticipation of litigation is not [recorded] in the regular course of business." United States v. Gwathney, 645 F.3d at 1140 (quoting Timberlake Constr. Co. v. U.S. Fidelity & Guar. Co., 71 F.3d 335, 342 (10th Cir. 1995)). "Any information provided by another person, if an outsider to the business preparing the record, must itself fall within a hearsay exception to be admissible." United States v. Gwathney, 645 F.3d at 1141 (citing Wilson v. Zapata Off-Shore Co., 939 F.2d 260, 271 (10th Cir.

1991)).  "The proponent of the evidence must lay the foundation for its admission."  Maples v.

Vollmer, No. CIV 12-0294, 2013 WL 1681234, at *8 (D.N.M. March 31, 2013)(Browning, J.).

See United States v. Ary, 518 F.3d at 786 ("The proponent of the document must also lay this

foundation for its admission."  (citing United States v. Samaniego, 187 F.3d 1222, 1224 (10th Cir.

1999)).  Police reports recording officers' observations, but not third parties' statements, may be

admissible under rule 803(6).  See Fed. R. Evid. 803(6), advisory committee's notes ("An

illustration is the police report incorporating information obtained from a bystander: the officer

qualifies as acting in the regular course but the informant does not.").  "[I]t is well established that

although entries in a police or investigating officer's report which result from the officer's own

observations and knowledge may be admitted, statements made to the officer by third parties under

no business duty to report may not."  United States v. Snyder, 787 F.2d 1429, 1434 (10th Cir.

1986)(citing United States v. Pazsint, 703 F.2d 420, 424 (9th Cir. 1983); Meder v. Everest &

Jennings, Inc., 637 F.2d 1182, 1186-87 (8th Cir. 1981); United States v. Yates, 553 F.2d 518, 521

(6th Cir. 1977); United States v. Smith, 521 F.2d 957, 964 (D.C. Cir. 1975)).  See United States v.

DeLeon, 316 F. Supp. 3d at 1307 (concluding, "[l]aw-enforcement officials, as part of their

ordinary duties, passed information received from confidential human sources to other officials

who, as part of their ordinary duties, recorded that information," but stating that the Court lacked

"enough information to determine whether the confidential human sources were acting in the

ordinary course when they provided information to law enforcement"); Maples v. Vollmer, 2013

WL 1681234, at *18 (concluding that a "911 call recording appears to fit within 803(6)'s hearsay

exception); Lunsford v. Howard, No. CIV 11-0169 LH/LAM, 2012 WL 13081663, at *6 (D.N.M.

March 31, 2012)(Hansen, J.)(admitting 911 calls, police report, and booking records under

803(6)); <u>United States v. Goad</u>, 739 F. Supp. 1459, 1461 (D. Kan. 1990)(Theis, J.)(deeming inadmissible witness statements in a police report).

<u>**NEW MEXICO LAW REGARDING PUNITIVE DAMAGES**</u>

"Punitive damages 'are not compensation for injury.'" <u>Gonzales v. Surgidev Corp.</u>, 1995-NMSC-047, ¶ 12, 899 P.2d 594, 597 (quoting <u>State v. Powell</u>, 1992-NMCA-086, ¶ 13, 839 P.2d 139, 144). "Punitive damages do not measure a loss to the plaintiff, but rather punish the tortfeasor for wrongdoing and serve as a deterrent." <u>Sanchez v. Clayton</u>, 1994-NMSC-064, ¶ 11, 877 P.2d 567, 572. "Punitive damages may not be awarded unless there is an underlying award of compensation for damages." <u>Gonzales v. Surgidev Corp.</u>, 1995-NMSC-047, ¶ 12, 899 P.2d at 597 (citing N.M. Rules Ann. 13-1827). "Punitive damages serve two important policy objectives under our state common law: to punish reprehensible conduct and to deter similar conduct in the future." <u>Akins v. United Steel Workers of Am., AFL-CIO, CLC, Local 187</u>, 2010-NMSC-031, ¶ 20, 237 P.3d 744, 749 (citing <u>Bogle v. Summit Inv. Co.</u>, 2005-NMCA-024, ¶ 34, 107 P.3d 520, 531). "[T]he award of punitive damages requires a culpable mental state because such damages aim to punish and deter 'culpable conduct beyond that necessary to establish the underlying cause of action.'" <u>Yedidag v. Roswell Clinic Corp.</u>, 2015-NMSC-012, ¶ 58, 346 P.3d 1136, 1152 (quoting <u>Walta v. Gallegos Law Firm, P.C.</u>, 2002-NMCA-015, ¶ 56, 40 P.3d 449, 461). "New Mexico recognizes that, although punitive damages are not normally available for a breach of contract, a plaintiff may recover punitive damages when a defendant's breach was 'malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights.'" <u>Anderson Living Tr. v. ConocoPhillips Co.</u>, 952 F. Supp. 2d 979, 1046 (D.N.M. 2013)(Browning, J.)(citing <u>Romero v. Mervyn's</u>, 1989-NMSC-081, ¶ 23, 784 P.2d 992, 998).

In determining punitive-damage awards, New Mexico courts apply a preponderance of the evidence standard. See Jessen v. Nat'l Excess Ins., 1989-NMSC-040, ¶ 15, 776 P.2d 1244, 1247-48 (citing United Nuclear Corp. v. Allendale Mut. Ins., 1985-NMSC-090, ¶¶ 14, 89, 709 P.2d 649, 653, 666). "To be liable for punitive damages, a wrongdoer must have some culpable mental state and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level." Clay v. Ferrellgas, Inc., 1994-NMSC-080, ¶ 12, 881 P.2d at 14 (citations omitted)(citing McGinnis v. Honeywell, Inc., 1990-NMSC-043, ¶ 31, 791 P.2d 452, 460; Loucks v. Albuquerque Nat'l Bank, 1996-NMSC-176, ¶ 48, 418 P.2d 191, 199). Factors to be weighed in assessing punitive damages are the enormity and nature of the wrong, and any aggravating circumstances. See Green Tree Acceptance, Inc. v. Layton, 1989-NMSC-006, ¶ 9, 769 P.2d 84, 87 (citing Sweitzer v. Sanchez, 1969-NMCA-055, ¶ 26, 456 P.2d 882, 886). Punitive damages may be imposed "when a party intentionally or knowingly commits wrongs," or "when a defendant is utterly indifferent to the plaintiff's rights, even if the defendant lacked actual knowledge that his or her conduct would violate those rights." Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346 P.3d at 1152 (citing N.M. Rules Ann. 13-1827; Kennedy v. Dexter Consol. Schs., 2000-NMSC-025, ¶ 32, 10 P.3d 115, 125-26). "Recklessness requires indifference to the rights of the victim, rather than knowledge that the conduct will violate those rights." Kennedy v. Dexter Consol. Schs., 2000-NMSC-025, ¶ 32, 10 P.3d at 125 (citing Torres v. El Paso Elec. Co., 1999-NMSC-029, ¶ 28, 987 P.2d 386, 397). "Recklessness in the context of punitive damages refers to 'the intentional doing of an act with utter indifference to the consequences.'" Torres v. El Paso Elec. Co., 1999-NMSC-029, ¶ 28, 987 P.2d at 397 (quoting N.M. Rules Ann. 13-1827). "The degree of the risk of danger involved in the activity in question is a relevant factor in determining

whether particular conduct rises to the level of recklessness." Torres v. El Paso Elec. Co., 1999-NMSC-029, ¶ 28, 987 P.2d at 397. "A defendant does not act with reckless disregard to a plaintiff's rights merely by failing 'to exercise even slight care,' absent the requisite 'culpable or evil state of mind.'" Anderson Living Tr. v. ConocoPhillips Co., 952 F. Supp. at 1031 (quoting Paiz v. State Farm Fire & Cas. Co., 1194-NMSC-079, ¶ 26, 880 P.2d 300, 308). The Court has previously addressed punitive damages under New Mexico law in various situations. See, e.g., Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1242 (D.N.M. 2008)(Browning, J.)(holding a genuine issue of material fact on punitive damages existed where a party had "demonstrated that persons at Eli Lilly may have been aware of a problem, perceived or actual, linking Prozac with increased suicidality and violence"); Applied Capital, Inc. v. Gibson, 558 F. Supp. 2d 1189, 1196 (D.N.M. 2007)(Browning, J.)(granting punitive damages where the defendant "intentionally deceived Applied Capital, misrepresenting Legato Staffing's financial resources and creditworthiness, the existence of the rig, and the bona fides of the transaction generally"); Faniola v. Mazda Motor Corp., No. CIV-02-1011 JB/RLP, 2004 WL 1354469, at *1, *6 (D.N.M. April 30, 2004)(Browning, J.)(noting that "a reasonable factfinder could [not] find that Mazda had a culpable mental state in designing [a] fuel tank" when "Mazda's design was and is accepted in the industry" and the design met "federal safety standards," although the facts showed that "[t]he brake shoe rotated under Faniola's vehicle, striking several places, and punctured her gas tank," causing the car to catch fire).

While the Supreme Court of New Mexico has not addressed punitive damages arising from automobile accidents, the Court of Appeals of New Mexico has upheld punitive damages awards when drivers used alcohol or drugs, drove while intoxicated and suffering from an extreme lack of

sleep, and drove erratically or far beyond the speed limit.  See DeMatteo v. Simon, 1991-NMCA-027, 812 P.2d 361; Svejcara v. Whitman, 1971-NMCA-093, 487 P.2d 167; Sanchez v. Wiley, 1997-NMCA-105, 946 P.2d 650.  In Svejcara v. Whitman, the Court of Appeals of New Mexico upheld a jury's punitive damages award where:

> Defendant was driving in a reckless manner while intoxicated.  He turned into slow moving on-coming traffic.  He stated he was traveling three miles per hour and yet the force of his car's impact spun plaintiffs' car almost 90 degrees, blew out the left rear tire, bent the left rear wheel, ruptured the gas tank, and bent the left rear door and fender for a total damage exceeding $1,000.00.  The collision caused both plaintiffs to receive personal injuries some of which are permanent and disabling.

1971-NMCA-093, ¶ 21, 487 P.2d at 170.  The Court of Appeals of New Mexico likewise upheld a jury's award in DeMatteo v. Simon, wherein the party "drove three to four hours the day before the accident, slept about five hours in his car, remained awake for the next twenty hours immediately prior to the accident, and then consumed marijuana shortly before the accident allowed the jury to conclude that punitive damages were warranted."  1991-NMCA-027, ¶ 7, 812 P.2d at 364.  In Sanchez v. Wiley, the Court of Appeals of New Mexico reversed a directed verdict for the defendant, because, as the defendant "appeared to be under the influence of alcohol immediately following the accident," a jury could reasonably award punitive damages.  1997-NMCA-105, ¶ 16, 946 P.2d at 655.

The Court predicts that the Supreme Court of New Mexico would agree with these Court of Appeals of New Mexico cases.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d at 1224-25.  The New Mexico Supreme Court has made clear that utter indifference is sufficient for awarding punitive damages, and the risks, even if not the certainty that a harm will occur, associated with excessive speed, erratic driving, and alcohol and drugs while driving are both known and high.  See, e.g., Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346

P.3d at 1152; <u>Torres v. El Paso Elec. Co.</u>, 1999-NMSC-029, ¶ 28, 987 P.2d at 397; <u>Green Tree</u> <u>Acceptance, Inc. v. Layton</u>, 1989-NMSC-006, ¶ 9, 769 P.2d at 87.  Further, the Supreme Court of New Mexico considers a party's knowledge of and failure to follow state law when upholding punitive damages awards.  <u>See</u> <u>Clay v. Ferrellgas, Inc.</u>, 1994-NMSC-080, ¶ 21, 881 P.2d at 16 ("Ferrellgas employees testified that they knew of the state laws that required them to install a vapor barrier and to properly vent the trunk of the car when they installed the tank. . . . There is no question that they did not comply with these requirements.").  In <u>DeMatteo v. Simon</u>, <u>Svejcara</u> <u>v. Whitman</u>, and <u>Sanchez v. Wiley</u>, the drivers using substances, speeding, and driving erratically egregiously violated well-established and understood driving rules and norms, which, like failing to follow the regulations for installing propane tanks, accompany "high risk[s] of harm."  <u>Clay v.</u> <u>Ferrellgas, Inc.</u>, 1994-NMSC-080, ¶ 24, 881 P.2d at 17.

## ANALYSIS

Walker withdrew her punitive damages claim against Valley Express but continues to raise her punitive damages claim against Spina.  The Court addresses, therefore, the claim against Spina.  First, the Court concludes that, contrary to discussions at the hearing, the majority of the Police Report is admissible, but the Court concludes that Walker has not met her burden to establish a genuine issue of material fact as to Spina's culpability for the accident.  Although Walker argues that Spina never applied his brakes as he approached the yellow light, and, according to Walker, was traveling above the speed limit or increased his speed as he approached the traffic light, <u>see</u> MSJ Response ¶¶ 2-3, at 1-2, the evidence does not establish a genuine factual question whether Spina acted willfully, wantonly, maliciously, recklessly, oppressively, or fraudulently, <u>see</u> <u>Clay v.</u>

<u>Ferrellgas, Inc.</u>, 1994-NMSC-080, ¶ 12, 881 P.2d at 14.  Accordingly, the Court will grant summary judgment for the Defendants.[15]

## I.     <u>THE POLICE REPORT IS ADMISSIBLE UNDER 803(8)(a)(iii) AND 801(2).</u>

The Court declines the Defendants' invitation to deem the Police Report inadmissible hearsay.  <u>See</u> MSJ Reply at 2.  To the extent that the Police Report records the officer's observations and findings, the Police Report falls under rule 803(8) of the Federal Rules of Evidence, or, alternatively, rule 803(6).  Any statements by Spina recorded within the Police Report qualify for the hearsay exception in rule 801(2), and so they too are admissible.  <u>See</u> Police Report at 4.

The majority of the Police Report is admissible.  The Court has characterized police reports as capable of admission in civil cases under rule 803(8)(B).  <u>See</u> <u>Dorato v. Smith</u>, 108 F. Supp. 3d at 1071 n.6.  Within the District of New Mexico, police reports have more frequently been considered under rule 803(8)(a)(iii).  The Court, and the Honorable Robert C. Brack, now-Senior United States Judge for the District of New Mexico, and the Honorable Karen B. Molzen, United States Magistrate Judge for the District of New Mexico, in a recommendation adopted by the Honorable Martha Vázquez, United States District Judge for the District of New Mexico, have

---

[15]This may be a case in which a New Mexico court would deny summary judgment.  <u>See</u> <u>McNeill v. Rice Eng'g & Operating, Inc.</u>, 2003-NMCA-078, ¶ 12, 70 P.3d 794, 798 ("Summary judgment is a drastic remedy that courts must apply with caution."  (citing <u>Rummel v. St. Paul Surplus Lines Ins. Co.</u>, 1997-NMSC-042, ¶ 9, 945 P.2d 985, 988)).  The Court, however, must apply the federal summary judgment standard, <u>see</u> <u>Kan. Penn Gaming, LLC v. HV Properties of Kan., LLC</u>, 662 F.3d 1275, 1284 (10th Cir. 2011), and the Court concludes that Walker has not "set forth specific facts showing that there is a genuine issue for trial."  <u>See</u> <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d at 1241.

also deemed police or investigative reports potentially admissible under rule 803(8)(a)(iii). See United States v. DeLeon, 316 F. Supp. 3d at 1306; Sanchez v. Cano-Marquez, 2015 WL 13662863, at *4; Wood v. Millar, 2015 WL 12661926, at *4; Michell v. Thompson, 2013 WL 12333985, at *3. The Tenth Circuit, the Court, the Honorable Curtis LeRoy Hansen, United States District Judge for the District of New Mexico, and the Honorable Franklin R. Theis, United States District Judge for the Third District of Kansas, have also addressed, under rule 803(6), police or investigation reports, and the Tenth Circuit identified rule 803(6) as another exception under which a court may admit police reports. See United States v. Snyder, 787 F.2d at 1434; United States v. DeLeon, 316 F. Supp. 3d at 1307; Lunsford v. Howard, 2012 WL 13081663, at *6; United States v. Goad, 739 F. Supp. at 1461.

The Court concludes that the Police Report is admissible under rule 803(8)(a)(iii).[16] Walker brings a civil suit, which does not threaten to contravene rule 803(8)(a)(iii)'s limitations on law enforcement reports in criminal cases. See Fed. R. Evid. 803(8)(a)(iii). The New Mexico State Police officer who produced the Police Report, "Q. Webb," Police Report at 4, acted during a "legally authorized investigation," Fed. R. Evid. 803(8)(a)(iii). See N.M. Stat. Ann. § 29-1-1.[17]

---

[16]The Court does not have sufficient evidence before it to determine whether the Police Report satisfied rule 803(6)'s requirements. Further, the Court has not been able to locate a statute conveying on New Mexico State Police a "legal duty to report," Fed. R. Evid. 803(8)(A)(iii), in an "Uniform Crash Report," Police Report at 1, observations from automobile accidents.

[17]This Statute provides:

It is hereby declared to be the duty of every sheriff, deputy sheriff, constable and every other peace officer to investigate all violations of the criminal laws of the state which are called to the attention of any such officer or of which he is aware, and it is also declared the duty of every such officer to diligently file a complaint or information, if the circumstances are such as to indicate to a reasonably prudent

Webb records events and findings from the crime scene -- including the automobile accident's location and date, the road's state, the automobiles' damages, and Spina's statements. See Fed. R. Evid. (8)(a)(iii); Police Report at 1-4; United States v. Snyder, 787 F.2d at 1434; United States v. DeLeon, 316 F. Supp. 3d at 1306-07. Although the 803(8)(a)(iii) exception does not cover Spina's statements, see, e.g., United States v. Snyder, 787 F.2d at 1434; Walker v. City of Okla. City, 2000 WL 135166, at *8, his statements, as an opposing party's statements, are excluded from hearsay, see Fed. R. Evid. 801(d)(2); Fed. R. Evid. 805. Accordingly, the Court deems the Police Report admissible to the extent that it records Webb's observations and Spina's statements. See Fed. R. Evid. (8)(a)(iii).

## II.   WALKER HAS NOT ESTABLISHED THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS WHETHER SPINA ACTED WITH THE REQUISITE CULPABILITY TO JUSTIFY PUNITIVE DAMAGES.

Preliminarily, "in a federal diversity action, the district court applies state substantive law -- those rights and remedies that bear upon the outcome of the suit -- and federal procedural law -- the processes or modes for enforcing those substantive rights and remedies." Los Lobos Renewable Power, LLC v. Americulture, Inc., 885 F.3d 659, 668 (10th Cir. 2018)(citing Sibbach v. Wilson & Co., 312 U.S. 1, 14 (1941)). In a diversity action, a district court considering a summary judgment motion applies "the substantive law of the forum state," and the standards for

---

person that such action should be taken, and it is also declared his duty to cooperate with and assist the attorney general, district attorney or other prosecutor, if any, in all reasonable ways. Such cooperation shall include the prompt reporting of all arrests for liquor law violations at licensed liquor establishments to the department of alcoholic beverage control. Failure to perform his duty in any material way shall subject such officer to removal from office and payment of all costs of prosecution.

N.M. Stat. Ann. § 29-1-1.

summary judgment established under rule 56(c). Kan. Penn Gaming, LLC v. HV Props. of Kan., LLC, 662 F.3d 1275, 1284 (10th Cir. 2011)(citing Salazar v. Butterball, LLC, 644 F.3d 1130, 1136 (10th Cir. 2011); Stickley v. State Farm Mut. Auto. Ins., 505 F.3d 1070, 1076 (10th Cir. 2007)). Accordingly, the Court, contrary to Walker's contentions at the hearing, see Tr. at 68:1-14 (A. Ayala); id. at 73:20-25 (A. Ayala), applies federal law in deciding the Defendants' MSJ.

Summary judgment is appropriate under rule 56(c) if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, the Court must construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. at 550-55. See also Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). The Court has previously noted:

> Under rule 56, summary judgment is proper only when the pleadings, affidavits, depositions or admissions establish that there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. The burden of establishing the nonexistence of a genuine issue of material fact is on the moving party.

Am. Mech. Solutions, L.L.C. v. Northland Process Piping, Inc., 184 F. Supp. 3d at 1074 (citing Celotex, 477 U.S. at 317).

> [T]he moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25 . . . . On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1.  The Defendants attempt to show that Walker "lacks evidence on an element of [her] claim," Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1, and specifically argue that Walker cannot show that Spina acted willfully, wantonly, maliciously, recklessly, oppressively, or fraudulently, see MSJ at 3-5; Clay v. Ferrellgas, Inc., 1994-NMSC-080, ¶ 12, 881 P.2d at 14.  The Court agrees with the Defendants and grants the Defendants' MSJ.

The Walker Aff. offers much inadmissible speculation and reliance on third-party evidence to support Walker's arguments.  See Walker Aff. ¶¶ 6-9, at 2.  In the Walker Aff., after describing the accident, Walker turns to speculation regarding Spina's state of mind leading into the collision, see Walker Aff. ¶¶ 6, 9, at 2 ("Spina informed me that he thought we were going to run the yellow light.  Which indicated to me that he saw my vehicle and the other vehicle he hit while we were stopped . . . and that he never considered slowing down, but accelerated his speed."); to normative assertions evaluating Spina's actions, see Walker Aff. ¶ 8, at 2 ("[H]e should not have prepared to run a yellow light, should have proceeded within the speed that was warranted with other vehicles on the roadway, and should have slowed down when he saw the yellow light, and then stopped at the red light . . . ."); id. ¶ 9, at 2 ("The conduct of Mr. Spina was very dangerous in that he was travelling to [sic]  fast, he never intended to stop for the red light, and that he finally ran the red light and that he went through the intersection hitting two cars in the process with his semi-truck."); and to evidentiary analysis using the Photographs, see Walker Aff. ¶ 7, at 2 ("[T]he photos produced by the Defendants in this case don't show any brake markings . . . . 'Exhibit E' [Photographs at  5] shows that Mr. Spina was traveling so fast that he stopped a considerable distance from the intersection after hitting two vehicles and running a red light.").  Where Walker

discusses Spina's state of mind, "such evidence is inadmissible because it appears to be speculation rather than based on personal knowledge." Mata v. Anderson, 685 F. Supp. 2d at 1237 n.2. In describing her "belief" what Spina should have done, but did not do, Walker's assertions are similarly inadmissible, because they discuss normative assertions -- not facts based on Walker's personal knowledge. Gonzales v. City of Albuquerque, 849 F. Supp. 2d at 1139 n.10. Finally, when describing and extrapolating from the brake marks shown in the Photographs, Walker bases her information on a source -- namely the Photographs at 5 -- other than her personal knowledge, see Walker Aff. ¶ 7, at 2; Walker's statement, therefore, like the speculation and normative assertions, is evidence not based on personal knowledge, see Fed. R. Civ. P. 56(c)(4).

The admissible evidence that Walker offers to support her contentions is limited. As the Court noted in footnote 2, it is reasonable to infer that Walker based the Walker Aff.'s facts describing the accident, like those enumerated in the next sentence, on her personal knowledge, and the Court deems such facts admissible. Accordingly, some facts in the record support Walker's argument: (i) that she did not hear Spina's brakes, see Walker Aff. ¶ 7, at 2; (ii) that Walker did not "suddenly stop," Walker Aff. ¶ 7, at 2; and (iii) that Spina told her that he thought she and the other driver "were going to run the yellow light," Walker Aff. ¶ 6, at 1-2. Further, the Photographs show, in the accident's aftermath, damage to the vehicles, see Photographs at 3-4, Spina's truck on the road's side after the traffic light, see Photographs at 5, and no brake marks before the intersection, see Photographs at 5. At the hearing, Walker emphasized that, per Spina's conversation with Walker following the accident, see Walker Aff. ¶ 6, at 1-2, and the police report, Spina saw the yellow light and chose to speed through it, see Tr. at 57:16-58:8 (A. Ayala); id. at

61:9-12 (A. Ayala). Walker supported her story by focusing on the Photographs at 5, which reveal "no tire marks before the [intersection] showing that he tried to break." Tr. at 62:8-9 (A. Ayala).

According to Walker at the hearing, this evidence supports an award for punitive damages, because Spina, contrary to New Mexico law, increased speed through a yellow light, see Tr. at 61:11-12 (A. Ayala), and, further violating New Mexico law, Spina did not stop for the red light and drove at a speed too fast to avoid colliding with other vehicles, see Tr. at 62:1-4 (A. Ayala). Walker's evidence, however, does not get her as far as she thinks. The record contains insufficient evidence to establish that a genuine issue of material fact exists whether Spina "intentionally or knowingly" committed a wrong, Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346 P.3d at 1152, or acted recklessly, i.e., "intentional[ly did] an act with utter indifference to the consequences," N.M. Civ. J.I. 13.1827.

Walker relies heavily, as indicated at the hearing, see Tr. at 57:16-58:8 (A. Ayala); id. at 61:9-12 (A. Ayala), on Spina's comment about running the yellow light and the lack of brake marks, to support her contention that Spina approached the light "with utter indifference to the consequences," N.M. Civ. J.I. 13.1827. Spina's comment about expecting Walker and the other driver "to run the yellow light," Walker Aff. ¶ 6, at 1-2, is ambiguous. The Court draws ambiguities in the light most favorable to Walker. Liberty Lobby, 477 U.S. at 255; Hunt v. Cromartie, 526 U.S. at 550-55. Even a reasonable inference in Walker's favor, however, does not transform Spina's statement into an assertion that he increased speed through the yellow light "with utter indifference to the consequences." N.M. Civ. J.I. 13.1827. Demonstrating a genuine issue of fact that Spina expected to make the light "with utter indifference to the consequences," N.M. Civ. J.I. 13.1827, requires extrapolating too much from the comment, even if the

Photographs at 5 reveal no brake marks before the intersection. While Walker demonstrates the existence of a question of fact whether Spina adequately slowed through the traffic light, Walker has no evidence to indicate affirmatively or from which to reasonably infer that Spina, "with utter indifference to the consequences," increased speed through the yellow light. N.M. Civ. J.I. 13.1827. Moreover, it is not a reasonable inference that he increased his speed; at most, he thought that he could clear the intersection on a yellow light. Walker has no evidence of Spina's state of mind, of a pattern of dangerous driving behavior before the accident evidencing intentional actions "with utter indifference to the consequences," N.M. Civ. J.I. 13.1827, or of Spina, "with utter indifference to the consequences," N.M. Civ. J.I. 13.1827, having intentionally consumed substances before he drove. Compare Sanchez v. Wiley, 1997-NMCA-105, ¶ 16, 946 P.2d at 655; DeMatteo v. Simon, 1991-NMCA-027, ¶ 7, 812 P.2d at 364; Svejcara v. Whitman, 1971-NMCA-093, ¶ 21, 487 P.2d at 170. As the Defendants noted at the hearing, see Tr. at 66:7-12 (Beaulieu), that the Photographs at 5 reflect Spina's truck at the side of the road some distance from the traffic light reveals that Spina pulled to the side of the road following the accident; the image does not demonstrate the existence of a genuine issue of fact whether Spina, "with utter indifference to the consequences," increased speed through the light. N.M. Civ. J.I. 13.1827. The absence of brake marks and the yellow-light comment do not affirmatively suggest, as Walker needs them to do to demonstrate the existence of a genuine issue of fact, that Spina "intentionally" did an act with "utter indifference to the consequences." N.M. Civ. J.I. 13.1827. Cf. Sanchez v. Wiley, 1997-NMCA-105, ¶ 16, 946 P.2d at 655 (upholding a jury award for punitive damages against a defendant who acted recklessly by driving while intoxicated and turning into slow on-coming traffic); DeMatteo v. Simon, 1991-NMCA-027, ¶ 7, 812 P.2d at 364 (upholding a jury award of

punitive damages against a defendant who acted recklessly when he consumed marijuana before the accident and "drove three to four hours the day before the accident, slept about five hours in his car, remained awake for the next twenty hours immediately prior to the accident"); Svejcara v. Whitman, 1971-NMCA-093, ¶ 21, 487 P.2d at 170 (finding that a reasonable juror could conclude that a defendant who drove while intoxicated acted recklessly).

Walker's additional facts, from the MSJ Response, Walker Aff., and hearing, are likewise insufficient to demonstrate a genuine factual question whether Spina approached and drove through the light with "utter indifference to the consequences." N.M. Civ. J.I. 13.1827. That Walker did not hear Spina's brakes or that she alleges that she did not suddenly stop are not evidence showing that Spina approached the intersection with "utter indifference to the consequences." N.M. Civ. J.I. 13.1827. Likewise, although Walker, in the MSJ Response, cites the Interrogatories Answers for the assertion that Spina "continued traveling at about 30 to 35 miles per hour," MSJ Response ¶ 2, at 1-2, contrary to Walker's interpretation, Spina admits to traveling at thirty to thirty-five miles per hour before the traffic light turned yellow, see Interrogatories Answers at 2, and estimates his speed at the impact as around fifteen miles per hour, see Interrogatories Answers at 5. The Police Report, as the Defendants noted at the hearing, see Tr. at 66:22-23 (Beaulieu), also does not mention Spina speeding, see Police Report at 1-4. There is nothing in the record from which a jury could reasonably infer that was speeding at any time. Finally, while Photographs at 3-4, from the accident's aftermath, show the damage to the vehicles, even viewing the evidence in the light most favorable to Walker, the Photographs are not evidence showing Spina's culpability. See Liberty Lobby, 477 U.S. at 255; Hunt v. Cromartie, 526 U.S. at 550-55. They reveal vehicular damage and not that Spina recklessly sped through the

intersection. Where the Court of Appeals of New Mexico looked to the damage from an automobile accident to support a punitive damages award, the deviation between the reasonable damages based on the defendant's allegations and the actual damages was much larger than here. Svejcara v. Whitman, 1971-NMCA-093, ¶ 21, 487 P.2d at 170. In Svejcara v. Whitman, the defendant alleged that he was driving at three miles per hour, but the evidence disputed his allegations and showed that he was intoxicated and "spun plaintiffs' car almost 90 degrees, blew out the left rear tire, bent the left rear wheel, ruptured the gas tank, and bent the left rear door and fender," and left the other drivers with permanent injuries. 1971-NMCA-093, ¶ 21, 487 P.2d at 170. Here, Spina sideswiped two vehicles with a commercial truck, and the Photographs reflect that damage.

Extrapolation from Spina's comment about Walker running the yellow light and a lack of brake marks in the Photographs, even alongside the other facts alleged in the MSJ Response, are insufficient to demonstrate a genuine issue of fact whether Spina acted with "utter indifference to the consequences." N.M. Civ. J.I. 13.1827. While Walker can show a genuine factual question whether Spina applied his brakes soon enough and whether he slowed to the fifteen miles per hour to which he states that he slowed, such factual issues do not equate -- and are not enough alone and without more -- to establish a genuine dispute of material fact whether Spina acted with utter indifference toward others on the road. The record does not contain evidence to dispute the Defendants' allegations that, before the accident, Spina was "traveling at about 30 to 35 miles per hour," which is a speed below the speed limit, MSJ ¶ 67, at 2, and, as a legal speed, does not suggest that Spina acted with utter indifference toward others on the road, cf. Svejcara v. Whitman, 1971-NMCA-093, ¶ 21, 487 P.2d at 170 (describing defendant as traveling at a speed that "spun

plaintiffs' car almost 90 degrees, blew out the left rear tire, bent the left rear wheel, ruptured the gas tank, and bent the left rear door and fender for a total damage exceeding $1,000.00"). The record likewise lacks evidence to contravene that Spina "applied his brakes as quickly as he could to stop." MSJ ¶ 6, at 2.

Sometimes people's rapid driving decisions are wrong. At traffic lights, a driver may overestimate the light's length, underestimate his or her braking time, forget his own speed, or misjudge the driver in front's intentions or speed. Lights turn yellow on even the most cautious driver, and a driver may have difficulty deciding whether slamming on the brakes with people behind is safer than proceeding into the intersection.[18] Drivers react to situations on roads in less than a second. See Reaction Times, How a Car Works, https://www.howacarworks.com/advanced-driving/reaction-times (last visited Dec. 10, 2018). In that time, a vehicle traveling thirty-five miles per hour travels around fifty feet. See Reaction Times, supra. Traveling 150 feet at thirty-five miles per hour takes less than three seconds.[19] It is

---

[18]Some municipalities have experimented with red-light cameras at intersections. Paul Guerin, City of Albuquerque Red Light Camera Study Final Report 5 (Oct. 2010). Albuquerque, New Mexico and Las Cruces, New Mexico have too. Guerin, supra, at 5; Alireza Moghimi, et al., Assessment of Impact of City of Las Cruces Safe Traffic Operations Program on Intersection Traffic Safety: Before-and-After Analysis of Crash and Violation Data 1 (Aug. 2012). Municipalities perceived red-light cameras as a tool to reduce "red light running related crashes." Guerin, supra, at 1. See also Moghimi, et al., supra, at 1. Studies show that these cameras' effectiveness depends on the intersection. Guerin, supra, at 44-47; Moghimi, et al., supra, at 14. A study in Albuquerque concluded that more rear-end collisions occurred at red-light-camera intersections than compared to non-red-light-camera intersections, Guerin, supra, at 45; this result may suggest that people slammed on their brakes more before red-light-camera intersections.

[19]The Federal Highway Administration's Manual on Uniform Traffic Control Devices for Streets and Highways recommends yellow lights last between three seconds, at a minimum, and six seconds, at a maximum. See Federal Highway Administration, Manual on Uniform Traffic Control Devices for Streets and Highways, § 4D.26(14), at 489 (2009 ed. with 2012 revisions). A

hard to say that any driver acting legally before the clock starts can demonstrate the scienter necessary for recklessness in less than three seconds. That accidents happen is not surprising. The people causing such accidents do not necessarily act with "utter indifference to the consequences" just because someone's person or vehicle was injured, and the mere fact that the driver drives a commercial truck does not change this fact. N.M. Civ. J.I. 13.1827.

Were the Court to agree with Walker that a genuine question of fact exists whether Spina acted with "utter indifference to the consequences" and to allow the jury to reach the punitive damages question, the Court is unsure what the potential punitive damages would deter. Negligence awards ideally deter actors from foregoing reasonable care, and so there is already a cost for truck drivers' automobile accidents near traffic lights. If the price for truck drivers to avoid risks is as low as driving more carefully, additional costs for incurring such risks are not necessary for deterrence. The benefit to a truck driver of his or her negligence will unlikely outweigh the costs. A punitive damages award here would not deter reckless decisions, but only a potentially bad -- regular -- decision.

The rationale for punitive damages in such a situation must be punitive. The Court concludes that Walker has not produced the evidence to demonstrate a genuine factual question whether Spina acted sufficiently culpably. On these facts, that Spina may not have adequately slowed or slowed at all does not warrant increasing his costs as punishment when a jury already

---

yellow light duration of four seconds is recommended when vehicles are travelling at thirty-five miles per hour. See Stop Short Yellow Lights, http://www.shortyellowlights.com/standards/ (last visited Dec. 10, 2018). At the recommended four seconds for a yellow light, a vehicle traveling at thirty-five miles per hour may be around 200 feet from an intersection when the driver sees a yellow light and clear the traffic light before it turns red. At the maximum six seconds, a driver around 300 feet from the same intersection may proceed through the light before the light is red.

may impose costs for his negligence.  To warrant punishing Spina, Walker must offer evidence showing Spina's culpability; this proof includes such evidence as that which illustrates that Spina approached the light expecting and intending to make the light utterly regardless the risks of harm to others.

Walker has not proffered evidence -- aside from speculation -- necessary for a reasonable jury to infer that Spina approached the intersection with the "utter indifference to the consequences" required for punitive damages in New Mexico.  <u>DeMatteo v. Simon</u>, 1991-NMCA-027, ¶ 7, 812 P.2d at 364.  <u>Cf.</u> <u>Sanchez v. Wiley</u>, 1997-NMCA-105, ¶ 16, 946 P.2d at 655; <u>DeMatteo v. Simon</u>, 1991-NMCA-027, ¶ 7, 812 P.2d at 364; <u>Svejcara v. Whitman</u>, 1971-NMCA-093, ¶ 21, 487 P.2d at 170.  The Court, thus, grants summary judgment for the Defendants on the issue of punitive damages.

**IT IS ORDERED** that the Defendants' Motion for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages, filed August 30, 2018 (Doc. 73), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Shavon M. Ayala
Ayala P.C.
Albuquerque, New Mexico

--and--

Anthony James Ayala
Law Offices of Anthony James A. Ayala
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Raul P. Sedillo
Allison M. Beaulieu
Butt Thornton & Baehr PC
Albuquerque, New Mexico

    *Attorneys for the Defendants Gregory J. Spina, Valley Express, Inc., and Great West Casualty Company*