# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SHIRLEY J. WALKER,

      Plaintiff,

vs.
                              No. CIV 17-0991 JB\SCY

GREGORY J. SPINA, VALLEY
EXPRESS, INC., and GREAT WEST
CASUALTY COMPANY,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion to Exclude Plaintiff's Expert Witnesses William J. Patterson, III, Keith W. Harvie, D.O. and Dr. Michael Rodriguez, filed July 27, 2018 (Doc. 58)("Disclosure Motion"), and (ii) the Defendants' Motion to Limit the Testimony of Plaintiff's Treatment Providers and Exclude Improper Expert Testimony, filed August 30, 2018 (Doc. 71)("Treatment Provider Motion"). The Court held a hearing on November 21, 2018. The primary issues are: (i) whether the Court should prohibit Michael Robert Rodriguez, Ph.D., a licensed clinical psychologist, <u>see</u> Joint Status Report and Provisional Discovery Plan at 8-9, filed January 2, 2018 (Doc. 16)("Joint Status Report"), from testifying, because Plaintiff Shirley Walker did not disclose that she would call him as an expert witness; (ii) whether the Court should prohibit Dr. Keith W. Harvie, D.O., a medical expert, and William Patterson, III, a legal economics expert, <u>see</u> Joint Status Report at 8, from testifying when Walker disclosed to Defendants Gregory Spina and Valley Express, Inc. that she would call them as expert witnesses in Discovery Responses and the First and Second Initial Disclosures but not in a formal expert witness disclosure; (iii) whether the Court should prohibit Patterson from offering evidence on Walker's cost-of-living expenses, because Walker did not amend the Patterson Report

to include information on such costs; and (iv) whether the Court should prohibit expert opinion testimony from Walker's treatment providers -- Dr. Rajan Mirchandani; Dr. Ellen Marder, a physician, see Progress Notes by Ellen Marder at 1 (dated July 7, 2016), filed July 27, 2018 (Doc. 59-5); Dr. Herbert Rachelson, an orthopedic surgeon, see Defendants' Reply in Support of Their Motion to Limit the Testimony of Plaintiff's Treatment Providers and Exclude Improper Expert Testimony at 2, filed September 20, 2018 (Doc. 82)("Treatment Provider Reply"); Dr. Arjan Khalsa, a chiropractor, see Treatment Provider Reply at 2; Dr. Jean Hamilton, a psychiatrist, see Psychiatric Evaluation by Jean A. Hamilton at 2 (dated March 20, 2017), filed August 4, 2018 (Doc. 62); and Michael Miller, a certified nurse practitioner, see Treatment Provider Motion at 2 -- when Walker identified Dr. Hamilton as a witness, although not an expert witness, in the Answer to Interrogatories, and in the First and Second Initial Disclosures, and the Defendants deposed the treatment providers which Walker will call at trial -- Dr. Rachelson, Dr. Khalsa, Dr. Hamilton, and Miller. Pursuant to Walker's representations, neither Dr. Rodriguez nor Dr. Harvie will testify at trial. The Court, accordingly, will preclude them from testifying. The Court will not exclude Patterson's testimony, because Walker provided the Defendants with the Harvie Report and the Patterson. Based on Walker's representation that Patterson will not testify to her cost-of-living expenses, the Court will exclude such testimony. Finally, because Walker's failure to disclose the treatment providers as expert witnesses is harmless, the Court will not limit the treatment providers' testimony on their diagnoses and their opinions on what caused Walker's injuries.

## FACTUAL BACKGROUND

The Court recited this case's facts and early procedural history in its Memorandum Opinion and Order at 2-3, 2018 WL 4100944, at *1, filed August 28, 2018 (Doc. 67). The Court incorporates that recitation here. The footnotes in the quotations are in the original.

> The Court takes its facts from Walker's Complaint for Personal Injuries and Damages (First Judicial District Court, County of Santa Fe, State of New Mexico), filed December 23, 2016, filed in federal court September 29, 2017 (Doc. 1-1)("Complaint"). The Court provides these facts for background. It does not adopt them as the truth, and it recognizes that the facts are largely Walker's version of events.
>
> On July 23, 2015, Defendant Gregory J. Spina was speeding on U.S. Highway 84/285 in a commercial vehicle that Defendant Valley Express, Inc. owned. See Complaint ¶¶ 6-7, at 2. As Spina approached a red light, he realized that he was going too fast to brake, so, instead of hitting the vehicles stopped side by side in front of him, he attempted to slip between them. See Complaint ¶ 7, at 2. Rather than avoiding the stopped vehicles, however, he sideswiped both of them, causing both cars to roll into the intersection. See Complaint ¶ 7, at 2-3. Walker was driving one of the sideswiped vehicles and, because of Spina's actions, suffered physical and emotional injuries. See Complaint ¶¶ 7, 11, at 2-4.

MOO at 2, 2018 WL 4100944, at *1.

## PROCEDURAL BACKGROUND

> Walker sues Spina and Valley Express, asserting negligence,[1] and sues Defendant Dixon Insurance Company, asserting that she has a claim for benefits against it under the [New Mexico Financial Responsibility Act, N.M. Stat. Ann. §§ 66-5-201 to 239] and Raskob[v. Sanchez, 1998-NMSC-045, 970 P.2d 580] for injuries that Spina's negligence caused. See Complaint ¶¶ 8-13, at 3-5. Spina and Valley Express removed the case to federal court on the basis of diversity jurisdiction. See Notice of Removal to the United States District Court for the District of New Mexico at 1, filed September 29, 2017 (Doc. 1)("Notice of Removal"). . . .

---

[1]Although the Complaint does not make this claim explicit, Walker presumably sues Valley Express under respondeat superior.

MOO at 2-3, 2018 WL 4100944, at *1.  The Amended Complaint at 1, filed August 28, 2018 (Doc. 68), terminated Dixon Insurance Company as a Defendant and added, in its place, Great West Casualty Company.

Walker provided the Defendants the Patterson Report "at or about June 27, 2017." Disclosure Motion at 1.  Walker transmitted the Harvie Report "at or about February 23, 2018," see Disclosure Motion at 1, and the Defendants have not received an expert report from Rodriguez, see Disclosure Motion at 1.  The Joint Status Report named Patterson, Dr. Harvie, and Rodriguez as expert witnesses for Walker.  See Disclosure Motion at 3; Joint Status Report at 8-9.  The Order Setting Case Management Deadlines and Discovery Parameters, filed February 1, 2018 (Doc. 21)("Discovery Order"), set the initial expert disclosure deadline for May 2, 2018. See Disclosure Motion at 2.  The Discovery Order, which the Honorable Steven C. Yarbrough, United States Magistrate Judge for the District of New Mexico,  entered, states:

> [P]arties must disclose the names of all expert witnesses, including treating physicians, the subject matter on which the experts will present evidence, and a summary of the facts and opinions to which the experts are expected to testify by this date.  Experts who are retained or specifically employed to provide expert testimony must also submit an expert report by this date.  See Fed R. Civ. P. 26(a)(2).  The parties must have their retained expert(s) ready to be deposed at the time they identify them and provide their reports.  Expert witnesses who are not required to provide a written report may be deposed before summary disclosure.

Discovery Order at 2 n.2 (quoted in Disclosure Motion at 2).  On July 3, 2017, Walker indicated in her Discovery Requests, and in the First and Second Initial Disclosures, that she would call Patterson as an expert on economic damages, and Walker produced the Patterson Report to the Defendants.  See Disclosure Response at 1-2.  The Defendants deposed Patterson on April 4, 2018. See Disclosure Response at 2.  The Defendants also deposed Walker's treatment providers -- Dr. Mirchandani, Dr. Marder, Dr. Rachelson, Dr. Khalsa, Dr. Hamilton, Miller, see Treatment

Provider Motion at 2, and Dr. Hassemer, Walker's "prior treatment provider and personal friend," Treatment Provider Motion at 3. Walker discloses her treatment providers in the Joint Status Report, but she does not identify the treatment providers as "non-retained expert witnesses." Second Motion at 3. See Joint Status Report at 5. Walker identifies approximately sixteen people who she may call as witnesses. See Treatment Provider Motion at 3.

1. **The Disclosure Motion.**

The Defendants first argue that Walker failed to comply with the Discovery Order and rule 26(a) of the Federal Rules of Civil Procedure. See Disclosure Motion at 2-3. The Defendants complain that, despite the instructions in the Discovery Order and rule 26(a), Walker has disclosed no expert witnesses and sought no discovery deadline extension. See Disclosure Motion at 4. While the Defendants admit that Walker provided the Harvie and Patterson Reports, according to the Defendants, Walker did not disclose whether she intended to use Dr. Harvie's or Patterson's testimony at trial. See Disclosure Motion at 4.

The Defendants contend that Walker's actions prejudiced the Defendants by creating unnecessary surprise, depositions, and costs, and led the Defendants to believe that Walker would call no expert witnesses at trial; the Defendants argue that Walker's failure either to disclose that she would call Rodriguez or to provide an expert report particularly prejudiced them. See Disclosure Motion at 5. The Defendants depict the prejudice as "incurable," because "time is a nonrefundable resource," and the Defendants argue that Walker deprived the Defendants of the time and information "to properly prepare for trial." Disclosure Motion at 5. According to the Defendants, that they have not had time to prepare responses to the experts "will prevent smooth proceeding" and raise "the potential for trial disruption." Disclosure Motion at 5. Further, the

Defendants note, they have not had the information to determine "additional experts which may be necessary for their defense." Disclosure Motion at 6. The Defendants conclude by noting that Walker has not shown that her "failure to comply with both Rule 26(a)(2)" and the Discovery Order was either "accidental or in good faith." Disclosure Motion at 6. The Defendants conclude that, accordingly, Walker has not shown that her actions are "substantially justified." Disclosure Motion at 6.

### 2. The Disclosure Response.

Walker replied on August 4, 2018. See Response to Defendants' Motion to Exclude Plaintiff's Expert Witnesses William Patterson, III, Keith W. Harvie, D.O. and Dr. Michael Rodriguez at 7, filed August 4, 2018 (Doc. 61)("Disclosure Response"). Walker indicates that she will call neither Dr. Harvie nor Rodriguez at trial, and "will not oppose an order excluding them from testifying at trial." Disclosure Response at 1. According to Walker, admitting Patterson's testimony at trial will not prejudice the Defendants, because, in her Discovery Requests, and in her First and Second Initial Disclosures, and by providing the Patterson Report, Walker conveyed to the Defendants that she will call Patterson as an expert witness. See Disclosure Response at 1-2. The Defendants, Walker avers, deposed Patterson for two-and-a-half hours, and so Walker's actions have not prejudiced the Defendants. See Disclosure Response at 2.

### 3. The Disclosure Reply.

The Defendants replied on August 30, 2018. See Defendants' Reply in Support of their Motion to Exclude Plaintiff's Expert Witnesses William J. Patterson, III, Keith W. Harvie, D.O., and Dr. Michael Rodriguez at 4, filed August 20, 2018 (Doc. 63)("Disclosure Reply"). First, the Defendants ask the Court to exclude Dr. Harvie's and Rodriguez' testimony, because Walker does

not oppose the exclusion and will call neither expert at trial.  <u>See</u> Disclosure Reply at 1.  The Defendants continue, explaining that Walker's actions prejudiced them.  <u>See</u> Disclosure Reply at 2.  The Defendants state that, at Patterson's deposition, the Defendants asked for an amended report, which Walker has not provided, and that the parties "left open" the deposition.  Disclosure Reply at 2.  Further, according to the Defendants, Walker has noted no reason for not disclosing her experts.  <u>See</u> Disclosure Reply at 2.  The Defendants also mention that they seek to prevent Walker's "treatment providers from testifying."  Disclosure Reply at 2.  The Defendants express concern that, "given her willingness not to call a medical expert, Plaintiff will seek to introduce expert testimony through her treating physicians, including testimony regarding causation."  Disclosure Reply at 3.  The Defendants note that, "[b]y failing to file an expert disclosure, Plaintiff failed to disclose the treatment providers she will call at trial."  Disclosure Reply at 3.  According to the Defendants, this failure to disclose prejudices the Defendants, and Walker, the Defendants note, has provided no substantial justification for the failure.  <u>See</u> Disclosure Reply at 3.

4. **The Treatment Provider Motion**.

The Defendants request that the Court limit testimony from Walker's treatment providers -- Dr. Mirchandani, Dr. Marder, Dr. Rachelson, Dr. Khalsa, Dr. Hamilton, Miller, and Dr. Hassemer, because Walker did not disclose such treatment providers "as expert witnesses."  Treatment Provider Motion at 1.  The Defendants note that they raised this argument briefly in their Disclosure Motion and that they expand on this argument in this Treatment Provider Motion.  <u>See</u> Treatment Provider Motion at 1.  According to the Defendants, Walker "has not filed any expert witness disclosure as required by Rule 26 or the" Discovery Order.  <u>See</u> Treatment Provider Motion at 3.  The Defendants cite <u>Montoya v. Sheldon</u>, 286 F.R.D. 602 (D.N.M.

2012)(Browning, J.), for the proposition that "Rule 701 of the Federal Rules of Evidence governs treating physician's testimony."  Treatment Provider Motion at 3.  A treating physician whom a party has not identified as an expert witness, the Defendants aver, is limited to lay witness testimony, which should be based on the witness' perception and not on "scientific, technical, or other specialized knowledge," and which should be "helpful to clearly understanding the witness' testimony or to determining a fact at issue."  Treatment Provider Motion at 3.  From this principle, the Defendants conclude that the Court should prohibit the treatment providers from testifying on "the standard of care and causation."  Treatment Provider Motion at 4.  See Treatment Provider Motion at 3-4.  The Defendants aver that allowing a physician to testify as an expert without disclosure violates Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)("Daubert").  See Treatment Provider Motion at 4.  The Defendants explain that Walker "has not yet declared her intent to have her treatment providers testify as experts, but Defendants anticipate she may attempt to elicit expert testimony at trial."  Treatment Provider Motion at 4. The Defendants request that the Court prohibit the treatment providers from testifying to opinions requiring their "skill and scientific knowledge," such as their diagnoses "and their opinions regarding" the causes for Walker's injuries, because, according to the Defendants, diagnoses are expert testimony and testifying to causation "requires knowledge within" rule 702's scope. Response at 4.  See Response at 4-5 (citing Montoya v. Sheldon, 286 F.R.D. at 613-14).

5.      **The Treatment Provider Response.**

Walker responded on September 6, 2018.  See Response to Defendants' Motion to Limit the Testimony of Plaintiff's Treatment on Providers and Exclude Improper Testimony, filed September 6, 2018 (Doc. 77)("Treatment Provider Response").  Walker admits that "several New

Mexico federal cases . . . support not allowing opinion testimony[.]" Treatment Provider Response at 1 (citing Sage-Allison v. Novartis Pharma. Corp., 2014 U.S. Dist. LEXIS 198243, at *20 (D.N.M. Sept. 2, 2014)(Wormuth, J.)). Walker specifies that her treatment providers will limit their testimony to opinions based on their examining and treating Walker, and asks that the Court allow such testimony. See Treatment Provider Response at 2. Walker explains that she provided 2,800 pages from the treatment providers to the Defendants. See Treatment Provider Response at 2. Walker contends that she named Dr. Hamilton as a witness in her Answer to Interrogatories, and in the First and Second Initial Disclosures, although Walker did not name her in the Joint Status Report. See Treatment Provider Response at 2. Walker further specifies that she will call only Dr. Rachelson, Dr. Khalsa, Dr. Hamilton, and Miller, and that the Defendants deposed Dr. Rachelson on July 20, 2018, Dr. Khalsa on May 15, 2018, Dr. Hamilton on July 27, 2018, and Miller on July 5, 2018. See Treatment Provider Response at 2. According to Walker, the Defendants used around two-and-a-half hours to depose each witness. See Treatment Provider Response at 3. Walker states that, after reviewing this information on the treatment providers, the Defendants have noted no instance in which the treatment providers would not "testify about the conclusions drawn from their own examination and treatment of" Walker. Treatment Provider Response at 3. Walker avers that caselaw permits the treatment providers to testify to their conclusions based on their examinations and treatment of Walker. See Treatment Provider Response at 3-5 (citing Sturgeon v. ABF Freight Sys., Inc., No. CIV 02-1317 JB/WDS, 2004 WL 5872664, at *2 (D.N.M. Jan. 14, 2004)(Browning, J.); Christopher W. Dyer, Note, Treating Physicians: Fact Witnesses or Retained Expert Witnesses in Disguise? Finding a Place for Treating Physician Opinions in the Iowa Discovery Rules, 48 Drake L. Rev. 719, 727-31 (2000)). Walker

avers that her failure to disclosure the treatment providers as experts has not surprised or prejudiced the Defendants. See Treatment Provider Response at 5-9 (citing Woodworker's Supply, Inc. v. Principal Mut. Life Ins., 170 F.3d 985, 993 (10th Cir. 1999)); FinHarvey v. Thiof N.M. at Albuquerque Care Ctr., LLC, No. CIV 12-0727 MCA/LAM, 2015 U.S. Dist. LEXIS 182693, at *18 (D.N.M. March 31, 2015)(Armijo, J.); Peshlakai v. Ruiz, No. CIV 13-0752 JB/ACT, 2013 U.S. Dist. LEXIS 173622, at *61-62 (D.N.M. Dec. 7, 2013)(Browning, J.); Coffey v. United States, No. CIV 08-0588 JB/LFG, 2012 WL 2175747 (D.N.M. May 26, 2012)(Browning, J.); Equal Emp't Opportunity Comm'n v. Outback Steak House of Fla., Inc., Civil Action No. 06-cv-01935-EWN-KLM, 2008 U.S. Dist. LEXIS 63758, at *16-18 (D. Colo. Aug. 20, 2008)(Nottingham, J.); Stone v. Deagle, Case Action No. 05-cv-1438-RPM-CBS, 2006 U.S. Dist. LEXIS 90430, at *14-15 (D. Colo. Dec. 14, 2006)(Shaffer, M.J.)).

### 6. **The Treatment Provider Reply.**

The Defendants begin by noting that Walker's arguments "are unclear." Treatment Provider Reply at 1. The Defendants state that Walker appears to admit "that her treatment providers cannot provide testimony regarding the causation of her injuries" and that she did not disclose her treatment providers as experts. Treatment Provider Reply at 1. The Defendants indicate that, although Walker seems to admit the latter fact, she asks that the Court allow the treatment providers to testify as experts. See Treatment Provider Reply at 1. The Defendants reiterate their request that the Court limit the treatment providers' testimony. See Treatment Provider Reply at 2. To advance this request, the Defendants explain that Dr. Rachelson, who Walker identifies in the Treatment Provider Response as a witness for trial, testified in the Deposition of Herbert Rachelson (taken July 20, 2018), filed September 20, 2018 (Doc. 82-

1)("Rachelson Depo."), that Walker suffered from "degenerative arthritis of the knee," Treatment Provider Reply at 2 (citing Rachelson Depo. at 12:11-12), and that Walker's collision with Spina "was 'an exacerbating or initiating injury that could have contributed' to Ms. Walker's symptoms," Treatment Provider Reply at 2 (quoting Rachelson Depo. at 13:18-24).  The Defendants ask that the Court prohibit Dr. Rachelson from repeating this diagnosis and opinion on causation at trial. See Treatment Provider Reply at 2.  The Defendants also explain that Dr. Khalsa diagnosed Walker "with a 'Grade 2 sprain/strain C0-S1, moderate, secondary to [motor vehicle accident (sic).'"  Treatment Provider Reply (quoting Deposition of Arjan Khalsa at 38:8-21 (taken May 15, 2018), filed September 20, 2018 (Doc. 82-2)("Khalsa Depo.")).  The Defendants describe Dr. Khalsa's medical opinion as one that "requires scientific, technical, or specialized knowledge," and request that the Court exclude this opinion.  Treatment Provider Reply at 2-3.  The Defendants further seek for the Court to preclude Dr. Hamilton from testifying to her diagnosis that Walker suffers from Post-Traumatic Stress Disorder ("PTSD"),[2] because PTSD "is a complex mental condition which a lay witness could not testify to."  Treatment Provider Reply at 3 (citing Montoya v. Sheldon, 286 F.R.D. at 630).  The Defendants would allow Dr. Hamilton to testify to treating Walker, but not about the diagnosis or the PTSD's cause.  See Treatment Provider Reply at 3.  The Defendants request that the Court apply the same limitations to Miller, who treated Walker for her PTSD.  See Treatment Provider Reply at 3.  The Defendants note that they cannot fully understand

---

[2]According to the Mayo Clinic, "[p]ost-traumatic stress disorder (PTSD) is a mental health condition that's triggered by a terrifying event -- either experiencing it or witnessing it.  Symptoms may include flashbacks, nightmares and severe anxiety, as well as uncontrollable thoughts about the event."  Post-Traumatic Stress Disorder (PTSD), Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/symptoms-causes/syc-20355967 (last visited Nov. 26, 2018).

Walker's arguments regarding "harmless error," Treatment Provider Reply at 3, but contend that Walker provides no substantial justification for failing to disclose her treatment providers and no evidence that the failure was harmless, see Treatment Provider Reply at 3. The Defendants conclude by summarizing that the Court has previously restricted a treatment provider's testimony when the treatment provider testified as a lay witness. See Treatment Provider Reply at 3-4.

### 7. The Hearing.

Early in the hearing, Walker indicated her decision not to seek "loss of wages, cost of household services, future medical expenses, or medical care," and to seek only hedonic, quality-of-life, damages. See Draft Transcript of Hearing at 8:19-24 (taken November 21, 2018)(A. Ayala) ("Tr.").[3] Starting with the issue in the Disclosure Motion, the Court clarified that Walker would not call Dr. Harvie and Rodriguez, and so Patterson is the only source of disagreement. See Tr. at 11:25-12:5 (Court, Ball). The Defendants reiterated their requests from the Disclosure Motion. See Tr. at 12:9-17 (Ball). The Court indicated its confusion whether the Patterson Report, which was disclosed on June 27, 2017, before a March 2, 2018, disclosure deadline, was untimely. See Tr. at 12:19-22 (Ball). The Defendants clarified that Walker did not file a formal disclosure of her expert witnesses. See Tr. at 12:23-13:1 (Ball). The Defendants explained that "the Court," in the Discovery Order, "had required an expert disclosure where plaintiffs would list each of the experts that they were going to call." Tr. at 13:5-7 (Ball). The Court requested that the Defendants identify the deadline that Walker missed, because the Defendants received the Patterson Report on January 7, 2017, and Walker listed Patterson in the Joint Status Report. See Tr. at 13:11-14

---

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

(Court).  The Defendants stated that they expected a disclosure finalizing Walker's experts and that they never received an amended report indicating all areas on which Patterson would testify. See Tr. at 14:9-23 (Ball).  The Court asked how, in the Defendant's view, the Patterson Report is deficient, see Tr. at 14:24-25 (Court), and the Defendants admitted that the initial report is not deficient, but that the Patterson Report does not indicate that it is a final report, see Tr. at 1:1-6 (Ball).  Walker, the Defendants clarified, has agreed to amend the Patterson Report to account for Patterson's opinions on Walker's future costs of living, and the Defendants stated that, if Walker seeks cost-of-living damages, the Defendants will seek to exclude such testimony.  See Tr. at 15:14-21 (Ball).

Walker, in response to the Court's question, affirmed that the Patterson Report contains the information to which Patterson will testify at trial.  See Tr. at 15:23-25 (Court, A. Ayala). Walker stated that he asked Patterson not to amend the report, because Walker would ask for only quality-of-life damages.  See Tr. at 16:10-13 (A. Ayala).  Walker explained that Patterson had opined on qualify-of-life damages; that Walker, in the Answer to Interrogatories, and in the First and Second Initial Disclosures, had informed the Defendants that she would call Patterson, and that the Defendants deposed Patterson on "his credentials, his education, work histories[,] cases he testified to[,] . . . education, publications."  Tr. at 17:3-5 (A. Ayala).  See id. at 16:6-14 (A. Ayala).  The Court asked whether the Defendants agreed that the Patterson Report contained the information to which Patterson would testify, see Tr. at 17:22-24 (Court), and the Defendants agreed with the Court, see Tr. at 17:25-18:1 (Ball).  The Court stated that it would deny the Disclosure Motion, because Walker timely filed the Patterson Report and the Defendants had suffered no prejudice.  See Tr. at 18:9-16 (Court).

Regarding the Treatment Provider Motion, the Defendants explained that, after they filed the Disclosure Motion, they realized that Walker might "attempt to elicit expert testimony from treatment provide[r]s." Tr. at 34:24-25 (Ball). The Defendants noted that, although Walker listed sixteen treatment providers as potential witnesses, she listed none as expert witnesses, as rule 26(a)(2) requires if they are going to testify as experts. See Tr. at 35:1-10 (Ball). The Defendants request that the Court follow its decision in Montoya v. Sheldon, and preclude the treatment providers from testifying on "standard of care, causation or any type of diagnosis." Tr. at 35:17-18 (Ball). See id. at 35:10-19 (Ball). The Defendants admitted that they deposed six treatment providers, but they explained that, because they did not expect the treatment providers to act as expert witnesses, they were focused on the treatment providers' statements about Walker's participation in the Senior Olympics. See Tr. at 36:1-9 (Ball). The Court clarified and the Defendants admitted that the Defendants "just don't know" what testimony Walker will seek from the treatment providers, Tr. at 36:10 (Court); see id. at 36:10-13 (Court, Ball), but, in response to the Court's questioning, the Defendants contended that "concrete" statements from the treatment providers concern them, Tr. at 36:15 (Court); see id. at 36:15-17 (Court, Ball). The Defendants explained that Dr. Rachelson testified in his deposition that Walker's left knee injury "was related to the accident . . .," Tr. at 36:22-23 (Ball); see id. at 37:20-25 (Ball), and that Dr. Hamilton testified that Walker's PTSD resulted from the accident, see Tr. at 37:1-4 (Ball). The Court asked when Dr. Rachelson and Dr. Hamilton developed their opinions, and the Defendants contended that Dr. Rachelson and Dr. Hamilton developed their opinions at the time of treatment. See Tr. at 37:15:22 (Court, Ball).

Walker indicated that she will call Dr. Rachelson, Dr. Khalsa, Dr. Hamilton, and Miller at trial.  See Tr. at 49:26-28 (A. Ayala).  Walker responded that she did not intentionally exclude the treatment providers from the expert witness list and noted that she listed the treatment providers elsewhere.  See Tr. at 38:24-39:3 (A. Ayala).  Further, Walker averred, as in her Treatment Provider Response, that any failure on her part is harmless error, because she disclosed to the Defendants that Dr. Hamilton would testify and on what.  See Tr. at 39:3-11 (A. Ayala).  The Court asked whether Walker "always intended to call these . . . treating physicians."  Tr. at 39:17-18 (Court).  Walker replied that she always has intended to call the treatment providers as witnesses, that she is not required to provide an expert report for the treatment providers, that she has disclosed the treatment providers, and that she has provided the Defendants her medical records. See Tr. at 39:19-41:7 (A. Ayala).  Walker contends that the Defendants complain that she did not provide them notice, but, according to Walker, the Defendants have Walker's medical records, have thoroughly deposed Dr. Rachelson, Dr. Khalsa, Dr. Hamilton, and Miller, and have an expert who has thoroughly reviewed these treatment providers and will respond to their testimony. See Tr. at 41:8-47:15 (A. Ayala).  Walker argues that the Defendants are not prejudiced and are very prepared and so, according to Walker, any error on Walker's part is harmless.  See Tr. at 47:16-48:6 (A. Ayala).

The Defendants responded that Walker did not list the treatment providers as experts and provided only a brief summary of the treatment provider's testimony.  See Tr. at 48:9-19 (Ball). The Defendants explained that, accordingly, they did not go into detail on Walker's PTSD in the depositions, and that the Defendants did not enter the depositions expecting to depose potential

experts.  See Tr. at 48:17-18 (Ball).  The Defendants indicated that they may want to raise concerns about the treatment providers' qualifications.  See Tr. at 50:16-51:2 (Ball).

The Court indicated that it would likely treat the treatment providers as "treating physician[s]" and not experts.  Tr. at 53:5-8 (Court).  The Court explained that, if it followed this inclination, it, accordingly, would allow the treatment providers to testify "about what they observed and what they saw at the time they were treating," Tr. at 53:9-10 (Court), but not to causation or continuing needs, see Tr. at 53:10-21 (Court).  The Court stated that it believed this limitation aligns with the Court's previous limitations on treating physicians.  See Tr. at 54:4-5 (Court).

## LAW REGARDING RULE 26

Rule 26(a)(1) requires parties to make initial disclosures to the other parties, relaying:

**(1)** ***Initial Disclosure.***

> **(A)** *In General.* Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties:
>
> > **(i)** the name and, if known, the address and telephone number of each individual likely to have discoverable information -- along with the subjects of that information -- that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;
> >
> > **(ii)** a copy -- or a description by category and location -- of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment;
> >
> > **(iii)** a computation of each category of damages claimed by the disclosing party -- who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which

each computation is based, including materials bearing on the nature and extent of injuries suffered; and

**(iv)** for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

Fed. R. Civ. P. 26(a)(1). Rule 26(e) requires a party who has made a disclosure under rule 26(a) -- or who has responded to an interrogatory, request for production, or request for admission -- to supplement or correct its disclosure or response in a timely manner if it learns that the disclosure or response is incomplete or incorrect. See Fed. R. Civ. P. 26(e). A party must also disclose expert witnesses that the party intends to call at trial. See Fed. R. Civ. P. 26(a)(2).

**(2)** *Disclosure of Expert Testimony*.

**(A)** *In General*. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702[4], 703[5], or 705[6].

**(B)** *Witnesses Who Must Provide a Written Report*. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report -- prepared and signed by the witness -- if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

---

[4]Rule 702 allows an expert qualified "by knowledge, skill, experience, training, or education" to testify on opinions meeting the requirements delineated within the rule. See Fed. R. Civ. P. 702.

[5]Rule 703 specifies that an expert may rely on information inadmissible at trial in forming his or her opinion. See Fed. R. Civ. P. 703.

[6]Rule 705 permits experts to testify without disclosing underlying facts on which they rely. See Fed. R. Civ. P. 705.

**(i)** a complete statement of all opinions the witness will express and the basis and reasons for them;

**(ii)** the facts or data considered by the witness in forming them;

**(iii)** any exhibits that will be used to summarize or support them;

**(iv)** the witness's qualifications, including a list of all publications authored in the previous 10 years;

**(v)** a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

**(vi)** a statement of the compensation to be paid for the study and testimony in the case.

**(C)** *Witnesses Who Do Not Provide a Written Report*. Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:

**(i)** the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and

**(ii)** a summary of the facts and opinions to which the witness is expected to testify.

Fed. R. Civ. P. 26(a)(2). Parties must adhere to the schedule that the court sets in providing expert witnesses disclosures, and, if the court provides no schedule, the parties must provide the expert witness disclosure ninety days before the trial date or date "for the case to be ready for trial," Fed. R. Civ. P. 26(a)(2)(D)(i), or "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party . . . , within 30 days after the other party's disclosure," Fed. R. Civ. P. 26(a)(2)(D)(ii). Before the date that the pretrial disclosures are due, see Fed. R. Civ. P. 26(e)(2), parties are required to supplement expert witness disclosures, reports, and depositions to correct and complete the provided information or provide information that "has not otherwise been made known to the other parties during the discovery process or in writing," Fed. R. Civ. P. 26(e)(1)(A), or "as ordered by the court," Fed. R. Civ. P. 26(e)(1)(B).

This disclosure requirement exists "to eliminate surprise and provide opposing counsel with enough information . . . to prepare efficiently for deposition, any pretrial motions and trial." Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1121-22 (D. Colo. 2006)(Kane, J.). See Fed. R. Civ. P. 37 advisory committee's note ("This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56.").

Rule 37(c) provides the Court with means to address failures to disclose:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). The Court may also impose other sanctions, including fee shifting, informing the jury of a party's failure to disclose, striking pleadings, or even dismissing the action. See Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii); Fed. R. Civ. P. 37(c)(1)(A)-(C). This rule prevents expert witnesses from testifying on matters that they failed to disclose in their reports. See Honey-Love v. United States, 664 F. App'x 358, 362 (5th Cir. 2016(unpublished)("[U]nder Rule 37(c), the presumptive sanction for failing to disclose a testifying expert or supply a required expert report or summary disclosures is to exclude or limit the expert's testimony unless the failure was substantially justified or harmless." (citing Fed. R. Civ. P. 37(c)(1); Fed. R. Civ. P. 26 advisory committee's note)); Sturgeon v. ABF Freight Sys., Inc., 2004 WL 5872664, at *3 (precluding a treating physician from testifying as an expert where "the only notice ABF received is that Sturgeon intended to call Jackson as a treating physician -- and not as an expert witness"); 7 Annotated Patent Digest § 41:169 ("Generally, an expert will be precluded from testifying to any opinions that were not disclosed in its expert report."). Whether a rule 26(a) violation is

substantially justified or harmless is a question for the district court's broad discretion. Woodworker's Supply, Inc. v. Principal Mut. Life Ins., 170 F.3d at 993 (holding that a damage theory purportedly not disclosed until trial did not warrant exclusion). The United States Court of Appeals for the Tenth Circuit has described this standard as follows:

> A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. Nevertheless, the following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.

Woodworker's Supply, Inc. v. Principal Mut. Life Ins., 170 F.3d at 993.

The Court has addressed the issue in several contexts. The Court frequently concludes that an untimely disclosure prejudices an opposing party, that the prejudice is incurable, and that the untimely disclosure disrupts trial when the disclosure occurs close to trial, the party did not previously know of the information contained in the disclosure, and/or the opposing party does not have an opportunity to engage in further discovery or depositions. See, e.g., Leon v. FedEx Ground Package Sys., Inc., No. CIV 13-1005 JB/SCY, 2016 WL 1158079, at *12-14 (D.N.M. March 1, 2016)(Browning, J.); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., No. CIV 08-1101 JB/RLP, 2009 WL 3672502, at *5 (D.N.M. Sept. 29, 2009)(Browning, J.); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., No. CIV 08-1101 JB/RLP, 2009 WL 3672373, at *12-14 (D.N.M. Sept. 24, 2009)(Browning, J.). For instance, in Leon v. FedEx Ground Package Systems, Inc., the Court concluded that, even though the Court deemed that there was no indication of bad faith or willfulness, the factors pointed against admitting expert testimony on additional statutory violations, because: (i) the testimony would surprise and prejudice the other party, because the expert could choose from many statutes on which to testify; (ii) the prejudice would be incurable,

because the expert could explore any statutory violation so the opposing party could not prepare; and (iii) the expert testimony would disrupt trial, because the last-minute testimony would force the opposing party to go on a fishing expedition on cross examination; and the Court would likely have to delay trial to allow the opposing party time to respond to the testimony; and (iv) there were no indications of bad faith or willfulness. See 2016 WL 1158079, at *12-14. Regarding the first element -- prejudice -- in Guidance Endodontics, LLC v. Dentsply International, Inc., the Court explained that a supplemental expert report disclosed soon before trial was prejudicial, because

> [t]he trial of a case is a substantial undertaking that consumes most or all of an attorney's time. Delivering an expert report to opposing counsel on the first day of trial, therefore, is not helpful. There is no time to prepare a rebuttal expert or investigate the principles underlying the expert's opinions.

2009 WL 3672502, at *5. The Court noted that the defendants could not "prepare a new or existing expert witness," and that the new expert report referenced "some recent research," of which the defendants were not informed, and this prejudice was incurable, because the trial had begun and the defendants were subject to a preliminary injunction, and that the defendants did not want to delay the trial and remain subject to the preliminary injunction. 2009 WL 3672502, at *5. The Court excluded the expert even though the Court found no evidence of bad faith or willfulness. See 2009 WL 3672502, at *5. In Guidance Endodontics, LLC v. Dentsply Int'l, Inc., the Court also concluded that: (i) the defendants were prejudiced and surprised when a supplemental report increased the damages estimate "from $1.2 million to $75.2 million" and the plaintiff had previously not disclosed the measure of damages it would seek; and (ii) the prejudice was incurable, because the defendants could not "re-depose [expert] McDonald and find a new rebuttal expert this late in the game when Guidance could have, with due diligence, disclosed this measure of damages during the discovery period." 2009 WL 3672373, at *12. The Court further noted that

the trial would be disrupted, because the defendants did not know the plaintiff would seek such damages and had no rebuttal expert to the expert. See WL 3672373, at *14.

When a party has time to respond to the information in an untimely disclosure or expert report, or when the party already knew of the information, the Court is less likely to conclude that the party has been prejudiced, that the prejudice is incurable, or that the trial will be disrupted. See, e.g., Coffey v. United States, 2012 WL 2175747, at *12-13; Kerns v. Bd. of Comm'rs of Bernalillo Cty., No. CIV 07-0771 JB/ACT, 2010 WL 1632732, at *7 (D.N.M. March 31, 2010)(Browning, J.); Wheeler Peak, LLC v. L.C.I.2, Inc., No. CIV 07-1117 JB/WDS, 2010 WL 611141, at *3 (D.N.M. Jan. 31, 2010)(Browning, J.); Gulfstream Worldwide Realty, Inc. v. Philips Elecs. N. Am. Corp., No. CIV-06-1165 JB/DJS, 2007 WL 4707080, at *4 (D.N.M. Aug. 14, 2007)(Browning, J.). For example, in reviewing the factors in Coffey v. United States, the Court concluded that, where the plaintiff filed an amended report: (i) there was "little or no prejudice or surprise," because the United States of America had approximately ten months to find an expert to testify on conduct at the Gallup Indian Medical center if it needed; (ii) the prejudice was curable, because the United States had the amended report when it deposed the expert, the United States was on notice of the report's opinions, and the United States could have sought relief by contacting the other party or the Court; (iii) the trial would not be disrupted, because the United States had the report for around ten months and could find additional witnesses; and (iv) there was no evidence of bad faith or willfulness. 2012 WL 2175747, at *12-13. In Wheeler Peak, LLC v. L.C.I.2, Inc., the Court deemed that a party suffered little prejudice from an expert report that:

> (i) was not signed, (ii) does not contain a complete statement of the basis of his opinions, and does not properly identify the facts, documents, or testimony upon which he relied; (iii) does not identify any summarizing exhibits to be used at trial;

and (iv) does not provide his curriculum vitae, or his qualifications, publications, or testimony, all of which rule 26 requires.

2010 WL 611141, at *3. The Court reasoned that:

(i) Hicks has since provided a signed report; (ii) Wheeler Peak made the two boxes of materials upon which Hicks relied available to [defendant] de la Torre at Hicks' deposition, and can make those materials available again if de la Torre wants to see them; (iii) Hicks produced his cv on June 22, 2009; and (iv) while Hicks submitted his second report about a month and a half after the deadline in the Court's Scheduling Order, de la Torre had Hicks' second report for almost seven months before Hicks' deposition.

2010 WL 611141, at *3 (citations to transcript omitted). See Kerns v. Bd. of Comm'rs of Bernalillo Cty., 2010 WL 1632732, at *7 (concluding that, where the defendants had the data included in a supplemental report and had time to depose the expert, the defendants suffered little prejudice, and the Court could cure the prejudice by allowing additional discovery); Gulfstream Worldwide Realty, Inc. v. Philips Elecs. N. Am. Corp., 2007 WL 4707080, at *4 (concluding that Gulfstream Reality did not suffer prejudice where Philips Electronics provided the report in an untimely manner but Gulfstream Reality was aware of the information in the report seven weeks before the discovery deadline and before deposing the expert, and the expert report, which was provided four months before trial, would not disrupt trial). See also Lewis v. Goldsberry, No. CIV 11-0283 JB/ACT, 2012 WL 681800, at *10 (D.N.M. Feb. 27, 2012)(Browning, J.)(concluding that the defendants suffered prejudice where the plaintiff missed the disclosure deadline and "the Defendants have been unable to ascertain to what each of Lewis' expert witnesses will testify or obtain their own experts to address that testimony").

## LAW REGARDING DIVERSITY JURISDICTION

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be

reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[7] If the Court finds only an

---

[7]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court that Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[8]  The Court may also rely on

---

[8]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . .  We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Tr. v. WPX Energy

Prod., LLC, 27 F. Supp. 3d 1188, 1243 & n.30 (D.N.M. 2014)(Browning, J.).[9]  Ultimately, "the

. . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions."(emphasis and title case omitted)).

[9]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state supreme court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state Supreme Court

precedent.  See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908.  See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or, the "so-called local-judge rule" in its analysis).  The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*.  Its holdings are descriptive and not prescriptive -- interpretive and not normative.  Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue."  Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))).  This statement may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, former United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573

F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., 353 F.3d 866 (10th Cir. 2003), the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866.  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely

the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, then-United States Circuit Judge for the Tenth Circuit, limitation in <u>Wankier v. Crown Equip. Corp.</u> of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even <u>Koch v. Koch Industries, Inc.</u>, 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which <u>Wankier v. Crown Equipment Corp.</u> relies, uses the more inclusive definition. In fact, <u>Wankier v. Crown Equipment Corp.</u> quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." <u>Koch v. Koch Indus., Inc.</u>, 203 F.3d at 1231.

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In <u>Kokins v. Teleflex, Inc.</u>, 621 F.3d 1297 (10th Cir. 2010), the Tenth Circuit, quoting <u>Wankier v. Crown Equipment Corp.</u>, refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. *See* <u>Kokins v. Teleflex, Inc.</u>, 621 F.3d at 1297 ("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc.], 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in original)(quoting <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the <u>Erie</u> doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. <u>Moore's</u> lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." <u>Moore's</u> § 124.22[4] (citing <u>State Farm Mut. Auto. Ins. v. Travelers Indem. Co.</u>, 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of <u>Erie</u>.

Court's task is to predict what the state supreme court would do." Wade v. EMCASCO Ins., 483

F.3d at 666. Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted).

## RELEVANT LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert . . ., trial courts have had

the responsibility to make certain that proffered experts will assist the jury in understanding the

evidence and in determining the factual issues it must decide." United States v. Gutierrez-Castro,

805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide

whether the expert is qualified to testify, but, under Daubert, whether the opinion testimony is the

product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

"Daubert . . . requires a court to scrutinize the proffered expert's reasoning to determine if that

reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.[10]

---

[10]One of the things that consistently amazes the Court is the unwillingness of modern lawyers to tailor their briefing to the particular judge before whom they argue. The Court still gets briefings filled with citations to other district cases, even though it has written opinions more directly on point. See, e.g., United States v. Begay, 310 F. Supp. 3d 1318, 1336 (D.N.M. 2018)(Browning, J.)(party citing Caine v. Burge, No. 11 C 8996, 2013 WL 1966381, at *1 (N.D. Ill. May 10, 2013)(Durkin, J.) to argue for admitting expert testimony); United States v. Chapman, No. CR 14-1065 JB, 2015 WL 10401776, at *3 (D.N.M. Aug. 28, 2015)(Browning, J.)(party citing First Data Corp. v. Konya, No. CIV 04-0856, 2007 WL 2116378, at *10 (D. Colo. July 20, 2007)(Kane, J.)). There is nothing wrong -- and a lot right -- with our colleagues in other states, but it mystifies the Court why lawyers continue not to research and know the judge before whom they are practicing.

Nowhere is the need to research the presiding judge more important than in the Daubert area. Given Daubert's and rule 702's demands, trial judges often have to write detailed opinions, with findings of fact and conclusions of law. See, e.g., Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150 (D.N.M. 2016)(Browning, J.); United States v. Rodriguez, 125 F. Supp. 3d 1216 (D.N.M. 2015)(Browning, J.); Montoya v. Sheldon, 286 F.R.D. 602 (D.N.M. 2012). Cf. Admissibility of Scientific Evidence, SJ081 ALI-ABA 1 , 21 ("Appellate courts increasingly insist that even when no Daubert hearing is held, the district court must create a sufficient record so that the basis for the admissibility decision can be reviewed."). The written opinions are a goldmine for figuring out what the trial judge is going to do with the new expert's report. Lawyers should

1. **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[11]  Rule 702 thus requires the trial court to "determine whether the expert is

proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist

---

research their judge thoroughly through Lexis and Westlaw.  In the 21st century, litigants can know their judge like the hand knows the glove.

When the Court was a young associate at a large law firm after its clerkships, the Court and a co-associate, and the Court's future partner, would swing by the University of New Mexico School of Law every evening after work, alternating days, to go through a box of slip opinions by the federal judges.  The lower federal judges in the early 1980s would send the opinion to the counsel of record by mail but also send a copy to the law library.  The Court and the other associate would copy almost every opinion and create binders by subject matter: rule 12(b)(1), rule 32, etc.  Some binders got so large that they got dividers to divide the opinions by specific judges.  The Court and the other associate kept up the laborious data collection even when the Court and the other associate started their own firm.  The Court and its firm would cite, quote, and discuss the opinions of the local federal judges back to them in its briefing.

If the Court went to this much travail to locate all the opinions of the judge before whom it was appearing, imagine what it thinks when it receives a brief citing, discussing, or quoting other courts' opinions on topics on which the Court has written, sometimes extensively and exhaustively.  In contrast to the paper world in which the Court lived in the early and mid-1980s, all an associate has to do with Lexis and Westlaw is put in the judge's name and the subject to be researched.  With research by judge and topic so easy today, there is no excuse for a lawyer not to know the opinion of the judge before whom they are practicing.

[11]Rule 702's most prominent hurdle is the sufficiency of basis.  Yet the judiciary's uncomfortableness with analyzing an opinion's basis can be seen in the conflict in the cases.  The

current conflict is whether the questions of sufficiency of basis, and of application of principles and methods, are matters of weight or admissibility. Compare David E. Bernstein & Eric G. Lasker, Defending Daubert: It's Time to Amend Federal Rule of Evidence 702, 57 Wm. & Mary L. Rev. 1, 32 (2015)("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." (quoting Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 255 (2d Cir. 2005)), with Bernstein & Lasker, supra, at 33 ("[T]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." (quoting Milward v. Acuity Speciality Prods. Grp. 639 F.3d 11, 22 (1st Cir. 2011)). There should not be a conflict. Rule 702 states that these are questions of admissibility. Yet many courts treat them as questions of weight. See, e.g., Bernstein & Lasker, supra, at 33 (citing several Courts of Appeals that instruct district courts to consider the sufficiency of basis and/or application of the methodology as questions of weight).

What is most interesting is what the divergence from Supreme Court precedent and rule 702 suggest. The divergence suggests that Daubert and rule 702 are too academic. Daubert and rule 702 write better than they work in the courtroom and in practice. Lower courts continue -- rightfully so -- to be uncomfortable with deciding these issues with the Sixth and Seventh Amendments to the Constitution of the United States protecting the right to jury trials in civil and criminal cases. Cf. Bernstein & Lasker, supra, at 33 ("[C]ourts have held that '[t]he district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.'" (quoting Manpower, Inc. v. Ins. of Pa., 732 F.3d 796, 806 (7th Cir.)); Ronald J. Allen, Esfand Fafisi, Daubert and Its Discontents, Brooklyn L.R., 131, 147 (2010)(describing an argument for Daubert's unconstitutionality under the Seventh Amendment).

The Court is concerned that the federal courts will overact to the wayward opinions that have created a split whether sufficiency of basis and application of methods is for the court or goes to the evidence's weight. The Court is concerned that the federal courts are going in the direction of new rules. There is thus a built-in institutional bias towards more rules and amendments. The Judicial Conference runs the federal judiciary through committees. See About the Judicial Conference, U.S. Cts., https://www.uscourts.gov/about-federal-courts/governance-judicial-conference/about-judicial-conference (last visited Jan. 5, 2019)("The Conference operates through a network of committees . . . "). The Judicial Conference has a Standing Committee on Rules. The Standing Committee has five Advisory Committees: (i) Civil Procedure; (ii) Criminal Procedure; (iii) Evidence; (iv) Bankruptcy; and (v) Appellate. See How the Rulemaking Process Works, U.S. Cts., https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works (last visited Jan. 5, 2019). Each of these advisory committees has a reporter, almost always a prominent professor. See Overview for the Bench, Bar, and Public, U.S. Cts., https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works/overview-bench-bar-and-public (last visited Jan. 5, 2019). The reporter position is more prestigious if the reporter can get new rules promulgated. They have to justify their existence. There is thus a very smart, likeable, and liked person putting pressure on the committee

the trier of fact to understand or determine a fact in issue." <u>United States v. Muldrow</u>, 19 F.3d

1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702

advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only

experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the

large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land

values."). An expert is "required to possess such skill, experience or knowledge in that particular

field as to make it appear that his opinion would rest on substantial foundation and would tend to

aid the trier of fact in his search for truth." <u>LifeWise Master Funding v. Telebank</u>, 374 F.3d 917,

928 (10th Cir. 2004). In <u>United States v. Goxcon-Chagal</u>, 886 F. Supp. 2d 1222, 1239 (D.N.M.

2012)(Browning, J.), the Court identified as relevant, and admitted, testimony on:

> (ii) the likelihood that a drug organization would entrust individuals outside of the
> organization with a large amount of drugs; (iii) the significance of the presence of
> multiple cellular telephones in the vehicle; (iv) the significance of the possession
> of multiple license plates; (v) the separation of individuals who package drugs and
> individuals who are drug couriers within a drug organization; (vi) the significance
> of the presence of multiple air fresheners in the vehicle; and (vii) the significance
> of the presence of a firearm in the vehicle.

886 Supp. 2d at 1239. The Court did not admit testimony on whether a highway portion was a

"drug route," because the "proposed testimony is too close to characterizing 'nearly any trip down

the interstate' as traveling in a known drug route" <u>United States v. Goxcon-Chagal</u>, 886 F. Supp.

2d at 1247. <u>See</u> <u>United States v. Harry</u>, 20 F. Supp. 3d 1196, 1243 (D.N.M.

---

to amend the rules. While judges are more conservative about promulgating new rules, they too
often succumb to the reporter's pressure. The result is that the federal judiciary and the bar gets a
host of new rules almost every year. The development of new rules burdens the federal judiciary
and the bar -- all of which are overworked -- with mandatory changes each year, often constituting
little more than stylistic changes. Everyone has to get new rule books every year. The burden of
new rules often does not justify the meager benefits of the changes.

2014)(Browning, J.)(deeming inadmissible testimony on a sex crime's victim's demeanor during an examination, because "demeanor is not always a reliable indicator whether someone is telling the truth, especially about sex -- then no expert testimony is needed. That knowledge is well within the knowledge of jurors and most people."); United States v. Rodella, No. CR 14-2783 JB, 2014 WL 6634310, at *25 (D.N.M. Nov. 19, 2014)(Browning, J.)(stating that "testimony regarding nationally accepted police standards is irrelevant" to issues of "excessive force and reasonableness). The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.[12] See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the

_____

[12]The Court is clipping the wings of experts all the time. See, e.g., Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d at 1204 (precluding an expert from discussing class certification requirements, but allowing the expert to testify to information about royalty instruments); United States v. Rodriguez, 125 F. Supp. 3d at 1255-56 (permitting an expert to describe a cartel's structure and organization, and to explain drug running, but not admitting the expert's testimony opining that the defendant was running drugs); Montoya v. Sheldon, 286 F.R.D. at 619 (precluding a treating physician from testifying about a party's PTSD diagnosis, opinions about the causes for a party's symptoms, or a party's prognosis). Attorneys ask experts to do too much, and experts try to do too much. The experts are being paid; they are trying to be helpful to the attorney. Cf. Mark I. Bernstein, Jury Evaluation of Expert Testimony under the Federal Rules, Drexel L.R. 239, 268 (2015)("Any use of expert witnesses paid by a party raises concerns of partisanship, competency, and honesty. Because experts are partisan witnesses paid by a party, there is an inevitable danger of bias.). The experts will often do anything. They toss statements into their reports to be helpful. Too many attorneys release the report as written -- without editing and without trimming. This failure to edit and to trim creates unnecessary litigation. Many expert reports contain statements that the proponent attorney does not need or even want. The reports draw Daubert motions or rule 702 challenges. The proponent is then forced to defend the statements that he or she does not even need or want.

expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). See United States v. Rodella, 2014 WL 6634310, at *20 ("Because of [the proposed expert's] lack of practical experience, lack of nationwide experience, and lack of an advanced degree in criminology or law enforcement, [the proposed expert's] is not qualified to testify about nationally accepted police procedures and practices."); United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1245 (determining an expert qualified to testify to drug trafficking when he had personal knowledge of the subject from working in the Drug Enforcement Agency for almost fifteen years).

Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion"). "The Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness." United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1214 (D.N.M. 2011)(Browning, J.)(citing United States v. Benally, 541 F.3d 990, 996 (10th Cir. 2008)). "The Tenth Circuit may draw this distinction because, generally, it is the jury's exclusive function to make credibility determinations . . . whereas a court makes a pretrial determination of the constitutional voluntariness of a statement." United States v. Ganadonegro, 805 F. Supp. 2d at 1214 (citation omitted)(citing United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)).

2.        **The Standard in Daubert.**

In its gatekeeper role, a court must assess the reasoning and methodology underlying an

expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of

the case, i.e., whether it is helpful to the trier of fact.   See Daubert, 509 U.S. at 594-95;

Witherspoon v. Navajo Ref. Co., No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18,

2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).[13]   The

---

[13]The current law -- and its trajectory -- are casting serious shadows over using expensive experts.  This is particularly true in cases involving jury trials.  It is probably a good time for the judiciary to rethink expert testimony rather than continuing with the current regime and making incremental changes.

Lawyers and appellate courts overemphasize the importance of experts, and distrust juries. See Sanja Kutnjak Ivkovic & Valerie P. Hans, Jurors' Evaluations of Expert Testimony: Judging the Messenger and the Message, 28 Law & Soc. Inquiry 441, 442 (2003)("One key assumption underlying the Daubert line of cases is that jurors might be duped by a persuasive but untrustworthy expert who testifies about matters that are not based on sound scientific principles or data."). Cf., Elaine E. Sutherland, Undue Deference to Experts Syndrome?, 16 Ind. Int'l & Comp. L. Rev. 375, 382 (2006)("After all, if one is coming from a position of ignorance, the person who holds the key to that certain body of knowledge is something of a savior.  The danger for the legal system is that this empowerment of the expert witness will result in undue deference to his or her opinion."). Appellate judges often do not have extensive or any trial experience, particularly as Presidents want to rule from the grave, and appoint younger and younger appellate judges, who often -- because of their years -- have not spent a lot of time trying cases in the courtroom before juries. Academics, corporate lawyers, general counsel, and appellate judges -- without considerable courtroom experience -- think that experts will easily mislead juries.  Yet, the Court talks regularly to juries after jury trials, and the Court listens to trial lawyers talking to juries after jury trials. Juries often expressly state that they disregarded the parties' experts.  The Court often hears comments like the "expert was arrogant and/or incomprehensible."

Part of the problem is that academics and, often, appellate jurists do not appreciate or understand modern American jurors.  Jurors have become very independent, and do not take direction well or easily from anyone -- the judge, lawyers, or experts.  The days of dressing up for court in coats and ties, and doing what the judge tells them to do are fading.  Jurors question everything.   If the Court tells them to go in one door, they want to use another.  Whereas jurors used to complement the Court's jury instructions as giving a roadmap to the jurors' decisions, jurors now criticize even the uniform or pattern jury instructions.  Modern American jurors do not like to think that they are being told what to do.  And they certainly do not like experts telling them what to do; modern American jurors do not like the idea of "experts" who are smarter than they

Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.[14] See Daubert, 509 U.S. at 594-95.  The district court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

---

are.

At the same time that modern American jurors are showing more independence, paternalistic Daubert hearings have proliferated.  This phenomenon raises many concerns.  One concern is the sheer prevalence of Daubert motions.  Cf. Cynthia Lynne Pike, The Impact of Revised MRE [sic] 702 and 703 in Response to Daubert, 52 Wayne L. Rev. 285, 301 (2006)(describing the effects of a state-specific rule resembling rule 702 and stating, "One of the more important tactical strategies in dealing with the court's role as gatekeeper under the new MRE 702 is the use of motions in limine and other pretrial evidentiary hearings.").  Motions to dismiss, class certification motions, and motions for summary judgment, sentencings, competency hearings -- in addition to testimony -- require Daubert hearings.  The costs of Daubert motions, to the court and the parties, is staggering.   The time-consuming nature of Daubert motions is overwhelming.

[14]Federal courts are obsessed with reliability problems.  This idea pops up several places and in several ways, creating multiple grounds upon which the court has the power to exclude the expert.  See Admissibility of Scientific Evidence, SJ081 ALI-ABA 1 , 27 (noting that courts treat the "assist the trier of fact" requirement for expert testimony as a relevancy requirement, and stating that rule 401 already requires evidence to be relevant).

Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . .). This obligation involves a two-part inquiry. Id. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" Id. (quoting Daubert, 509 U.S. at 592 . . .). In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ." Id. (quoting Daubert, 509 U.S. at 592-93 . . .). Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand." Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted). "The second inquiry is related to the first. Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . . The evidence must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert, 509 U.S. at 591). If the expert's proffered testimony fails on the first prong, the court does not reach the second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884. In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert to non-scientific expert testimony. See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." (quoting Carmichael v. Samyang Tires, Inc., 923 F. Supp. 1514, 1521 (S.D. Ala. 1996)). The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert will not apply to all cases:

Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do

not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert, a court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert, 509 U.S. at 595). "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted)(quoting Dodge v. Cotter Corp., 328 F.3d at 1222). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury. See Norris v. Baxter Healthcare Corp., 397 F.3d at 881. The Tenth Circuit noted in Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206. The United States Court of Appeals for the Ninth Circuit noted in Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994):

Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (D.N.M. Dec. 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion. See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis. At worst, the link has been tested and found to be untenable. Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. at 146. See Hollander v. Sandoz Pharm. Corp., 289 F.3d at 1209 (noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D.

Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans.").  Courts have excluded experts' opinions when the experts depart from their own established standards.  See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

      **3.**       **Necessity of Evaluating an Issue Under Daubert.**

The restrictions in Daubert apply to both "novel" expert testimony and "well-established propositions." 509 U.S. at 593 n.11 ("Although the Frye[15] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence.").  "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended."  Daubert, 509 U.S. at 593 n.11.  "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201."  Daubert, 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ."  Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780

---

[15]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."  293 F. at 1014.

(10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology,[16] and in fact some courts have indicated their acceptance of it.").[17]

---

[16]PCR, a "[p]olymerase chain reaction," Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780, is a widely used method for copying DNA segments. Polymerase Chain Reaction, Wikipedia, https://en.wikipedia.org/wiki/Polymerase_chain_reaction (last visited Nov. 28, 2018).

[17]Much of the focus of current debate about experts is on forensic evidence, which comes in many forms. The challenge to forensic evidence comes from two areas: (i) the federal courts; and (ii) the scientific community. The reports of the National Academies of Science ("NAS") and the President's Council of Advisors on Science and Technology ("PCAST") raise challenges to the reliability of forensic methods. See Executive Office of the President President's Council of Advisors on Science and Technology, Report to the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (Sept. 2016); Committee on Identifying the Needs of the Forensic Sciences Community, National Research Council, Strengthening Forensics Science in the United States: A Path Forward (July 2009). There is increasing skepticism of the legal profession's most cherished evidence, including fingerprints, DNA, firearms, and breath tests. See, e.g., President's Council of Advisors on Science and Technology, supra, at 67-110; Committee on Identifying the Needs of the Forensic Sciences Community, supra, at 42-48.
    The Court is concerned that the federal judiciary is moving toward a freestanding rule on forensic evidence. The Court is not a big fan of addressing the topic of forensic evidence through rulemaking. No rule, procedures manual, or note is needed to tell judges that there is no certainty with forensic opinions. There is also no reasonable degree of certainty. These opinions are now considered overstated: in the old days -- like last week -- attorneys would routinely ask: "Doctor, in your opinion, to a reasonable degree of certainty, that the plaintiff's appendix was on the left side of the body?"
    The nation does not need another rule. An examination of Article VII -- Opinions and Expert Testimony -- shows six rules: (i) rule 701 -- Opinion Testimony by Lay Witnesses; (ii) rule 702 -- Testimony by Expert Witnesses; (iii) rule 703 -- Bases of an Expert's Opinion Testimony; (iv) rule 704 -- Opinion on an Ultimate Issue; (v) rule 705 -- Disclosing the Facts or Data Underlying an Expert's Opinion; (vi) rule 706 -- Court-Appointed Expert Witnesses (a bad idea in about all cases). See Fed. R. Evid. 701-06. If the reporter would drop rule 706, perhaps there

## LAW REGARDING TREATING PHYSICIAN TESTIMONY

If a treating physician testifies as an expert witness, the testimony's proponent must disclose the treating physician as an expert and produce an expert report, or a summary of the expert's subject matter and the proposed testimony. See Fed. R. Civ. P. 26a)(2)(B); Fed. R. Civ. P. 26(a)(2)(C). Rule 26(b) requires parties to disclose in a timely manner any expert witnesses. See Fed. R. Civ. P. 26(a)(2)(A). When a party retains or "specially employ[s]" an expert for litigation or when the excerpt is a "party's employee regularly involve[d in] giving expert testimony," the parties must disclose a written expert report. Fed. R. Civ. P. 26(a)(2)(B).[18] The

---

would be room for a rule pertaining to forensic evidence.

The Court is concerned with what a new rule would look like. The judiciary could make its point in a committee note, but without a new rule, there is no need for a new note. The PCAST report does not propose a change to the Evidence Rules. Rather, PCAST proposes a best procedures manual. See President's Council of Advisors on Science and Technology, supra, at 145. It would be better if legal leaders do like Duke University School of Law has done for class actions and the Sedona Conference has done for electronic discovery. See Class-Action Settlement Conference, Duke Law, https://law.duke.edu/judicialstudies/conferences/oct2016/ (last visited Jan. 7, 2019); The Sedona Conference Working Group Series, The Sedona Conference, https://thesedonaconference.org/wgs (last visited Jan. 7, 2019). Rather than a new rule or note, the Court believes that a best practices manual -- prepared by professional leaders come together to write -- and not the judiciary -- would be the better approach.

The Court expects several difficulties with a new rule. The first difficulty with any rule on forensic evidence will be determining to whom it should apply. A new rule would presumably apply to forensic witnesses' testimony. Such witnesses include people testifying about evidence about through scientific means, by comparing patterns, or by "experimental or scientific analysis." See Evidence, Black's Law Dictionary (10th ed. 2014). After the Court and the bar have identified the universe of experts to whom the rule applies or the best practices apply, the new rules' requirements must be determined. An expert must already satisfy all of rule 702's requirements. Under a new rule, the expert will also need to satisfy all of the new requirements. With more handles, the chances of exclusion or limiting are enhanced. Rule 702's requirements, however, are enough, and the law should not require more.

[18]Before December 1993, rule 26 stated, in pertinent part:

---

advisory committee notes to the 1993 amendment to rule 26(a)(2) states that the rule allows a

treating physician who is disclosed as an expert to give expert testimony without submitting a

written report:

> [T]his rule . . . continue[s] to use the term "expert" to refer to those persons who
> will testify under Rule 702 of the Federal Rules of Evidence with respect to
> scientific, technical, and other specialized matters.  The requirement of a written
> report in paragraph (2)(B), however, applies only to those experts who are retained
> or specially employed to provide such testimony in the case. . . . A treating
> physician, for example, can be deposed or called to testify at trial without any
> requirement for a written report. Fed. R. Civ. P. 26(a)(2)(B) advisory committee's
> note.  When a witness or a treating physician is not disclosed as an expert under
> 26(a)(2), the witness can "still testify as [a] fact witness . . , but [cannot] testify as
> [an] expert . . . ."  Musser v. Gentiva Health Servs., 356 F.3d 751, 757 (7th Cir.
> 2004)(holding that, while the treating physicians were not required to give an expert
> report, they could not testify as experts where the plaintiff failed to disclose the
> physicians under rule 26(a)(2), only doing so under rule 26(a)(1)).  See Weese v.
> Schukman, 98 F .3d 542, 550 (10th Cir. 1996)(holding that treating physician, not
> disclosed under rule 26(a)(2), was allowed to give proper lay witness testimony
> under rule 701); Davoll v. Webb, 194 F.3d 1116, 1138 (10th Cir. 1999)(holding
> that treating physician's testimony was proper lay testimony, because the physician
> "explained various medical terminology and drew a diagram . . . [which] clarified

---

(b) **Discovery Scope and Limits.** Unless otherwise limited by order of the court in
accordance with these rules, the scope of discovery is as follows:

. . . .

> (4) **Trial Preparation: Experts.**  Discovery of facts known and opinions
> known by experts, otherwise discoverable under the provisions of
> subdivision (b)(1) of this rule and acquired or developed in anticipation of
> litigation or for trial may be obtained only as follows:
>
> > (A)(*i*) A party may through interrogatories require any other party
> > to identify each person the other party expects to call as an expert
> > witness at trial, to state the subject matter on which the expert is
> > expected to testify, and to state the substance of the facts and
> > opinions to which the expert is expected to testify and a summary of
> > the grounds for each opinion. (*ii*) Upon motion, the court may order
> > further discovery by other means . . . .

Fed. R. Civ. P. 26 (1992).

his testimony on his treatment of [the plaintiff] and did not constitute opinion testimony.").

Fed. R. Civ. P. 26(a)(2) advisory committee's notes. When an expert is not "retained or specially employed to provide testimony" or a "party's employee regularly involve[d] in giving expert testimony," Fed. R. Civ. P. 26(a)(2)(B), the party should disclose its intent to use the expert and specify "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify," Fed. R. Civ. P. 26(a)(2)(C).

> A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705. Frequent examples include physicians or other health care professionals and employees of a party who do not regularly provide expert testimony. Parties must identify such witnesses under Rule 26(a)(2)(A) and provide the disclosure required under Rule 26(a)(2)(C). The (a)(2)(C) disclosure obligation does not include facts unrelated to the expert opinions the witness will present.

52 No. 4 Crim. Law Bulletin ART 9.

In 2000, amendments to rule 701 changed the requirements for lay testimony. See 4 Jack Weinstein & Margaret Berger, Weinstein's Federal Evidence § 701.03[4][b], at 701-31 (J. McLaughlin ed., 2d ed. 2012). Under rule 701, before December, 2000, lay witness testimony was subject to only two restrictions; lay testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701 (1997). In 2000, the language restricting lay witnesses' opinions to only opinions "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702," was added to "ensure . . . that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 and Fed. R. Crim. P. 16 by simply calling an expert witness in the guise of a lay person." Fed. R. Evid. 701

advisory committee's notes.  <u>See</u> Weinstein & Berger, <u>supra</u> § 701.03[4][b], at 701-31 (noting that

the 2000 amendment to rule 701 "ensures evidence qualifying as expert testimony . . . will not

evade the reliability scrutiny mandated by . . . Rule 702 . . . [and] provides assurance that parties

will not use Rule 701 to evade the expert witness pretrial requirements of Federal Rule of Civil

Procedure 26 and Federal Rule of Criminal Procedure 16").  A witness not properly identified as

an expert pursuant to rule 26 may thus testify as a lay witness to opinions which are "(a) rationally

based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or

to determining a fact in issue; and (c) not based on scientific, technical, or other specialized

knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  The Advisory Committee on the

Federal Rules of Evidence notes that the 2000 amendment to rule 701 was intended to distinguish

between testimony rather than witnesses:

> The amendment does not distinguish between expert and *lay witnesses,* but rather
> between expert and *lay testimony.*  Certainly it is possible for the same witness to
> provide both lay and expert testimony in a single case. . . .  The amendment makes
> clear that any part of a witness' testimony that is based upon scientific, technical,
> or other specialized knowledge within the scope of Rule 702 is governed by the
> standards of Rule 702 and the corresponding disclosure requirements of the Civil
> and Criminal Rules.

Fed. R. Evid. 701 advisory committee's notes (emphasis in original).

According to the drafters of the 2000 amendments, allowing a treating physician to testify

in the same capacity and to the same extent as an expert, without requiring even disclosure of the

physician's identity, would undermine both the <u>Daubert</u> analysis and rule 702 requirements.  Any

plaintiff could get around the disclosure requirements of rule 26(a)(2) and <u>Daubert</u>'s reliability

standards by simply asking a physician for treatment, even once, instead of hiring a physician as

an expert for the trial.  The Honorable Bruce Black, United States District Judge for the District of

New Mexico, discussed why the 2000 amendments dealing with expert testimony suggest care must be taken to restrict the testimony of treating physicians not disclosed as experts under rule 26(a)(2):

> [L]ay witnesses may only offer opinions based on their own perceptions and may not offer opinions based on scientific, technical, or other specialized knowledge. Fed. R. Evid. 701. This latter restriction was added by a 2000 amendment in order to prevent parties from smuggling in expert testimony under Rule 701 (lay witnesses), thus, evading the reliability analysis of *Daubert* and the disclosure requirements of Rule 26(a)(2). 4 Jack B. Weinstein and Margaret A. Berger, Weinstein's Federal Evidence § 701.03[4] [b] (J.M. McLaughlin ed., Matthew Bender 2d ed. 2005). As a result, this amendment compels courts to categorize more testimony from treating physicians as subject to expert disclosure requirements and some courts have barred testimony from physicians about their diagnosis and treatment, finding that such opinions are necessarily based on expert knowledge. Dorothea Beane & Theodore E. Karatinos, Catching the Chameleon: When is the Treating Physician an Expert?, in 51-May Fed. Law. 26, 27 (2004). Under Tenth Circuit law, treating physicians not disclosed as experts are limited to testimony based on personal knowledge and may not testify beyond their treatment of a patient.

Witherspoon v. Navajo Ref. Co., 2005 WL 5988650, at *2.

Before the 2000 amendments, courts concluded that a treating physician testified as a lay witness when he or she testified based on his or her personal experience treating a patient. See Davoll v. Webb, 194 F.3d at 1138-39; Weese v. Schukman, 98 F .3d at 550; Piper v. Harnischfeger Corp., 170 F.R.D. 173, 175 (D. Nev. 1997)(McQuaid, J.)("It is common place for a treating physician during, and as part of, the course of treatment of a patient to consider things such as the cause of the medical condition, the diagnosis, the prognosis and the extent of disability caused by the condition, if any."). Courts allowed treating physicians to testify to observations, diagnoses, and opinions about causation that treating physicians formed while treating patients.

> Treating physicians are not retained for purposes of trial. Their testimony is based upon their personal knowledge of the treatment of the patient and not information acquired from outside sources for the purpose of giving an opinion in anticipation

of trial. They are witnesses testifying to the facts of their examination, diagnosis and treatment of a patient. It does not mean that the treating physicians do not have an opinion as to the cause of an injury based upon their examination of the patient or to the degree of injury in the future. These opinions are a necessary part of the treatment of the patient. Such opinions do not make the treating physicians experts as defined by Rule 26(b)(4)(C).

Baker v. Taco Bell Corp., 163 F.R.D. 348, 349 (D. Colo. 1995)(Abram, M.J.). In Weese v.

Schukman, the Tenth Circuit held that the district court did not err in allowing the physician to

testify as a lay witness about his opinions whether his care met the standard of care and about

causation for a patient that he treated:

> Although [the plaintiff] does not challenge [the treating physician]'s testimony under the lay opinion rule, we note that any opinions offered by [the physician] were based on his experience as a physician and were clearly helpful to an understanding of his decision making process in the situation. Moreover, in a pretrial order, the district court specifically ruled that [the physician], as a non-expert, could "testify regarding the standard of care and causation. . . ." Accordingly, the court did not err in admitting [the] testimony.

98 F.3d at 550. In Davoll v. Webb, while the Tenth Circuit uses language that would lead one to

believe that a treating physician "should be given 'loose rein to state what are truly facts, even if

they are expert facts,'" the holding in the case was much narrower. 194 F.3d at 1138

(quotingWeinstein & Berger, supra § 701.08). The Tenth Circuit held only that the treating

physician did not give improper expert testimony in testifying to his opinion that the patient

suffered from psychological stress:

> With respect to the "psychological impairment" testimony . . . [the physician] simply stated that, based on his interactions with [the plaintiff], he understood that [the plaintiff] was suffering from psychological stress because Denver was "pressuring him to retire." . . . [The physician] did not attempt to name a particular psychological disorder or give an in-depth analysis as to [the plaintiff]'s mental health. He simply stated . . . that the retirement proceedings caused [the plaintiff] stress. . . . That conclusion is within the province of a lay witness such as [the physician] who has personal knowledge of the situation.

Davoll v. Webb, 194 F.3d at 1138-39 (emphasis added).  The Tenth Circuit noted that "[a] treating physician, even when testifying as a lay witness, may state 'expert' facts to the jury in order to explain his testimony."  194 F.3d at 1138.  The Tenth Circuit held that, while the treating physician explained "various medical terminology and drew a diagram explaining Mr. Davoll's injury, those actions . . . clarified his testimony on his treatment of [the patient] and did not constitute opinion testimony."  194 F.3d at 1138.

After the 2000 amendments, a treating physician still acts as a lay witness when testifying to his treating or caring for a patient.  See Guerrero v. Meadows, 646 F. App'x 597, 602 (10th Cir. 2016)(unpublished)("A treating physician does not need to be certified as an expert witness and may testify as a lay witness 'if he or she testifies about observations based on personal knowledge, including the treatment of the party.'" (quoting Davoll v. Webb, 194 F.3d at 1138));[19] Smith v. Auto-Owners Ins., No. 15-CV-1153 SMV/GBW, 2018 WL 400767, at *2 (D.N.M. Jan. 12, 2018)(Vidmar, J.)("Under Tenth Circuit law, treating physicians not disclosed as experts are

---

[19]Guerrero v. Meadows is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Guerrero v. Meadows and Parker v. Central Kansas Medical Center, 57 F. App'x. 401 (10th Cir. 2003), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

limited to testimony based on personal knowledge and may not testify beyond their treatment of a patient." (quoting Witherspoon v. Navajo Refining Co., 2005 WL 5988650, at *2)); Duran v. Home Depot USA, Inc., No. CV 13-608 WJ/SCY, 2014 WL 12601509, at *2 (D.N.M. Aug. 13, 2014)(Yarbrough, J.)("[C]ase law makes clear that any testimony offered by a treating physician must be based solely on his or her treatment of the patient and may include opinions regarding causation, diagnosis, prognosis, extent of disability, and future care."); Montoya v. Napolitano, No. CIV 13-30 JCH/GBW, 2014 WL 11515018, at *1 (D.N.M. Aug. 1, 2014)(Wormuth, J.)(limiting treating physicians from whom the proponent provided a required disclosure to testifying on "their diagnosis and treatment of Plaintiff's condition"). See also, McCann v. Miller, 502 F. App'x 163, 172 (3d Cir. 2012)("The court permitted the physicians to testify on 'their observations, information they received from their patients, . . . the extent of their examination,' and their diagnoses." (internal citation to case documents omitted)); 52 No. 4 Crim. Law Bulletin ART 9 n.13 ("Typically, a physician who has treated a party for injuries is not considered to be 'retained or specially employed' within the meaning of Rule 26(a)(2)(B)." (quoting Rule 26(a)(2)(B)); 6 Moore's Federal Practice § 26.23[2][b][iii] (3d Ed. 2002)("The majority rule is that an expert report is not required from treating physicians except when that physician will testify to matters learned outside the scope of treatment." (quoted in Bynum v. MVM, Inc., 241 F.R.D. 52, 54 (D.D.C. 2007)(Friedman, J.)).

A treating physician testifying to opinions formed according to others' observations of the patient or according to conclusions drawn for litigation purposes similarly still acts as an expert witness. See, e.g., 52 No. 4 Crim. Law Bulletin ART 9 n.13 ("Generally speaking, a witness asked to form an opinion for purposes of testifying is providing expert testimony. On the other hand, a

physician who testifies as to an opinion he or she formulated in the course of treating a patient is generally providing factual information.").  For instance, in <u>Parker v. Central Kansas Medical Center</u>, 57 F. App'x. 401, 404 (10th Cir. 2003)(unpublished), the Tenth Circuit held that the United States District Court for the District of Kansas did not err in striking the affidavit testimony of the plaintiff's treating physician, "conclud[ing] that [the physician's] opinion as to the standard of care and causation was expert testimony relating to treatment beyond that which was incidental to her personal care and treatment." 57 F. App'x at 404 (noting that the plaintiff's treating physician "should have been identified as an expert" to allow the physician to "testify to the standard of care and causation").  The Tenth Circuit distinguished <u>Weese v. Shuckman</u>, reasoning that, in <u>Weese v. Schukman</u>, the physician testified based on his own treatment of the patient, while the physician in <u>Parker v. Central Kansas Medical Center</u> testified to another physician's treatment of the patient:

> *Weese* is distinguishable on its facts.  There, the defendant doctor testified as to the standard of care and causation regarding his treatment of the plaintiff, "based on his experience . . . [and to aid the jury's] understanding of his decision making process in the situation."  By contrast, [the treating physician]'s affidavit related to the standard of care regarding another physician's refusal to treat and to the causation of complications allegedly resulting from delay in treatment.  [The treating physician] should have been identified as an expert witness and [the plaintiff] should have disclosed that [the treating physician] would testify as to the standard of care and causation.

57 F. App'x at 404 (internal citation and emphasis omitted)(quoting <u>Weese v. Schukman</u>, 98 F.3d at 550).  In <u>Sturgeon v. ABF Freight Systems, Inc.</u>, the Court granted a motion to strike portions of a plaintiff's affidavit that were beyond the scope of a treating physician, because the plaintiff failed to disclose the physician as an expert witness under rule 26(a)(2) before the expert disclosure deadline.  <u>See</u> 2004 WL 5872664, at *3. Because the physician treated the plaintiff from 1994 to 1996, the Court restricted the physician to "his personal care and treatment of [the plaintiff]" during

that time period. 2004 WL 5872664, at *3. The Court did not allow the physician to testify as to the plaintiff's current medical status or opine on his status by reliance on other physicians' records, and also did not allow the physician to "offer expert medical and/or legal opinions as to the [plaintiff's] alleged current disability." 2004 WL 5872664, at *3. According to the Tenth Circuit, "[t]his is consistent with Rule 701(a) of the Federal Rules of Evidence, which states that: 'If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . rationally based on the witness's perception.'" Guerrero v. Meadows, 646 F. App'x at 602.

Although many courts have continued to analyze treating physician testimony under the rubric that predates the 2000 amendments, see, e.g., Scholl v. Pateder, No. 09-CV-02959-PAB-KLM, 2011 WL 2473284, at *4 (D. Colo. June 22, 2011)(Mix, M.J.)(noting that, when "a treating physician may be required to form an opinion about the cause of an injury in order to properly treat it," "the physician may testify about his opinion regarding causation 'to the limited extent that [the opinion was] a necessary part of a patient's treatment' without being considered a retained expert witness." (quoting Starling v. Union Pac. R.R., 203 F.R.D. 468, 479 (D. Kan. 2001)(O'Hara, M.J.))); Farris v. Intel Corp., 493 F. Supp. 2d 1174, 1180 (D.N.M. 2007)(Black, J.)(permitting treating physician "to give expert testimony regarding 'fact opinions' as to causation, diagnosis, prognosis, and the extent of Plaintiff's disability or injury derived from his observations and treatment." (quoting Ngo v. Standard Tools & Equip. Co., 197 F.R.D. 263, 266-67 (D. Md. 2000)(Day, M.J.)); William P. Lynch, Doctoring the Testimony: Treating Physicians, Rule 26, and the Challenges of Causation Testimony, 33 Rev. Litig. 249, 260–61 (2014)("A surprising number of cases have followed Davoll and have allowed treating physicians to give opinion testimony as lay witnesses."), treating physicians testifying as lay witnesses are,

under the amended rule 701, more limited in what they can testify about diagnoses and causation, cf., Lynch, supra, at 261 (stating that treating physicians "have the education, training, and professional experience that qualifies them as experts, and . . . their testimony consists of opinions based on scientific, technical, or other specialized knowledge within the scope of Rule 702"); Stephen A. Saltzburg et. al, Federal Rules of Evidence Manual § 701,02[7], at 701-18 (10th ed. 2011)(explaining that, under the 2000 amendments, a treating physician can explain that a patient was coughing, but the treating physician cannot identify with what the treating physician diagnosed the patient or what caused the coughing). Rule 701 no longer permits a treating physician to offer "any opinions . . . based on . . . experience as a physician and . . . clearly helpful to an understanding of [the] decision making process in the situation," Davoll v. Webb, 194 F.3d at 1138 (quoting Weese v. Schukman, 98 F.3d at 550), but requires that those opinions not be based on scientific, technical, or specialized knowledge, see Smith v. Auto-Owners Ins., 2018 WL 400767, at *4 ("Davoll was decided in 1999 -- before the year 2000 amendment to Federal Rule of Evidence 701. Therefore, to the extent that *Davoll* could be read as allowing a treating physician to 'state expert facts to the jury' when testifying as a lay witness, the case has been overruled." (footnote omitted)(citing Equal Emp't Opportunity Comm'n v. Sbarro's Italian Eatery, No. 2:00CV774, 2003 WL 26084606, at *1 (D. Utah Sept. 11, 2003)(Benson, J.)(unpublished))); Witherspoon v. Navajo Ref. Co., 2005 WL 5988650, at *1 ("As a result, this amendment compels courts to categorize more testimony from treating physicians as subject to expert disclosure requirements and some courts have barred testimony from physicians about their diagnosis and treatment, finding that such opinions are necessarily based on expert knowledge."); Musser v. Gentiva Health Servs., 356 F.3d at 757 n.2 ("[A] treating doctor (or similarly situated witness) is

providing expert testimony if the testimony consists of opinions based on 'scientific, technical, or other specialized knowledge' regardless of whether those opinions were formed during the scope of interaction with a party prior to litigation."); Weinstein & Berger, <u>supra</u> § 701.03[4][b], at 701-37 ("If the proposed testimony is based on scientific, technical, or other specialized knowledge, it is expert testimony."); 29 Charles Wright et. al, <u>Federal Practice and Procedure</u> § 6253, at 119 & 2012 Supp. at 30 (1997 & Supp. 2012)(noting that while there was "nothing in Rule 701[to] prohibit . . . a lay witness from arriving at an opinion through the application of specialized experience . . . [the 2000] amendment to the provision establishes just such a prohibition.").

Under the amended rule 701, "a treating physician who has not been identified as an expert witness pursuant to Rule 26(a)(2) may not provide testimony beyond the scope of her treatment of plaintiff and [the physician's] conclusions must fall within the province of a lay witness." <u>Parker v. Cent. Kan. Med. Ctr.</u>, 57 F. App'x. at 404 (internal quotations omitted)(quoting <u>Parker v. Cent. Kan. Med. Ctr.</u>, 178 F. Supp. 2d 1205, 1210 (D. Kan. 2001)(Murguia, J.)). <u>See</u> <u>N.K. by Bruestle-Kumra v. Abbott Labs.</u>, 731 F. App'x 24, 26 (2d Cir. 2018)("The Federal Rules of Evidence provide that only Rule 702 expert witnesses may provide expert medical opinions." (citing Fed. R. Evid. 701(c))). "Rule 701 does not permit a lay witness to express opinion as to matters which are beyond the realm of common experience and which require special skill and knowledge of an expert witness." <u>James River Ins. v. Rapid Funding, LLC</u>, 658 F.3d 1207, 1214 (10th Cir. 2011)(internal quotations omitted)(quoting <u>Randolph v. Collectramatic, Inc.</u>, 590 F.2d 844, 846 (10th Cir. 1979)). District courts should not allow treating physicians testifying as lay witnesses to voice their opinions based on their specialized knowledge about their diagnoses and opinions

as to what caused their patients' injuries; according to Stephen A. Saltzburg et. al, <u>Federal Rules of Evidence Manual</u>, a physician can testify to what he observed:

> When the physician testifies that the plaintiff was coughing and running a fever, this is lay witness testimony governed by Rule 701. However, if the physician also testifies that he diagnosed the patient as having Reactive Airways Dysfunction Syndrome caused by exposure to a toxic chemical, then this is testimony based on scientific, technical, or other specialized knowledge and must be qualified under Rule 702.

Saltzburg et. al, <u>supra</u> § 701,02[7], at 701-18.

Although a treating physician can give what he or she perceived a patient to communicate about injuries' causes, a treating physician testifying as a lay witness cannot testify to medical opinions regarding causation, because such opinions require "knowledge derived from previous professional experience[, which] falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." <u>James River Ins. v. Rapid Funding, LLC</u>, 658 F .3d at 1215 (quoting <u>United States v. Smith</u>, 640 F.3d 358, 365 (D.C. Cir. 2011)). See <u>N.K. by Bruestle-Kumra v. Abbott Labs.</u>, 731 F. App'x at 26 ("[I]f Plaintiffs proffered Dr. Lewis as a non-expert factual witness, she could not provide the expert testimony required to establish causation."); <u>Bynum v. MVM, Inc.</u>, 241 F.R.D. at 54 ("Without an expert report, a treating physician may not testify as to issues of causation, foreseeability, prognosis, and permanency." (internal quotation marks omitted)(<u>Kirkham v. Societe Air France</u>, 236 F.R.D. 9, 11 (D.D.C. 2006)); <u>United States v. Henderson</u>, 409 F.3d 1293, 1300 (11th Cir. 2005)(holding that physician's testimony about an injury's cause was "a hypothesis" and therefore not lay testimony); <u>Witherspoon v. Navajo Ref. Co.</u>, 2005 WL 5988650, at *2 (concluding that physician who treated the plaintiffs in a toxic tort case, not disclosed under rule 26(a)(2), could testify only to "observations and treatment developed while actually treating Plaintiffs," and could not testify to "any causation opinions drawn"); 6

Jones on Evidence § 39:64 (7th ed.)("There is authority that a treating physician may describe an injury he or she examined and treated without complying with the rules governing expert testimony, but, if not listed as an expert, may not express an opinion as to its precise cause.").

A treating physician's opinions regarding diagnoses of a medical condition are often expert testimony, because diagnosis requires judgment based on scientific, technical, or specialized knowledge. See James River Ins. v. Rapid Funding, LLC, 658 F.3d at 1214 (holding that a calculation involving depreciation is improper lay testimony, because "[t]echnical judgment is required in choosing among different types of depreciation"). "Diagnosis has been defined as 'the use of scientific or clinical methods to establish the cause of a person's illness' . . . [and, therefore,] seem[s] to fall beyond the scope of permissible lay testimony." Beane & Karatinos, supra, at 27 (quoting Taber's Cyclopedic Medical Dictionary 557 (Donald Venes & Clayton Thomas eds., 19th ed. 2001)). There are cases, however, where a diagnosis may be lay testimony, because it is within the province of the common person or requires limited expertise. See James River Ins. v. Rapid Funding, LLC, 658 F.3d at 1214 ("Rule 701 allows lay witnesses to offer observations that are common enough and require a limited amount of expertise, if any." (internal quotations and alterations omitted)(quoting United States v. VonWillie, 59 F.3d 922, 929 (9th Cir. 1995))); United States v. Henderson, 409 F.3d at 1300 (noting that the "diagnosis . . . that [the plaintiff]'s jaw was fractured, would be permissible lay testimony."). For instance, diagnosing that a patient suffers from a complicated medical condition is expert testimony. See Frazier v. Ind. Dep't of Labor, No. IP01-0198-C-T/G, 2003 WL 21254424, at *4 (S.D. Ind. March 17, 2003)(Tinder, J.)("Any specific diagnoses of the plaintiff's [medical, psychological or psychiatric conditions] . . . require expert testimony."); Hahn v. Minn. Beef Indus., Inc., No. Civ.002282(RHK/SRN), 2002 WL 32658476,

at *3 (D. Minn. May 29, 2002)(Kyle, J.)("Depression and anxiety disorder are complex injuries, requiring expert (as opposed to lay) testimony regarding diagnosis and causation."). In <u>Ferris v. Pennsylvania Federation Brotherhood of Maintenance of Way Employees</u>, 153 F. Supp. 2d 736 (E.D. Pa. 2001)(DuBois, J.), where the plaintiff asked that the treating physician be allowed to testify to diagnosis as a lay witness, the United States District Court for the Eastern District of Pennsylvania concluded that a treating psychologist could not "testify regarding any specific medical diagnosis of [the plaintiff's] mental ailments as the conditions from which he suffers -- depression and anxiety disorder -- are complex injuries beyond the knowledge of a layperson." 153 F. Supp. 2d at 746.

The Court, therefore, will adhere to its conclusions in <u>Montoya v. Sheldon</u>.[20]  The Court will permit a treating physician to testify to observations of their patient, statements from a patient about causation, and basic conclusions within lay witnesses' grasp. <u>See</u> 286 F.R.D. at 619.  The Court will exclude testimony from treating physicians on complicated diagnoses, prognoses, and causation. <u>See</u> 286 F.R.D. at 619.  In <u>Montoya v. Sheldon</u>, the Court considered about what to

---

[20]On a clean slate, the Court would allow treating physicians to testify to the opinions on diagnoses and causation that the treating physicians developed while treating the patient.  In litigation, parties produce medical records.  A party with access to medical records recording the treating physicians' contemporaneous diagnoses and opinions on causation cannot be wholly surprised when the treating physician voices those opinions in a deposition or a trial.  Treating physicians rarely remember every patient and every diagnosis, and usually have to look at their notes to testify -- the same notes and medical records that a party likely provides to the opposing party.  If rule 26's disclosure requirements seek to prevent surprise as to what a witness will testify at deposition or trial, disclosing treating physicians' opinions only minimally contributes to the goal.  At best, the disclosure requirements ease the parties' workload by resulting in concise summaries of the treating physicians' opinions as opposed to pages of medical records.  The Court would, if it could, allow treating physicians to state what they did and thought when treating a patient, but the Court would not allow them to testify about opinions that they formed after litigation began or in preparation for litigation.

allow treating physicians treating a plaintiff to testify regarding the plaintiff's panic attacks and PTSD. See 286 F.R.D. at 619. The Court permitted the treating physician to "testify to any of D. Montoya's panic attacks that she perceived, and D. Montoya's descriptions of the panic attacks he suffered." 286 F.R.D. at 619. "Dr. Bath can also refer to them as 'panic attacks,'" because lay witness' experiences embrace such conclusions and terminology. 286 F.R.D. at 619. The Court also allowed the treating physician to state that the plaintiff informed her that the panic attacks began after the defendants' alleged unconstitutional action. See 286 F.R.D. at 619. The Court reasoned that none of this permitted testimony required scientific, technical or specialized knowledge. See 286 F.R.D. at 619. The Court explained that it would preclude the treating physician from testifying to her opinion whether the alleged unconstitutional conduct caused the panic attacks or her diagnosis of the plaintiff with PTSD, because mental disorders are complicated and beyond a lay witness' realm of experience. See 286 F.R.D. at 620. Further, the Court would not allow the treating physician to testify

> to any of her future projections, including: (i) if D. Montoya's [(the plaintiff's)] panic attacks will continue or for how long; (ii) how long D. Montoya may continue to suffer from any mental disease with which she diagnosed him at time she treated him; (iii) how she anticipates that D. Montoya's condition will lessen or become more severe; and (iv) the amount of damages D. Montoya will require to treat his condition.

286 F.R.D. at 620.

## ANALYSIS

Because Walker indicates that she will call neither Dr. Harvie nor Rodriguez as experts at trial, the Court will not address the Defendants' arguments to exclude them as experts at trial. See Disclosure Response at 1; Tr. at 11:25-12:5 (Court, Ball). The Court will allow Patterson to testify as an expert witness, because the Court concludes that the Patterson Report meets the

Discovery Order's and rule 26(a)(2)'s requirements. Moreover, even if the Patterson Report does not meet the Discovery Order's and rule 26(a)(2)'s deadline, the Court concludes that Walker's failure to formally disclose Patterson as an expert witness is harmless. The Court, thus, will deny the Disclosure Motion, in part. Walker's failure to disclose the treatment providers as experts is also harmless. Accordingly, the Court will not limit the treatment providers' testimony and will deny the Treatment Provider Motion.

## I.  THE COURT WILL NOT EXCLUDE PATTERSON'S TESTIMONY FOR FAILURE TO DISCLOSE.

The Court will not exclude Patterson's expert testimony for Walker's alleged failure to disclose Patterson as an expert. First, the Court concludes that, by providing the Defendants the Patterson Report, Walker satisfies the Discovery Order and rule 26(a)(2). Second, the Court concludes that, even if the Patterson Report does not satisfy the Discovery Order and rule 26(a)(2), Walker's failure to satisfy the requirement is harmless.

### A.  WALKER PROVIDED PATTERSON'S EXPERT REPORT WITHIN THE DEADLINE.

The Court concludes that Walker satisfied the Discovery Order's and 26(a)(2)'s disclosure requirements. The Defendants contend that Walker should have submitted a formal disclosure listing the expert witnesses that she plans to call. See Tr. at 12:23-13:1 (Ball). The Defendants differentiate this disclosure from the Patterson Report; the Defendants understood that "the Court had required an expert disclosure where plaintiffs would list each of the experts that they were going to call." Tr. at 13:5-7 (Ball). The Court disagrees with the Defendants and concludes that the Patterson Report, without a separate formal disclosure, suffices as an expert disclosure.

The Defendants cite the Discovery Order and rule 26(a)(2)(A)(1) for the proposition that Walker is required to submit a "formal disclosure" identifying her expert witnesses. Disclosure Motion at 2-4. Rule 26(a)(2)(A)(1) states: "In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present." Fed. R. Civ. P. 26(a)(2)(A)(1). The Discovery Order provides:

> Parties must disclose the names of all expert witnesses, including treating physicians, the subject matter on which the experts will present evidence, and a summary of the facts and opinions to which the experts are expected to testify by this date. Experts who are retained or specifically employed to provide expert testimony must also submit an expert report by this date. _See_ Fed R. Civ. P. 26(a)(2). The parties must have their retained expert(s) ready to be deposed at the time they identify them and provide their reports. Expert witnesses who are not required to provide a written report may be deposed before summary disclosure.

Discovery Order at 2, n.2.

> Rule 26(a)(2)(B) discusses accompanying an expert disclosure with a "written report":

> Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report -- prepared and signed by the witness -- if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony

Fed. R. Civ. P. 26(a)(2)(B). The Court notes that the word "accompanied" could suggest that the expert disclosure and written report are separate items; the word might reflect that the expert disclosure should come alongside the written report.

The Court does not, however, agree with the Defendants that the expert disclosure must be a separate, formal disclosure or discrete, explicit statement. The purpose of such disclosures as the expert disclosure and the expert report is "to eliminate surprise and provide opposing counsel with enough information . . . to prepare efficiently for deposition, any pretrial motions and trial." Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d at 1121-22. The expert report "exists to 'set forth

the substance of the direct examination.'" Leon v. FedEx Ground Package Sys., Inc., 2016 WL 1158079, at *11 (quoting Fed. R. Civ. P. 26 advisory committee's notes). The rule 26(a)(2)(B) provisions' language reflects that the expert report identifies who the party may introduce as an expert at trial and to what evidence the expert might testify; the report requires "a statement of the compensation to be paid for the study and testimony in the case," Fed. R. Civ. P. 26(a)(2)(B)(vi); "any exhibits that will be used to summarize or support [the expert's opinion]," Fed. R. Civ. P. 26(a)(2)(B)(ii); and "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition," Fed. R. Civ. P. 26(a)(2)(B)(v). The Discovery Order similarly requires disclosure of a collection of information, including the expert's identity, the proposed testimony's subject matter, and proposed testimony's opinions and facts. See Disclosure Motion at 2. The Court sees no sound reason why one document cannot accomplish these several tasks. See Severance v. Chastain, No. 4:15-CV-74 CAS, 2018 WL 5995393, at *4 (E.D. Mo. Nov. 15, 2018)(Shaw, J.)(conflating the expert report and the expert disclosure requirement and stating that rule 26(a)(2)(A) "requires the disclosure of expert testimony to include a list of the witness's publications"); Zottola v. Anesthesia Consultants of Savannah, P.C., 169 F. Supp. 3d 1348, 1359 (S.D. Ga. 2013)(Hall, J.)(treating an expert report as capable of satisfying the disclosure requirement and precluding sanctions under Fed. R. Civ. P. 37(c) and stating "[p]laintiff did not identify Mr. Espinoza as an expert, provide any qualifications for him, provide an expert report for him, or show that the failure to disclose him was substantially justified"); Experts, MECLE-PGDD § 20.2.4 ("The federal scheduling order requires that for all experts who must be disclosed under Fed. R. Civ. P. 26(a)(2)(A), disclosure must be made by providing "a complete statement of all opinions to be expressed and the basis and reasons therefor"

(quoting Fed. R. Civ. P. 26(a)(2)(A)(2)).  Cf. C. Expert Discovery, Sword & Shield: Prac. Approach to Sec. 1983 Litig. § 2.VII.C (discussing the expert disclosure and expert report as separate items and stating: "[f]or any such witness who is either retained to provide expert testimony in the case or is an employee who regularly provides expert testimony, the party must also provide" an expert report but not noting that the expert report cannot satisfy the disclosure requirement); Robert Matthew Lovein, A Practitioner's Guide: Federal Rule of Civil Procedure 26(a) -- Automatic Disclosure, 47 Syracuse L. Rev. 225, 260 (1996)(discussing a disclosure requirement and a separate expert report requirement but not stating that the report cannot satisfy the disclosure requirement).  Disclosing an expert report with a proposed expert's name notifies the opposing party that the party might call the expert at trial.  This function fulfills the expert disclosure's role: "a party must disclose to the other parties the identity of any witness it may use at trial." Fed. R. Civ. P. 26(a)(2)(A).  Accordingly, the Court concludes that Walker is not required to produce a separate, expert disclosure outside the Patterson Report.

The Court further concludes that Walker produced the Patterson Report, which identifies Patterson as an expert and contains information on which he might testify, in a timely manner. Walker submitted the Patterson Report on July 27, 2017.  See Disclosure Motion at 1.  Rule 26(a)(2)(D) requires a party to "make . . . disclosures at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  The Discovery Order requires Walker to fulfill her rule 26(a)(2) disclosures by May 2, 2018.  See Discovery Order rule 26(a)(2).  July 27, 2017, is nearly eight months before May 2, 2018, and, thus, Walker did not miss the deadline to disclose her witnesses.

**B.    EVEN IF PATTERSON'S EXPERT REPORT WERE NOT A SUFFICIENT DISCLOSURE, WALKER'S ERROR WAS HARMLESS.**

The Court concludes that, even if Walker's expert disclosure was insufficient or untimely, the late disclosure was harmless. The Defendants contend that, as Walker did not disclose that she intended to use Patterson at trial as an expert witness, the Defendants could not use their time to prepare for his expert testimony. See Disclosure Motion at 5. The Defendants further argue that, because Patterson has not supplemented the Patterson Report with cost-of-living damages, the Defendants will suffer prejudice from their lack of access to that proposed testimony. See Disclosure Reply at 2. As Walker indicated at the hearing that she would not seek cost-of-living damages and that the Patterson Report contains all information to which Patterson will testify at trial, see Tr. at 15:23-25 (Court, A. Ayala); id. at 16:10-13 (A. Ayala), the Court will not address the Defendants' latter argument. Regarding the Defendants' first argument, the Court reasons that: (i) the Defendants suffer little to no prejudice or surprise from Walker's actions, because, in July, 2017, Walker notified the Defendants of Patterson's proposed testimony in the Second Interrogatories Response and Patterson Report; (ii) if the Defendants suffered prejudice, such prejudice was curable, because the Defendants could have spoken with Walker or with the Court about the prejudice; (iii) Walker's actions will not disrupt trial, because Walker has had over a year and six months to determine how to address the Patterson Report's information; and (iv) there is no evidence of bad faith or willfulness on Walker's part. See Woodworker's Supply, Inc. v. Principal Mut. Life Ins., 170 F.3d at 993.

First, the Defendants have suffered little to no prejudice, or surprise, from Walker's action. Walker indicates in her Second Initial Disclosures that she will call Patterson as an expert witness and provide the Patterson Report well before trial; on July 3, 2017, Walker identified Patterson as

an expert witness in the Second Initial Disclosures and, on July 27, 2017, Walker provided the Patterson Report, and the trial is scheduled for February 11, 2019.  See Disclosure Motion at 1; Disclosure Response ¶ 3, at 1-2; Notice of Hearing, filed November 29, 2018 (Doc. 101).  The Defendants received notice of Walker's intent to call Patterson through the Second Initial Disclosures and obtained the Patterson Report, containing the information on which he might testify, before deposing Patterson, which they did on April 4, 2018, for two-and-a-half hours. See Disclosure Response ¶ 3, at 2.  The Defendants have had more than a year and six months to prepare a response to Patterson's proposed testimony based on the Patterson Report and they have had more than eight months to prepare a response based on Patterson's deposition.  Cf. Coffey v. United States, 2012 WL 2175747, at *12-13 (deeming no prejudice to a party when the party had ten months to find an expert); Wheeler Peak, LLC v. L.C.I.2, Inc., 2010 WL 611141, at *3 (deeming seven months between receiving an expert report and a deposition sufficient time to counsel against concluding that the delay in disclosing the report caused prejudice); Kerns v. Bd. of Comm'rs of Bernalillo Cty., 2010 WL 1632732, at *7 (stating that defendants who had the information in a late-provided supplemental report and had time to depose the expert suffered little prejudice); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 2009 WL 3672502, at *5 (emphasizing that disclosure soon before trial was prejudicial); Gulfstream Worldwide Realty, Inc. v. Philips Elecs. N. Am. Corp., 2007 WL 4707080, at *4 (concluding that seven weeks between receiving an expert report and deposing the expert did not result in prejudice).  The Defendants' strongest argument is that, without a formal disclosure informing them that Walker would call Patterson as an expert, the Defendants have lost time preparing a response to Patterson's proposed testimony.  See Disclosure Motion at 5-6.  The facts, however, counter the Defendants' contention,

because they demonstrate that the Defendants have had considerable time to prepare such a response.

Second, the Defendants could have cured any prejudice or surprise that they suffered by communicating with Walker whether she would call Patterson as an expert witness. The Defendants took this option in leaving Patterson's deposition open and speaking with Walker about supplementing the Patterson Report with cost-of-living evidence. See Disclosure Response at 2. Cf. Coffey v. United States, 2012 WL 2175747, at *12-13 (stating that a party could cure prejudice by seeking relief from the other party or the Court, and noting that the party was on notice of the expert's opinions). The Court, accordingly, is not persuaded that the Defendants incurably lost their valuable resource -- time. See Disclosure Motion at 5. The Defendants have shown that they knew how to cure any prejudice or surprise that Walker caused.

Third, the Defendants have provided little evidence that Walker's actions will disrupt the trial. The Defendants have had more than a year and six months to find an expert, and to prepare their response to Patterson's proposed testimony at trial; they even had more than eight months to prepare for Patterson's deposition and a similar amount of time to prepare their response to Patterson's deposition. Cf. Leon v. FedEx Ground Package Sys., Inc., 2016 WL 1158079, at *12-14 (concluding that a last-minute disclosure would disrupt trial); Coffey v. United States, 2012 WL 2175747, at *12-13 (deeming that a party would not disrupt trial where the party had ten months to prepare before trial); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 2009 WL 3672502, at *5 (stating that prejudice from a tardy disclosure was incurable when trial had already started); Gulfstream Worldwide Realty, Inc. v. Philips Elecs. N. Am. Corp., 2007 WL 4707080, at *4 (stating that an expert report provided four months before trial would not disrupt trial). The

Defendants cannot plausibly argue that they have not had the opportunity to reasonably prepare for Patterson's testimony. See Disclosure Motion at 5-6. Given the amount of time that the Defendants have had to prepare, the Court concludes that the trial will not be disrupted.

Finally, there is no evidence that Walker acted willfully or in bad faith. The Defendants contend simply that, because Walker did not file an expert disclosure within the deadline, Walker acted willfully or in bad faith. See Disclosure Motion at 6. Walker, however, filed the Patterson Report many months before the May 2, 2018, deadline. See Disclosure Motion at 1-2. Even if Walker should have filed a formal disclosure stating that she might call Patterson as an expert at trial, that she filed the Patterson Report recounting Patterson's proposed testimony suggests that she attempted to disclose Patterson as an expert witness, and was not acting willfully or in bad faith to shirk her duty to disclose him.

## II. THE COURT WILL NOT LIMIT THE TREATMENT PROVIDERS' TESTIMONY, BECAUSE WALKER'S FAILURE TO DISCLOSE THE TREATMENT PROVIDERS AS EXPERTS IS HARMLESS.

Walker indicated that she plans to call Dr. Rachelson, Dr. Khalsa, Dr. Hamilton, and Miller at trial. See Tr. at 49:26-28 (A. Ayala). The Court concludes that Walker did not disclose the treatment providers as experts. Walker's failure to disclose the treatment providers was not substantially justified, but the failure was harmless. Accordingly, the Court will deny the Defendants' request that it preclude the treatment providers from testifying to their diagnoses and opinions on what caused Walker's injuries.

Preliminarily, the Defendants ask that the Court follow Montoya v. Sheldon and exclude the treatment providers' diagnosis and opinions on what caused Walker's injuries. See Response at 4-5 (citing Montoya v. Sheldon, 286 F.R.D. at 613-14). The Court concludes that it will follow

its decision in <u>Montoya v. Sheldon</u> to determine what testimony from the treatment providers is expert testimony, and that the information that the Defendants seek to exclude constitutes expert testimony. Although describing observations of Walker's symptoms or observations from meetings with Walker constitutes lay witness testimony, if the treatment providers testify to their diagnoses of Walker's injuries or the causes for Walker's injuries, they will be providing expert testimony. <u>See</u> Saltzburg et al., <u>supra</u> § 701,02[7], at 701-18 (noting that a treating physician could testify as a lay witness to the fact that a patient was coughing). The Court does not have before it a summary of the treatment providers' proposed testimony. The Court looks to the Defendants' summaries of Dr. Rachelson's, Dr. Khalsa's, Dr. Hamilton's, and Miller's depositions for the treatment providers' potential testimony. Were Dr. Rachelson to state that the collision with Spina caused Walker's knee pain or detail Walker's diagnosis of arthritis, such testimony would be expert testimony. <u>See</u> <u>Montoya v. Sheldon</u>, 286 F.R.D. at 619 (allowing the treating physician to testify to the plaintiff's description of his panic attacks and to state that the plaintiff's panic attacks increased after the defendants' alleged unconstitutional conduct). Similarly, Dr. Khalsa would be opining as an expert witness were he to state that the collision with Spina was the cause of Walker's sprain or strain or to give a medical diagnosis for the injury. <u>See</u> <u>Montoya v. Sheldon</u>, 286 F.R.D. at 619. Finally, because mental conditions are complicated, if Dr. Hamilton or Miller testify to diagnosing Walker with PTSD or opine that the collision with Spina caused the PTSD, they would be providing expert testimony. <u>See</u> <u>Montoya v. Sheldon</u>, 286 F.R.D. at 620 (precluding a treatment provider from testifying as a lay witness to a PTSD diagnosis).

The Court will exclude the treatment providers' expert testimony if Walker did not disclose the treatment providers as experts and the failure to disclose was not substantially justified or

harmless. Fed. R. Civ. P. 37(c)(1). First, the parties do not dispute that Walker did not disclose the treatment providers as expert witnesses, and the Court concludes that Walker did not disclose the treatment providers as experts. See Treatment Provider Motion ¶ 5, at 3; Treatment Provider Response ¶ 1-5, at 1-3; Treatment Provider Reply at 1; Tr. at 38:24-39:3 (A. Ayala). Walker is correct that she did not need to provide an expert report for the treatment providers, whom she has neither retained nor specially employed and who are not Walkers' employees. See Fed. R. Civ. P. 26(a)(2)(B); Tr. at 38:24-39:3 (A. Ayala). For such experts, Walker should have, however, provided a summary of "the subject matter on which the witness is expected to present evidence," and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). Walker has not done what the rule requires. Although Walker mentions the subject matter on which the treatment providers might testify in the Joint Status Report at 5-6, and asserts that she provided similar information on Dr. Hamilton in the Answer to Interrogatories and First and Second Initial Disclosures, see Treatment Provider Response at 2; Tr. at 39:3-11 (A. Ayala), the Joint Status Report does not summarize the opinions to which the proposed experts would testify, see Joint Status Report at 5-6, and the Court has not seen the summary that Walker provided for Dr. Hamilton. See Cripe v. Henkel Corp., 858 F.3d 1110, 1112-13 (7th Cir. 2017)(concluding that treating physicians who "summarize[d] the plaintiff's narration of symptoms and propose[d] a course of treatment" without describing the opinions that they would offer at trial did not satisfy rule 26(a)(2)(C)(ii)'s disclosure requirements); Duran v. Home Depot USA, Inc., 2014 WL 12601509, at *2 (describing as insufficient summaries of treating physician testimony stating that the treatment providers will testify on the "Plaintiff's injuries, medical care, treatment, rehabilitation, the success of treatment and the need for future treatment," and "that the treating

physician's evaluation and opinions are contained in the medical records previously provided to Defendant" because such "boilerplate disclosure states nothing about the facts and opinions to which each of the treating physicians will testify"). Accordingly, Walker has not followed rule 26's disclosure requirements.

Second, the Court concludes that Walker's actions were not substantially justified. See Fed. R. Civ. P. 37(c)(1). Walker has provided no evidence to show that her failure to disclose the treatment providers as experts was "substantially justified." Fed. R. Civ. P. 37(c)(1). Walker stated that any failure to disclose was only inadvertent. See Tr. at 49:26-28 (A. Ayala).

Finally, the Court, however, concludes that Walker is correct that any failure to disclose the treatment providers as experts was harmless. See Tr. at 47:16-48:6 (A. Ayala). First, the Court concludes that the Defendants have not suffered prejudice or surprise. Although Walker did not alert the Defendants that the treatment providers might act as experts or provide the Defendants with the opinions that the treatment providers might provide as experts, the potential expert testimony that Walker plans to elicit from the treatment providers likely does not surprise the Defendants. The medical records, Answer to Interrogatories, and First and Second Initial Disclosures notify the Defendants about the treatment providers, and disclose information about the treating physicians' diagnoses and statements about the causes for Walker's injuries. The Court doubts that testimony from the treatment providers about such information would surprise the Defendants; that the Defendants raise their concerns about what they expect Walker might elicit from the treating physicians suggests that the Defendants anticipate such testimony. Further, the Defendants have had time to prepare for such testimony and have prepared for such testimony. The Joint Status Report, identifying the treatment providers, except Dr. Hamilton, as witnesses

was filed on January 2, 2017, which is more than a year before the trial date.  Cf. Coffey v. United States, 2012 WL 2175747, at *12-13 (determining that a party suffered no prejudice when the party had had ten months to prepare for an expert's testimony).  The Defendants deposed the treatment providers for approximately two-and-a-half hours each, and the deposition transcripts reveal that the Defendants questioned at least Dr. Rachelson about her opinions regarding the causes for Walker's knee injury.  See Rachelson Depo. at 12:6-8; id. at 11-12.  Further, according to Walker, the Defendants have expert witnesses aligned to rebut the treatment providers' testimony.  See Tr. at 41:8-47:15 (A. Ayala).

Some factors counsel toward concluding that the Defendants suffered prejudice or surprise. The Defendants did not anticipate that the treatment providers might act as experts and did not have access to the opinions that the experts might provide, and so the Defendants have not approached the depositions or the trial accordingly.  See Tr. at 48:17-18 (Ball).  See McCann v. Miller, 502 F. App'x at 172 (upholding a district court's decision to preclude a treating physician's testimony on causation and prognosis when the testifying physician's proponents did not disclose their intent to call the treating physician as an expert until shortly before trial and noting that, at that point, the trial court was not obliged to postpone the trial).  The Defendants could rely on Montoya v. Sheldon to identify what the Court deemed expert testimony, and the Defendants explained that, in their depositions, they focused on Walker's participation in the Senior Olympics. See Tr. at 36:1-9 (Ball).  Moreover, Walker did not clarify that she might elicit expert testimony from the treatment providers until the Defendants filed their Disclosure Motion, and the Court is uncomfortable excusing Walker's failure to disclose based on Walker's attempt to correct her mistake only after facing potential sanctions.  The Court, however, concludes that more factors

counsel toward concluding that the Defendants are not surprised or prejudiced.[21]

Second, any prejudice is curable. The Defendants might have cured the prejudice by anticipating that Walker might elicit expert testimony from the treatment providers and strategizing for the depositions with such concerns in mind. The Defendants engage in such anticipation in the Treatment Provider Motion by noting that Walker might elicit expert testimony from the treatment providers. The Defendants also might have contacted the Court or Walker with their concerns about the treatment providers' testimony. Cf. Coffey v. United States, 2012 WL 2175747, at *12-13 (stating that a party could cure prejudice by seeking relief from the other party or the Court, and noting that the party was on notice of the expert's opinions).

Third, the failure to disclose the treatment providers as experts will not disrupt the trial. The trial is set for approximately seven weeks from the date that the Court publishes this opinion.

---

[21]Although the Court concludes that the Defendants are not prejudiced or surprised, the Court is also concerned that this conclusion undermines rule 26. Because medical records might frequently alert parties to the specialized knowledge on which treating physicians may testify, concluding that a party is never prejudiced by an opposing party's failure to disclose a treating physician as an expert undermines the disclosure requirements of rule 26. Although the medical records might alert a party to potential expert testimony, if a party has only the medical records from which to prepare for depositions and trial, following rule 26 at least alleviates some guesswork that remains about what a treating physician may testify. As rule 26 exists, a party should not have to anticipate, without information from opposing counsel, that a treating physician will act as an expert every time the party obtains medical records. Cf. Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d at 1121-22 (describing that rule 26 is "to eliminate surprise and provide opposing counsel with enough information . . . to prepare efficiently for deposition, any pretrial motions and trial"); Fed. R. Civ. P. 37 advisory committee's notes ("This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56."). Moreover, the Court is uncomfortable adopting an approach that would essentially alleviate a party's need to adhere to the Federal Rules of Civil Procedure. Parties in Walker's position should not be able to avoid repercussions for ignoring their obligations under the Federal Rules of Civil Procedure.

As noted in the preceding paragraph, the Defendants have Walker's medical records, deposed the treatment providers for approximately two-and-a-half hours each, and have an expert prepared to rebut the treatment providers' testimony.  Cf. Coffey v. United States, 2012 WL 2175747, at *12-13 (deeming that a failure to disclose would not disrupt trial where the party could prepare before trial to respond to the non-disclosed information).

Fourth, no evidence reflects that Walker acted willfully or in bad faith in not disclosing the treatment providers as experts.  Neither party puts forth any reason for Walker's failure to disclose other than her inadvertence.  Accordingly, the factors for determining whether a party's failure to disclose was harmless point toward deeming harmless Walker's failure to disclose the treatment providers as experts.[22]

The Court makes no blanket assertion that counsels' failures to disclose treating physicians as experts are always harmless, but, on the facts before the Court, the Court is convinced that the Defendants suffer little, if any, surprise or prejudice.  The Defendants have Walker's medical

---

[22]That Walker's failure to disclose the treatment providers is harmless reveals that the 2000 amendments to the Federal Rules of Evidence were probably wrong and have not been helpful. Disclosure under rule 26's disclosure requirements is often not necessary to prevent treating physicians' testimony from surprising opposing counsel.  A patient's medical records likely contain the information on which a treating physician may testify; the medical records at least include the information regarding the opinions that the treating physician developed while treating the patient.  The treating physician likely cannot remember more than what he or she can read in the medical records, so the testimony is probably contained.  Rule 701's requirements restricting lay witness testimony to testimony not based on specialized knowledge, nevertheless, puts much treating physician testimony under rule 26's expert disclosure requirements.  If treating physicians' testimony cause opposing counsel little or no surprise or prejudice, however, courts have no basis under rule 37 to exclude expert testimony from treating physicians whom a party did not properly disclose.  Although the Court would not say that all failures to disclose treating physicians as experts are harmless, that rule 701 and rule 26 distinguish between treating physicians as lay witnesses and expert witnesses, and require parties to disclose treating physicians who will testify as experts becomes less important if the harmless-failure-to-disclose analysis leads courts to admit treating physicians' expert testimony.

reports, deposed the treatment providers, and obtained an expert to reply to the treatment providers. Further, the Defendants did not ask for Walker to disclose the treatment providers as experts before the depositions; they did not request that Walker summarize the treatment providers' expert opinions in preparation for depositions or trial. Rather, not long before trial, the Defendants discovered a technicality to impede the treatment providers' testimony. The Court is willing to mitigate any prejudice or surprise to the Defendants that information of which the Defendants were unaware caused. So far, however, the Defendants have not identified such information. The Court, moreover, is concerned that excluding the treatment provider's testimony may cause Walker to suffer more than the Defendants here, who may suffer no prejudice. If Walker loses all her experts, Walker loses much of her case. The Defendants' minimal to nonexistent surprise or prejudice does not outweigh this threat to Walker's case. Accordingly, the Court denies the Treatment Provider Motion.

IT IS ORDERED that: (i) the Defendants' Motion to Exclude Plaintiff's Expert Witnesses William J. Patterson, III, Keith W. Harvie, D.O. and Dr. Michael Rodriguez, filed July 27, 2018 (Doc. 58), is granted in part and denied in part; (ii) pursuant to Walker's representations, Dr. Keith Harvie and Michael Rodriguez cannot testify at trial; (iii) William Patterson may testify at trial as an expert on hedonic damages only; and (iii) the Defendants' Motion to Limit the Testimony of Plaintiff's Treatment Providers and Exclude Improper Expert Testimony, filed August 30, 2018 (Doc. 71), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Shavon M. Ayala
Ayala P.C.
Albuquerque, New Mexico

--and--

Anthony James Ayala
Law Offices of Anthony James A. Ayala
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Allison M. Beaulieu
Raul P. Sedillo
Butt Thornton & Baehr PC
Albuquerque, New Mexico

      *Attorneys for the Defendants*