# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SHIRLEY J. WALKER,

      Plaintiff,

vs.                                                                    No. CIV 17-0991 JB\SCY

GREGORY J. SPINA, VALLEY
EXPRESS, INC., and GREAT WEST
CASUALTY COMPANY,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendants' Motion to Exclude Expert Testimony of William Patterson, filed August 30, 2018 (Doc. 72)("Motion"). The Court held a hearing on November 21, 2018. The primary issues are: (i) whether the Court should allow William Patterson, an economic consultant from Albuquerque, New Mexico, <u>see</u> Curriculum Vitae at 1, filed September 6, 2018 (Doc. 75), to testify to the hedonic damages that Plaintiff Shirley Walker suffered from her automobile accident with Defendant Gregory J. Spina, who Defendant Valley Express, Inc. employed; and (ii) whether the Court should exclude the Patterson Report (dated June 6, 2017), filed August 30, 2018 (Doc. 72-1). The Court will grant the Motion in part and deny it in part. Pursuant to the United States of America Court of Appeals for the Tenth Circuit and persuaded by other New Mexico federal district court opinions, the Court will preclude Patterson from quantifying S. Walker's hedonic damages or providing a benchmark figure for her hedonic damages. The Court will allow Patterson to testify generally about hedonic damages, including what they are and the factors considered in valuing them. The Court will preclude admission of the Patterson Report at trial.

## FACTUAL BACKGROUND

The Court recited this case's facts and early procedural history in its Memorandum Opinion and Order at 2-3, 2018 WL 4100944, at *1, filed August 28, 2018 (Doc. 67). The Court incorporates that recitation here. The footnotes in the quotations are in the original.

> The Court takes its facts from S. Walker's Complaint for Personal Injuries and Damages (First Judicial District Court, County of Santa Fe, State of New Mexico), filed December 23, 2016, filed in federal court September 29, 2017 (Doc. 1-1)("Complaint"). The Court provides these facts for background. It does not adopt them as the truth, and it recognizes that the facts are largely S. Walker's version of events.
>
> On July 23, 2015, Defendant Gregory J. Spina was speeding on U.S. Highway 84/285 in a commercial vehicle that Defendant Valley Express, Inc. owned. See Complaint ¶¶ 6-7, at 2. As Spina approached a red light, he realized that he was going too fast to brake, so, instead of hitting the vehicles stopped side by side in front of him, he attempted to slip between them. See Complaint ¶ 7, at 2. Rather than avoiding the stopped vehicles, however, he sideswiped both of them, causing both cars to roll into the intersection. See Complaint ¶ 7, at 2-3. S. Walker was driving one of the sideswiped vehicles and, because of Spina's actions, suffered physical and emotional injuries. See Complaint ¶¶ 7, 11, at 2-4.

MOO at 2, 2018 WL 4100944, at *1.

## PROCEDURAL BACKGROUND

> S. Walker sues Spina and Valley Express, asserting negligence,[1] and sues Defendant Dixon Insurance Company, asserting that she has a claim for benefits against it under the [New Mexico Financial Responsibility Act, N.M. Stat. Ann. §§ 66-5-201 to -239] and Raskob[ v. Sanchez, 1998-NMSC-045, 970 P.2d 580] for injuries that Spina's negligence caused. See [S. Walker's Complaint for Personal Injuries and Damages (First Judicial District Court, County of Santa Fe, State of New Mexico), filed December 23, 2016, filed in federal court September 29, 2017 (Doc. 1-1)("Complaint")] ¶¶ 8-13, at 3-5. Spina and Valley Express removed the

---

[1] Although the Complaint does not make this claim explicit, S. Walker presumably sues Valley Express under respondeat superior.

MOO at 2, 2018 WL 4100944, at *1.

case to federal court on the basis of diversity jurisdiction. <u>See</u> Notice of Removal to the United States District Court for the District of New Mexico at 1, filed September 29, 2017 (Doc. 1)("Notice of Removal").

MOO at 2-3, 2018 WL 4100944, at *1. The Amended Complaint terminated Defendant Dixon Insurance Company as a Defendant and added, in its place, Defendant Great West Casualty Company. <u>See</u> Amended Complaint at 1.

S. Walker "indicated in discovery responses that she may call Mr. Patterson to testify regarding economic damages, including loss of household services, future medical expenses, and loss of value of enjoyment of life." Motion at 2. <u>See generally</u> Patterson Report. On July 27, 2018, the Defendants filed the Defendants' Motion to Exclude Plaintiff's Expert Witnesses William J. Patterson, III, Keith W. Harvie, D.O., and Michael Rodriguez, filed July 27, 2018 (Doc. 58)("Disclosure Motion"), in which they seek to exclude Patterson because S. Walker did not "provide an expert disclosure." Motion at 2. The Court addresses the Disclosure Motion in a separate Memorandum Opinion and Order, filed January 9, 2019 (Doc. 111).

In the Motion, the Defendants describe Patterson's proposed testimony. <u>See</u> Motion at 2-3. The Court summarizes that, and other, information about Patterson here to provide context for the Motion. Patterson is an economic consultant with Legal Economics, in Albuquerque. <u>See</u> Curriculum Vitae at 1. Patterson has a B.A. in economics from Carleton College, in Northfield, Minnesota and has served as an expert witness in several cases in New Mexico state and federal court. <u>See</u> Curriculum Vitae at 1, 4. According to Patterson, the collision with Spina cost S. Walker household services worth $141,599.00. Motion at 2 (citing Patterson Report at 1). Patterson specifies that S. Walker would pay $1,000.00 per year for medical expenses, <u>see</u> Motion at 3 (citing Patterson Report at 1). He also lists specific numbers for S. Walker's loss of enjoyment

of life.  See Motion at 3 (citing Patterson Report at 1).  He estimates that S. Walker suffered $10,000.00 a year in hedonic damages and calculates that the present value of these damages is $102,707.00.  Patterson Report at 1.  In the Patterson Report, Patterson includes his calculations for this $102,707.00 number.  See Patterson Report at 4.  On Wednesday, April 4, 2018, the Defendants deposed Patterson.  See Motion at 2 (citing generally Patterson Report; Deposition of William Patterson (Excerpts)(taken April 4, 2018), filed August 30, 2018 (Doc. 72)("Patterson Depo.").  The Monday before the Patterson Depo., Patterson received documents on S. Walker.  See Motion at 2 (citing generally Patterson Report; Patterson Depo.).  The documents -- "the Deposition Transcript of Shirley S. Walker's deposition; each of Ms. S. Walker's discovery responses and the supplements of those responses; medical records from various providers; Senior Olympics documents; and various pleadings," Motion at 2 n.1 (citing Patterson Depo. at 72:1-84:23) -- did not change Patterson's opinions, see Response at 2 (citing Patterson Depo. at 6:1-8; id. at 65:23-67:6).

1.     **The Motion.**

The Defendants argue that Patterson bases his opinions on "speculation and generalities," and not on facts, and that "his methods are not supported by economic principles or literature." Motion at 5.  In the Motion, the Defendants describe Patterson's methodology.  See Motion at 2-3.  According to the Defendants, "Patterson did not interview Ms. Walker prior to drafting the report of his opinions."  Motion at 2 (citing Patterson Depo. at 32:15-19).  The Defendants note that Patterson testified that his calculation for S. Walker's lost value in household services are based on Kathryn E. Walker and Margaret E. Woods' "Time Use, the Value of Household Production of Goods and Services," Motion at 2 (citing Patterson Depo. 34:16-23), in which K.

Walker and Woods "compiled data regarding time spent on household services for women under 55 who were employed and unemployed, and women over 55 who were employed and not employed," Motion at 3, and draw data from a 1967 to 1968 study of 1,296 families in Syracuse, New York, see Motion at 2. According to the Defendants, "[t]he Study did not take into consideration single women over 55 years of age who were not employed." Motion at 3 (citing Patterson Depo. at 39:8-22). The Defendants indicate that Patterson assumes such single women belong in the same category as married women over 55 years old but "d[oes] not know whether his assumption [is] correct." Motion at 3. According to the Defendants, Patterson testified that the $1,000.00 per year for medical expenses represents a "benchmark figure" and not an actual figure for S. Walker's medical expenses. Motion at 3 (citing Patterson Depo. at 48:20-24; id. at 49:2-50:7; id. at 51:1-16). Further, the Defendants explain that Patterson bases S. Walker's hedonic damages on the value of statistical lives, and "does not know what Ms. S. Walker's specific lost pleasure of life is." Motion at 3 (citing Patterson Depo. at 56:4-5).

According to the Defendants, the substance of Patterson's proposed testimony was found inadmissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)("Daubert"), and Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1245 (10th Cir. 2000), see Motion at 5, and such testimony "routinely is excluded," Motion at 5. The Defendants explain that courts and economic literature criticize "hedonic damages," and the "disparity of results reached in published value-of-life studies and trouble regarding their underlying methodology" have led courts to reject hedonic damages. Motion at 6. The Defendants indicate that "the trend is away from allowing expert opinion testimony on valuation of hedonic damages." Motion at 6 (citing McGuire v. City of Santa Fe, 954 F. Supp. 230, 233 (D.N.M. 1996)(Black, J.)). Although

the Defendants concede that courts have admitted "explanations of hedonic damages," the Defendants aver that Patterson proposes to testify only to inadmissible information on value-of-life studies and the value of S. Walker's hedonic damages. Motion at 7. The Defendants explain that Patterson relies on statistical-life values drawn "from governmental studies, such as wage differential or willingness to pay studies," which courts have recognized as "based on assumptions that have not been, and cannot be, validated." Motion at 8. According to the Defendants, because the statistical-life valuations are anonymous, hedonic damages valuations do not reflect the "injured individuals' loss of enjoyment of life." Motion at 8. The Defendants further note that Patterson has not "purport[ed] to give an opinion" on the value of S. Walker's loss of enjoyment of life or "a specific value the jury should award," but proffers only a "benchmark for the jury to consider." Motion at 8-9 (citing Patterson Report at 7; Patterson Depo. at 21-53:5). Courts, the Defendants note, have rejected such benchmark figures, because the figures do not reflect individual loss. See Motion at 9. According to the Defendants, Patterson's valuation assumes that S. Walker will live until ninety-one, but this estimation ignores S. Walker's "lifestyle," "medical history," age, and employment status. Motion at 10. The Defendants additionally argue that a jury can "understand and calculate" hedonic damages, and so, such damages do not aid the jury. Motion at 9. The Defendants further allege that Patterson points to no "peer-reviewed literature" supporting his methodology, Motion at 10, and that Patterson does not know in which category in K. Walker and Woods' "Time Use, the Value of Household Production of Goods and Services" S. Walker belongs, see Motion at 10 (citing Patterson Depo. at 41:11-15).

The Defendants also contend that Patterson speculates about S. Walker's "future medical expenses." Motion at 10. Patterson does not know S. Walker's required future medical treatment,

or the actual and inflationary rates for her medical treatment.  See Motion at 1.  Patterson, the Defendants argue, therefore, "proposed general future medical expenses."  Motion at 11.  Further, the Defendants aver that S. Walker does not distinguish between "timeframes for different forms of medical treatment," Motion at 11, but "lumps all treatment together into one of three general categories," Motion at 11.  The Defendants note that, although Patterson knows of no future medical expenses, he "proposes" to give the jury "'benchmark' figures of future expenses."  Motion at 11.  The Defendants argue that, given that Patterson bases such figures on "speculative and unidentified treatment," the testimony will not help the jury but will instead confuse the jury.  Motion at 11.

2.  **The Response.**

S. Walker replied on September 6, 2018.  See Response to Defendants' Motion to Exclude Expert Testimony of William Patterson at 6, filed September 6, 2018 (Doc. 75)("Response").  S. Walker begins by asserting that New Mexico law governs the issue, because the Court sits in diversity jurisdiction.  See Response ¶ 1, at 1.  S. Walker asserts that New Mexico state courts have permitted expert testimony on hedonic damages.  See Response ¶ 3, at 2.  According to S. Walker, New Mexico courts have repeatedly admitted Patterson's expert testimony on the substance to which he proposes to testify here.  See Response ¶ 2, at 2.  S. Walker notes that Patterson has a B.A. in economics; has taught economics; has written on "legal-economic topics," such as the value of life; and has testified "over 100 times" "in court."  Response at 2.  S. Walker indicates that, in Gurule v. Ford Motor Co., No. 29,296, 2011 WL 2071701, at *9-10 (N.M. Ct. App. Feb. 17, 2011), the Court of Appeals of New Mexico upheld the admission of Patterson's testimony on hedonic damages.  See Response ¶ 4, at 2.  S. Walker quotes Gurule v. Ford Motor

Co.: "We must evaluate the expert's personal knowledge and experience to determine whether the expert's conclusions on a given subject may be trusted." Response ¶ 4, at 2 (quoting Gurule v. Ford Motor Co., 2011 WL 2071701, at *8). S. Walker also notes that New Mexico has rejected the federal rules for experts and that New Mexico does not apply "the standard of scientific reliability" to experts testifying based on specialized knowledge. Response ¶ 4, at 3 (quoting Gurule v. Ford Motor Co., 2011 WL 2071701, at *8). S. Walker further avers that the Court of Appeals of New Mexico has rejected all arguments that the Defendants raise against Patterson's testimony. See Motion ¶ 4, at 5. S. Walker summarizes that, under New Mexico law, Patterson's testimony will aid the jury; Patterson is qualified to give an opinion on S. Walker's damages; and Patterson will base his testimony on his expertise. See Motion ¶ 4, at 5.

### 3. The Reply.

The Defendants replied on September 20, 2018. See Defendants' Reply in Support of Their Motion to Exclude Expert Testimony of William Patterson at 5, filed September 20, 2018 (Doc. 83)("Reply"). The Defendants argue that "[t]he admissibility of evidence in diversity cases in federal court is generally governed by federal law," Reply at 1 (quoting Sims v. Great Am. Life Ins., 469 F.3d 870, 880 (10th Cir. 2006)), and that the Court should apply "the Federal Rules of Evidence in determining the admissibility of expert testimony on the subject of hedonic damages," Reply at 1-2 (internal quotation marks omitted)(quoting BNSF Ry. v. LaFarge Sw., Inc., No. CIV 06-1076 MCA/LFG, 2009 WL 4279849, at *1 (D.N.M. Feb. 9, 2009)(Armijo, J.)). The Defendants reiterate that the Court should limit or exclude Patterson's testimony and repeat their arguments from the Motion. See Reply at 2-3. According to the Defendants, although the Tenth Circuit and New Mexico federal district courts "have allowed economists to testify about the

meaning of hedonic damages and how they differ from other damages," the Court should exclude computations of such damages. Reply at 4. The Defendants note that S. Walker ignores that a United States Magistrate Judge for the District of New Mexico prohibited Patterson "from testifying regarding benchmark figures or calculations of hedonic damages." Reply at 4 (citing Fuller v. Finley Res., Inc., No. CIV 14-0883 WPL/GBW, 2016 WL 3854053, at *3 (D.N.M. April 6, 2016)(Lynch, M.J.)). The Defendants request that the Court exclude Patterson's testimony and the Patterson Report from trial, or, in the alternative, limit Patterson's testimony and prohibit him "from testifying regarding calculations of loss of household services, Plaintiff's future medical expenses, and hedonic damages and providing benchmark figures to the jury." Reply at 4.

### 4. **The Hearing**.

At the hearing on November 21, 2018, S. Walker indicated her decision not to seek "loss of wages, cost of household services, future medical expenses, or medical care," and to seek only hedonic, quality-of-life, damages. See Draft Transcript of Hearing at 8:19-24 (taken November 21, 2018)(A. Ayala)("Tr.").[2] The Defendants conceded that this stipulation alleviated many concerns that their Motion raises. See Tr. at 18:20-22 (Ball). The Defendants noted that a remaining dispute involves whether New Mexico law or federal law should govern whether Patterson may testify as an expert to hedonic damages, and argued both that federal law should apply and that, under federal law, the Court should not permit Patterson to testify to such damages. See Tr. at 18:22-19:9 (Ball). The Court indicated that it thought that, in a prior opinion, it had delineated how New Mexico federal district courts approach expert testimony on hedonic

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

damages. See Tr. at 19:12-17 (Court). The Defendants explained that New Mexico federal district courts routinely exclude such testimony. See Tr. at 19:18-23 (Ball). In response to the Court's questions about New Mexico state courts' attitude toward expert testimony on hedonic damages, the Defendants explained that New Mexico state courts permit such testimony, including testimony on benchmark figures for hedonic damages. See Tr. at 20:9-20 (Court, Ball).

The Court inquired what Patterson would testify. See Tr. at 20:21-22 (Court). The Defendants responded that Patterson will give the jury a figure of $102,707.00 for S. Walker's hedonic damages, and that Patterson reaches that number by choosing $10,000.00 a year as a benchmark for S. Walker's lost value of life, multiplying that $10,000.00 by S. Walker's life expectancy, and adjusting that number to its present value. See Tr. at 20:23-21:5 (Ball); id. at 21:8-18 (Ball). The Court questioned why Patterson could not testify to this figure and methodology, because the Court does not know how to make this calculation, and the Defendants explained that no reliable methodology for calculating hedonic damages exists and that New Mexico federal district courts have repeatedly concluded that such testimony is unreliable. See Tr. at 21:19-23:23 (Ball, Court). In response to the Court's question regarding what Patterson could testify, the Defendants noted that Patterson could define hedonic damages for the jury. See Tr. at 24:1-15 (Court, Ball).

S. Walker indicated that the "real issue in this case," Tr. at 25:21-22 (A. Ayala), is whether New Mexico law or federal law should determine whether Patterson can testify to hedonic damages. See Tr. at 25:22-26:2 (A. Ayala). S. Walker complained that, in a New Mexico state court, under Gurule v. Ford Motor Co., Patterson could testify as an expert to hedonic damages, because New Mexico state courts do not apply rule 702 to non-scientific testimony, and expressed

that S. Walker suffers from the Defendants' forum shopping.  See 25:22-28:11 (A. Ayala).  S. Walker admitted that the Defendants' concerns about Patterson's methodology form grounds for impeachment, and noted that Patterson's opinions did not change after he read S. Walker's deposition, medical records, and other documents.  See Tr. at 28:13-29:18 (A. Ayala).  According to S. Walker, if the Court applies New Mexico law, the Court must decide whether Patterson's opinions have a proper basis and whether he has the knowledge and experience to testify to hedonic damages, and S. Walker notes that, in Gurule v. Ford Motor Co., the Court of Appeals of New Mexico decided these questions in Patterson's favor.  See Tr. at 29:18-30:12 (A. Ayala).

The Defendants responded that, in Sims v. Great American Life Insurance, the Tenth Circuit stated that federal law governs the evidence admitted in diversity cases and that, in Nicholson v. Evangelical Lutheran Good Samaritan Society, Inc., No. CIV 16-0164 JB/KK, 2017 WL 3127799, at *34 (D.N.M. July 21, 2017)(Browning, J.), the Court determined that, in diversity cases, rules 701 and 702 control evidence's admission.  See Tr. at 32:9-18 (Ball).  The Defendants contended that they should receive federal law's benefits after removing the case to federal court.  See Tr. at 32:18-24 (Ball).

The Court indicated that, from what it remembered, experts cannot quantify hedonic damages for the jury, but that experts can explain that methodologies for quantifying hedonic damages exist and can define hedonic damages.  See Tr. at 33:4-18 (Court).  The Court stated that it is not inclined to allow Patterson to quantify hedonic damages or to allow S. Walker to introduce the Patterson Report, because the report is hearsay, but the Court promised the parties that the Court would issue an opinion on the question.  See Tr. at 33:21-34:5 (Court).  This Memorandum Opinion and Order is the promised opinion.

## RELEVANT LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided <u>Daubert</u> . . . , trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under <u>Daubert</u>, whether the opinion testimony is the product of a reliable methodology." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d at 1224. "<u>Daubert</u> . . . requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d at 1224.[3]

---

[3]One of the things that consistently amazes the Court is the unwillingness of modern lawyers to tailor their briefing to the particular judge before whom they argue. The Court still gets briefings filled with citations to other district cases, even though it has written opinions more directly on point. <u>See</u>, <u>e.g.</u>, <u>United States v. Begay</u>, 310 F. Supp. 3d 1318, 1336 (D.N.M. 2018)(Browning, J.)(party citing <u>Caine v. Burge</u>, No. 11 C 8996, 2013 WL 1966381, at *1 (N.D. Ill. May 10, 2013)(Durkin, J.)) to argue for admitting expert testimony); <u>United States v. Chapman</u>, No. CR 14-1065 JB, 2015 WL 10401776, at *3 (D.N.M. Aug. 28, 2015)(Browning, J.)(party citing <u>First Data Corp. v. Konya</u>, No. CIV 04-0856, 2007 WL 2116378, at *10 (D. Colo. July 20, 2007)(Kane, J.)). There is nothing wrong -- and a lot right -- with our colleagues in other states, but it mystifies the Court why lawyers continue not to research and know the judge before whom they are practicing.

Nowhere is the need to research the presiding judge more important than in the <u>Daubert</u> area. Given <u>Daubert</u>'s and rule 702's demands, trial judges often have to write detailed opinions, with findings of fact and conclusions of law. <u>See</u>, <u>e.g.</u>, <u>Abraham v. WPX Prod. Prods., LLC</u>, 184 F. Supp. 3d 1150 (D.N.M. 2016)(Browning, J.); <u>United States v. Rodriguez</u>, 125 F. Supp. 3d 1216 (D.N.M. 2015)(Browning, J.); <u>Montoya v. Sheldon</u>, 286 F.R.D. 602 (D.N.M. 2012). <u>Cf.</u> Admissibility of Scientific Evidence, SJ081 ALI-ABA 1 , 21 ("Appellate courts increasingly insist that even when no <u>Daubert</u> hearing is held, the district court must create a sufficient record so that the basis for the admissibility decision can be reviewed."). The written opinions are a goldmine for figuring out what the trial judge is going to do with the new expert's report. Lawyers should research their judge thoroughly through Lexis and Westlaw. In the 21st century, litigants can know their judge like the hand knows the glove.

When the Court was a young associate at a large law firm after its clerkships, the Court and a co-associate, and the Court's future partner, would swing by the University of New Mexico

1.      **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[4]  Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist

_____

School of Law every evening after work, alternating days, to go through a box of slip opinions by the federal judges.  The lower federal judges in the early 1980s would send the opinion to the counsel of record by mail but also send a copy to the law library.  The Court and the other associate would copy almost every opinion and create binders by subject matter: rule 12(b)(1), rule 32, etc. Some binders got so large that they got dividers to divide the opinions by specific judges.  The Court and the other associate kept up the laborious data collection even when the Court and the other associate started their own firm.  The Court and its firm would cite, quote, and discuss the opinions of the local federal judges back to them in its briefing.

If the Court went to this much travail to locate all the opinions of the judge before whom it was appearing, imagine what it thinks when it receives a brief citing, discussing, or quoting mostly other courts' opinions on topics on which the Court has written, sometimes extensively and exhaustively.  In contrast to the paper world in which the Court lived in the early and mid-1980s, all an associate has to do with Lexis and Westlaw is put in the judge's name and the subject to be researched.  With research by judge and topic so easy today, there is no excuse for a lawyer not to know the opinion of the judge before whom they are practicing.

[4]Rule 702's most prominent hurdle is the sufficiency of basis.  Yet the judiciary's uncomfortableness with analyzing an opinion's basis can be seen in the conflict in the cases.  The current conflict is whether the questions of sufficiency of basis, and of application of principles and methods, are matters of weight or admissibility.  Compare David E. Bernstein & Eric G. Lasker, Defending Daubert: It's Time to Amend Federal Rule of Evidence 702, 57 Wm. & Mary L. Rev. 1, 32 (2015)("[W]hen an expert opinion is based on data, a methodology, or studies that

are simply inadequate to support the conclusions reached, <u>Daubert</u> and Rule 702 mandate the exclusion of that unreliable opinion testimony." (quoting Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 255 (2d Cir. 2005)), <u>with</u> Bernstein & Lasker, <u>supra</u>, at 33 ("[T]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." (quoting <u>Milward v. Acuity Speciality Prods. Grp.</u> 639 F.3d 11, 22 (1st Cir. 2011)). There should not be a conflict. Rule 702 states that these are questions of admissibility. Yet many courts treat them as questions of weight. <u>See</u>, <u>e.g.</u>, Bernstein & Lasker, <u>supra</u>, at 33 (citing several Courts of Appeals that instruct district courts to consider the sufficiency of basis and/or application of the methodology as questions of weight).

What is most interesting is what the divergence from Supreme Court precedent and rule 702 suggest. The divergence suggests that <u>Daubert</u> and rule 702 are too academic. <u>Daubert</u> and rule 702 write better than they work in the courtroom and in practice. Lower courts continue -- rightfully so -- to be uncomfortable with deciding these issues with the Sixth and Seventh Amendments to the Constitution of the United States protecting the right to jury trials in civil and criminal cases. <u>Cf.</u> Bernstein & Lasker, <u>supra</u>, at 33 (2015)("[C]ourts have held that '[t]he district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.'" (quoting <u>Manpower, Inc. v. Ins. of Pa.</u>, 732 F.3d 796, 806 (7th Cir.)); Ronald J. Allen, Esfand Fafisi, <u>Daubert and its Discontents</u>, Brooklyn L.R., 131, 147 (2010)(describing an argument for Daubert's unconstitutionality under the Seventh Amendment).

The Court is concerned that the federal courts will overact to the wayward opinions that have created a split whether sufficiency of basis and application of methods is for the court or goes to the evidence's weight. The Court is concerned that the federal courts are going in the direction of new rules. There is thus a built-in institutional bias towards more rules and amendments. The Judicial Conference runs the federal judiciary through committees. <u>See</u> <u>About the Judicial Conference</u>, U.S. Cts., https://www.uscourts.gov/about-federal-courts/governance-judicial-conference/about-judicial-conference (last visited Jan. 5, 2019)("The Conference operates through a network of committees . . . "). The Judicial Conference has a Standing Committee on Rules. The Standing Committee has five Advisory Committees: (i) Civil Procedure; (ii) Criminal Procedure; (iii) Evidence; (iv) Bankruptcy; and (v) Appellate. <u>See</u> <u>How the Rulemaking Process Works</u>, U.S. Cts., https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works (last visited Jan. 5, 2019). Each of these advisory committees has a reporter, almost always a prominent professor. <u>See</u> <u>Overview for the Bench, Bar, and Public</u>, U.S. Cts., https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works/overview-bench-bar-and-public (last visited Jan. 5, 2019). The reporter position is more prestigious if the reporter can get new rules promulgated. They have to justify their existence. There is thus a very smart, likeable, and well-liked person putting pressure on the committee to amend the rules. While judges are more conservative about promulgating new rules, they too often succumb to the reporter's pressure. The result is that the federal judiciary and the bar gets a host of new rules almost every year. The development of new rules burdens the federal judiciary and the bar -- all of which are overworked -- with mandatory changes each year, often

the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d

1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702

advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only

experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the

large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land

values."). An expert is "required to possess such skill, experience or knowledge in that particular

field as to make it appear that his opinion would rest on substantial foundation and would tend to

aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917,

928 (10th Cir. 2004). See United States v. Harry, 20 F. Supp. 3d 1196, 1243 (D.N.M.

2014)(Browning, J.)(deeming inadmissible testimony on a sex crime's victim's demeanor during

an examination, because "demeanor is not always a reliable indicator whether someone is telling

the truth, especially about sex -- then no expert testimony is needed. That knowledge is well within

the knowledge of jurors and most people."); United States v. Rodella, No. CR 14-2783 JB, 2014

WL 6634310, at *25 (D.N.M. Nov. 19, 2014)(Browning, J.)(stating that "testimony regarding

nationally accepted police standards is irrelevant" to issues of "excessive force and"

reasonableness). The proponent of expert testimony has the burden of establishing by a

preponderance of the evidence that the pertinent admissibility requirements are met.[5] See Morales

---

constituting little more than stylistic changes. Everyone has to get new rule books every year. The
burden of new rules often does not justify the meager benefits of the changes.

[5]The Court is clipping the wings of experts all the time. See, e.g., Abraham v. WPX Prod.
Prods., LLC, 184 F. Supp. 3d at 1204 (precluding an expert from discussing class certification
requirements, but allowing the expert to testify to information about royalty instruments); United
States v. Rodriguez, 125 F. Supp. 3d at 1255-56 (permitting an expert to describe a cartel's
structure and organization, and to explain drug running, but not admitting the expert's testimony

v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).  Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications."  Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted).  See United States v. Rodella, 2014 WL 6634310, at *20 ("Because of [the proposed expert's] lack of practical experience, lack of nationwide experience, and lack of an advanced degree in criminology or law enforcement, [the proposed expert's] is not qualified to testify about nationally accepted police procedures and practices.");  United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1245 (determining an expert qualified to testify to drug trafficking when he had personal knowledge of the subject from working in the Drug Enforcement Agency for almost fifteen years).

Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert

---

opining that the defendant was running drugs); Montoya v. Sheldon, 286 F.R.D. at 619 (precluding a treating physician from testifying about a party's PTSD diagnosis, opinions about the causes for a party's symptoms, or a party's prognosis.  Attorneys ask experts to do too much, and experts try to do too much.  The experts are being paid; they are trying to be helpful to the attorney.  Cf. Mark I. Bernstein, Jury Evaluation of Expert Testimony Under the Federal Rules, Drexel L. Rev. 239, 268 (2015)("Any use of expert witnesses paid by a party raises concerns of partisanship, competency, and honesty.  Because experts are partisan witnesses paid by a party, there is an inevitable danger of bias.").  The experts will often do anything.  They toss statements into their reports to be helpful.  Too many attorneys release the report as written -- without editing and without trimming.  This failure to edit and to trim creates unnecessary litigation.  Many expert reports contain statements that the proponent attorney does not need or even want.  The reports draw Daubert motions or rule 702 challenges.  The proponent is then forced to defend the statements that he or she does not even need or want.

testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion"). "The Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness." United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1214 (D.N.M. 2011)(Browning, J.)(citing United States v. Benally, 541 F.3d 990, 996 (10th Cir. 2008)). "The Tenth Circuit may draw this distinction because, generally, it is the jury's exclusive function to make credibility determinations . . . whereas a court makes a pretrial determination of the constitutional voluntariness of a statement." United States v. Ganadonegro, 805 F. Supp. 2d at 1214 (citation omitted)(citing United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)).

## 2. **The Standard in Daubert.**

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert, 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).[6] The

_____

[6]The current law -- and its trajectory -- are casting serious shadows over using expensive experts. This is particularly true in cases involving jury trials. It is probably a good time for the judiciary to rethink expert testimony rather than continuing with the current regime and making incremental changes.

Lawyers and appellate courts overemphasize the importance of experts, and distrust juries. See Sanja Kutnjak Ivkovic & Valerie P. Hans, Jurors' Evaluations of Expert Testimony: Judging the Messenger and the Message, 28 Law & Soc. Inquiry 441, 442 (2003)("One key assumption underlying the Daubert line of cases is that jurors might be duped by a persuasive but untrustworthy expert who testifies about matters that are not based on sound scientific principles or data."). Cf., Elaine E. Sutherland, Undue Deference to Experts Syndrome?, 16 Ind. Int'l & Comp. L. Rev. 375,

Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness'

382 (2006)("After all, if one is coming from a position of ignorance, the person who holds the key to that certain body of knowledge is something of a savior. The danger for the legal system is that this empowerment of the expert witness will result in undue deference to his or her opinion."). Appellate judges often do not have extensive or any trial experience, particularly as Presidents want to rule from the grave, and appoint younger and younger appellate judges, who often -- because of their years -- have not spent a lot of time trying cases in the courtroom before juries. Academics, corporate lawyers, general counsel, and appellate judges -- without considerable courtroom experience -- think that experts will easily mislead juries. Yet, the Court talks regularly to juries after jury trials, and the Court listens to trial lawyers talking to juries after jury trials. Juries often expressly state that they disregarded the parties' experts. The Court often hears comments like the "expert arrogant and/or incomprehensible."

Part of the problem is that academics and, often, appellate jurists do not appreciate or understand modern American jurors. Jurors have become very independent, and do not take direction well or easily from anyone -- the judge, lawyers, or experts. The days of dressing up for court in coats and ties, and doing what the judge tells them to do are fading. Jurors question everything. If the Court tells them to go in one door, they want to use another. Whereas jurors used to complement the Court's jury instructions as giving a roadmap to the jurors' decisions, jurors now criticize even the uniform or pattern jury instructions. Modern American jurors do not like to think that they are being told what to do. And they certainly do not like experts telling them what to do; modern American jurors do not like the idea of "experts" who are smarter than they are.

At the same time that modern American jurors are showing more independence, paternalistic Daubert hearings have proliferated. This phenomenon raises many concerns. One concern is the sheer prevalence of Daubert motions. Cf. Cynthia Lynne Pike, The Impact of Revised MRE 702 and 703 in Response to Daubert, 52 Wayne L. Rev. 285, 301 (2006)(describing the effects of a state-specific rule resembling rule 702 and stating, "One of the more important tactical strategies in dealing with the court's role as gatekeeper under the new MRE 702 is the use of motions in limine and other pretrial evidentiary hearings."). Motions to dismiss, class certification motions, and motions for summary judgment, sentencings, competency hearings -- in addition to testimony -- require Daubert hearings. The costs of Daubert motions, to the court and the parties, is staggering. The time-consuming nature of Daubert motions is overwhelming.

method is generally accepted as reliable in the relevant medical and scientific community.[7]
See Daubert, 509 U.S. at 594-95. The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence. See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . .). This obligation involves a two-part inquiry. Id. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" Id. (quoting Daubert, 509 U.S. at 592 . . .). In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ." Id. (quoting Daubert, 509 U.S. at 592-93 . . .). Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand." Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted). "The second inquiry is related to the first. Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . . The evidence must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter

---

[7]Federal courts are obsessed with reliability problems. This idea pops up several places and in several ways, creating multiple grounds upon which the court has the power to exclude the expert. See Admissibility of Scientific Evidence, SJ081 ALI-ABA 1 , 27 (noting that courts treat the "assist the trier of fact" requirement for expert testimony as a relevancy requirement, and stating that rule 401 already requires evidence to be relevant).

Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert, 509 U.S. at 591). If the expert's proffered testimony fails on the first prong, the court does not reach the second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884. In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert to non-scientific expert testimony. See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." (quoting Carmichael v. Samyang Tires, Inc., 923 F. Supp. 1514, 1521 (S.D. Ala. 1996)). The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert, a court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert, 509 U.S. at 595). "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted)(quoting Dodge v. Cotter Corp., 328 F.3d at 1222). The proponent of the

expert's opinion testimony bears the burden of establishing that the expert is qualified, that the

methodology he or she uses to support his or her opinions is reliable, and that his or her opinion

fits the facts of the case and thus will be helpful to the jury.  See Norris v. Baxter Healthcare Corp.,

397 F.3d at 881.  The Tenth Circuit noted in Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193

(10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206.  The United States Court of Appeals for the Ninth Circuit noted in Claar v.

Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method.   Certainly, scientists may form initial tentative hypotheses.  However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (Dec. 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion. See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis. At worst, the link has been tested and found to be untenable. Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. at 146. See Hollander v. Sandoz Pharm. Corp., 289 F.3d at 1209 (noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3. **Necessity of Evaluating an Issue Under Daubert.**

The restrictions in Daubert apply to both "novel" expert testimony and "well-established propositions." 509 U.S. at 593 n.11 ("Although the *Frye*[8] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." Daubert, 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert, 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Att'y Gen. of Okla. v.

---

[8]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014.

Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology,[9] and in fact some courts have indicated their acceptance of it.").[10]

---

[9]PCR, a "[p]olymerase chain reaction," Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780, is a widely used method for copying DNA segments. Polymerase Chain Reaction, Wikipedia, https://en.wikipedia.org/wiki/Polymerase_chain_reaction (last visited Nov. 28, 2018).

[10]Much of the focus of current debate about experts is on forensic evidence, which comes in many forms. The challenge to forensic evidence comes from two areas: (i) the federal courts; and (ii) the scientific community. The reports of the National Academies of Science ("NAS") and the President's Council of Advisors on Science and Technology ("PCAST") raise challenges to the reliability of forensic methods. See Executive Office of the President President's Council of Advisors on Science and Technology, Report to the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (Sept. 2016); Committee on Identifying the Needs of the Forensic Sciences Community, National Research Council, Strengthening Forensics Science in the United States: A Path Forward (July 2009). There is increasing skepticism of the legal profession's most cherished evidence, including fingerprints, DNA, firearms, and breath tests. See, e.g., President's Council of Advisors on Science and Technology, supra, at 67-110; Committee on Identifying the Needs of the Forensic Sciences Community, supra, at 42-48.

The Court is concerned that the federal judiciary is moving toward a freestanding rule on forensic evidence. The Court is not a big fan of addressing the topic of forensic evidence through rulemaking. No rule, procedures manual, or note is needed to tell judges that there is no certainty with forensic opinions. There is also no reasonable degree of certainty. These opinions are now considered overstated: in the old days -- like last week -- attorneys would routinely ask: "Doctor, in your opinion, to a reasonable degree of certainty, that the plaintiff's appendix was on the left side of the body?"

The nation does not need another rule. An examination of Article VII -- Opinions and Expert Testimony -- shows six rules: (i) rule 701 -- Opinion Testimony by Lay Witnesses; (ii) rule 702 -- Testimony by Expert Witnesses; (iii) rule 703 -- Bases of an Expert's Opinion Testimony; (iv) rule 704 -- Opinion on an Ultimate Issue; (v) rule 705 -- Disclosing the Facts or Data Underlying an Expert's Opinion; (vi) rule 706 -- Court-Appointed Expert Witnesses (a bad idea in about all cases). See Fed. R. Evid. 701-06. If the reporter would drop rule 706, perhaps there would be room for a rule pertaining to forensic evidence.

The Court is concerned with what a new rule would look like. The judiciary could make its point in a committee note, but without a new rule, there is no need for a new note. The PCAST report does not propose a change to the Evidence Rules. Rather, PCAST proposes a best procedures manual. See President's Council of Advisors on Science and Technology, supra, at 145. It would be better if legal leaders do like Duke University School of Law has done for class actions and the Sedona Conference has done for electronic discovery. See Class-Action Settlement Conference, Duke Law, https://law.duke.edu/judicialstudies/conferences/oct2016/ (last

## LAW REGARDING EXPERT TESTIMONY ON HEDONIC DAMAGES

The majority of courts limit or exclude expert testimony on hedonic damages.  See, e.g., Flowers v. Lea Power Partners, LLC, No. 09-CV-569 JAP/SMV, 2012 WL 1795081, at *3-4 (D.N.M. April 2, 2012)(Parker, J.)("Generally, New Mexico United States District Judges have excluded or limited expert testimony on hedonic damages."); McGuire v. City of Santa Fe, 954 F. Supp. at 233-34 ("[A]fter the Daubert decision, courts have generally rejected expert testimony on hedonic damages.").  Experts may not quantify hedonic damages, but experts may provide qualitative testimony defining hedonic damages and explaining what factors are relevant to valuing hedonic damages.  See, e.g., Smith v. Ingersoll-Rand Co., 214 F.3d at 1245; BNSF Ry. v. LaFarge Sw., Inc., 2009 WL 4279849, at *2 ("The majority rule in federal courts, however, is that expert testimony which places a *dollar figure* before the jury in an attempt to *quantify* the value of a human life is inadmissible and does not meet the relevance and reliability factors set forth in *Daubert* and its progeny." (emphasis in original)); Lujan v. Cooper Tire & Rubber Co., No. CIV. 06-173RHS/KBM, 2008 WL 7489095, at *2 (D.N.M. June 13, 2008)(Scott, M.J.)("[A]ny expert

_____

visited Jan. 7, 2019); The Sedona Conference Working Group Series, The Sedona Conference, https://thesedonaconference.org/wgs (last visited Jan. 7, 2019).  Rather than a new rule or note, the Court believes that a best practices manual -- prepared by professional leaders that come together to write -- and not the judiciary -- would be the better approach.

The Court expects several difficulties with a new rule.  The first difficulty with any rule on forensic evidence will be determining to whom it should apply.  A new rule would presumably apply to forensic witnesses' testimony.  Such witnesses include people testifying about evidence about through scientific means, by comparing patterns, or by "experimental or scientific analysis."  See Evidence, Black's Law Dictionary (10th ed. 2014).  After the Court and the bar have identified the universe of experts to whom the rule applies or the best practices apply, the new rules' requirements must be determined.  An expert must already satisfy all of rule 702's requirements.  Under a new rule, the expert will also need to satisfy all of the new requirements.  With more handles, the chances of exclusion or limiting are enhanced.  Rule 702's requirements, however, are enough, and the law should not require more.

testimony attempting to quantify such damages invades the fact finder's domain."); Harris v. United States, No. CIV 06-0412 JP/KBM, 2007 WL 4618597, at *2 (D.N.M. June 7, 2007)(Parker, J.)("[T]he weight of authority within this Court appears to favor excluding testimony concerning a hypothetical benchmark."); Raigosa v. Roadtex Transp. Corp., No. CIV 04-0305 RLP/WDS, 2005 WL 8164177, at *3 (D.N.M. Feb. 10, 2005)(Puglisi, M.J.)("I am persuaded by the weight of authority that rejects expert testimony placing a dollar figure on hedonic damages, finding such testimony unreliable, untestable, failing to meet the requirement of general acceptibility [sic] and/or invading the province of the fact finder.").

> The Tenth Circuit and numerous cases from this District have excluded expert testimony on hedonic damages from an economist who attempts to testify to a specific dollar figure, benchmark figures or a range of values to be used in calculating such damages, but have allowed testimony about the concept of hedonic damages and the broad areas of human experience the jury should consider in determining those damages.

Fuller v. Finley Res., Inc., 2016 WL 3854053, at *2.

In Smith v. Ingersoll-Rand Co., the Tenth Circuit provided the touchstone for expert testimony on hedonic damages. See Smith v. Ingersoll-Rand Co., 214 F.3d at 1245. The Tenth Circuit upheld a district court's exclusion of an expert's quantification of hedonic damages, and the district court's admission of the expert's testimony on the "definition of loss of enjoyment of life" and what he considers in valuing the loss of enjoyment of life -- "the effect the injury has on 'the ability to enjoy the occupation of your choice,' 'activities of daily living,' 'social leisure activities' and 'internal well-being.'" 214 F.3d at 1245 (quotation marks without citations in the original). The Tenth Circuit noted that, "[t]roubled by the disparity of results reached in published value-of-life studies and skeptical of their underlying methodology, the federal courts which have considered expert testimony on hedonic damages in the wake of Daubert have unanimously held

quantifications of such damages inadmissable [sic]." Smith v. Ingersoll-Rand Co., 214 F.3d at 1245. The Tenth Circuit did not, however, opine on "the admissibility of studies purporting to quantify hedonic damages" and directly addressed only whether "the district court appropriately exercised its Rule 702 gatekeeping function." 214 F.3d at 1245.

New Mexico federal district courts routinely follow the same delineation that the Tenth Circuit articulated in Smith v. Ingersoll-Rand Co.; they permit expert testimony explaining hedonic damages and exclude testimony quantifying hedonic damages. See, e.g., Griego v. Douglas, No. CIV 17-0244 KBM/JHR, 2018 WL 1010277, at *2 (D.N.M. Feb. 20, 2018)(Molzen, M.J.)(permitting "qualitative testimony" on the "the general concept and meaning of value of life damages and the areas of human experience deserving of consideration," but excluding "quantitative measure[s]" for hedonic damages); Hart v. Corr. Corp. of Am., No. CIV 11-00267 MCA/WPL, 2014 WL 12670796, at *3-5 (D.N.M. May 6, 2014)(Armijo, J.)(permitting an expert to testify "regarding the general concept of hedonic damages," but not to quantify hedonic damages for the jury); Chavez v. Marten Transp., Ltd., No. CIV 10-0004 MV/RLP, 2012 WL 988008, at *2-3 (D.N.M. March 22, 2012)(Vazquez, J.)(admitting testimony on "(1) an economist's interpretation of the concept and meaning of hedonic damages; (2) the broad areas of human experience to consider in determining hedonic damages for a particular plaintiff, including how he spent leisure time and whether he participated in recreational activities, hobbies, or community activities," but not on figures quantifying hedonic damages); Flowers v. Lea Power Partners, LLC, 2012 WL 1795081, at *3-4 (precluding an expert from testifying to a benchmark figure for hedonic damages, but admitting "generalized testimony" about the concept of hedonic damages); BNSF Ry. v. LaFarge Sw., Inc., 2009 WL 4279849, at *2 (precluding expert testimony

quantifying a particular individual's hedonic damages or benchmark figures for hedonic damages); Harris v. United States, 2007 WL 4618597, at *2 (excluding testimony on a benchmark figure for hedonic damages).

## LAW REGARDING DIVERSITY JURISDICTION

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[11] If the Court finds only an

---

[11]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[12]  The Court may also rely on

_____

departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a state supreme court case that a federal court that Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[12]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that

Tenth Circuit decisions interpreting New Mexico law. See <u>Anderson Living Tr. v. WPX Energy Prod., LLC</u>, 27 F. Supp. 3d 1188, 1243 & n.30 (D.N.M. 2014)(Browning, J.).[13] Ultimately, "the

         case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

         . . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

         . . . .

         The question has practical aspects of great importance in the proper administration of justice in the federal courts. It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship. In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

<u>Fid. Union Tr. Co. v. Field</u>, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point." <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 (citing <u>King v. Order of United Commercial Travelers</u>, 333 U.S. 153, 159 (1948)). See 17A James Wm. Moore et al., <u>Moore's Federal Practice</u> § 124.20 (3d ed. 1999)("<u>Moore's</u>")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions." (emphasis and title case omitted)).

    [13]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges. If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court. This result frustrates the purpose of <u>Erie</u>, which held that federal courts must apply state court interpretations of state law, rather

than their own, in part so that parties achieve a consistent result regardless of the forum. This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight. On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation. Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth

Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state supreme court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state Supreme Court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908. See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or, the "so-called local-judge rule" in its analysis). The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive and not prescriptive -- interpretive and not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the

formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))). This statement may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, former United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., 353 F.3d 866 (10th Cir. 2003), the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus,

when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866.  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, then-United States Circuit Judge for the Tenth Circuit, limitation in Wankier v. Crown Equip. Corp. of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court.  "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., 621 F.3d 1297 (10th Cir. 2010), the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d at 1297 ("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to

Court's task is to predict what the state supreme court would do." Wade v. EMCASCO Ins., 483

F.3d at 666.  Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted).

## LAW REGARDING NEW MEXICO LAW ON HEDONIC DAMAGES

An expert testifying on specialized, non-scientific knowledge in New Mexico must be

qualified as an expert, testify to information reliably based in his expertise, and provide testimony

helpful to the trier of fact.  See N.M. R. Evid. 11-702; Banks v. IMC Kalium Carlsbad Potash Co.,

2003-NMSC-026, ¶ 19, 77 P.3d 1014, 1018; State v. Torres, 1999-NMSC-010, ¶ 45, 976 P.2d at

34; State v. Alberico, 1993-NMSC-047, ¶ 45, 861 P.2d 192, 202.  New Mexico's rule 11-702

states:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue.

N.M. R. Evid. 11-702.  The Supreme Court of New Mexico Court has refused to extend the

Daubert analysis to experts testifying based on specialized -- but not on scientific -- knowledge.

See Banks v. IMC Kalium Carlsbad Potash Co., 2003-NMSC-026, ¶ 19, 77 P.3d at 1018

(upholding, after Kumho Tire Co. v. Carmichael, the holding from State v. Torres, 1999-NMSC-

010, ¶ 43, 976 P.2d at 34 that the "application of the *Daubert* factors is unwarranted in cases where

expert testimony is based solely upon experience or training").  "Regardless of whether the subject

---

independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at
tension with the above-quoted Supreme Court precedent, as well as its own prior case law.
Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior
federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State
Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court
is bound to abide by the Tenth Circuit's interpretation of Erie.

matter involves scientific, technical, or other specialized knowledge, however, a witness must qualify as an expert in the field for which his or her testimony is offered before such testimony is admissible." State v. Torres, 1999-NMSC-010, ¶ 45, 976 P.2d at 34. An expert's proposed testimony must also reflect "a reliable basis in the knowledge and experience of his discipline." Gurule v. Ford Motor Co., 2011 WL 2071701, at *8 (quoting State v. Alberico, 1993-NMSC-047, ¶ 45, 861 P.2d at 202).

The Supreme Court of New Mexico has not spoken to whether an expert may testify to hedonic damages. The Court, therefore, must predict whether the Supreme Court of New Mexico would admit testimony on hedonic damages. See Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d at 1224-25. The Court predicts that the Supreme Court of New Mexico would allow an expert to quantify hedonic damages. The Court of Appeals of New Mexico has stated that, "it is not improper for the trial court to permit an economist to testify regarding his or her opinion concerning the economic value of a plaintiff's loss of enjoyment of life," Sena v. N.M. State Police, 1995-NMCA-003, ¶ 29, 892 P.2d 604, 611. The Court of Appeals of New Mexico has allowed an economist to testify to hedonic damages' meaning, to methods for calculating hedonic damages, and to quantify a party's hedonic damages. See Gurule v. Ford Motor Co., 2011 WL 2071701, at *7; Couch v. Astec Industries, Inc., 2002-NMCA-084, ¶ 16-20,53 P.3d 398, 402-03. Although, in Gurule v. Ford Motor Co., the Court of Appeals of New Mexico recognized that "most courts have found quantifying the value of a human life, including the loss of enjoyment component, to be based on an unreliable methodology," Gurule v. Ford Motor Co., 2011 WL 2071701, at *9 (citing Smith v. Ingersoll-Rand Co., 214 F.3d at 1245), the Court of Appeals of New Mexico permitted the expert's "definitional" testimony about hedonic damages and provision

of a "range of values" for hedonic damages, <u>Gurule v. Ford Motor Co.</u>, 2011 WL 2071701, at *9. In <u>Couch v. Astec Industries, Inc.</u>, the Court of Appeals of New Mexico permitted an expert to testify that value of a statistical life studies put "the average value of a whole life" around $3 million. <u>Couch v. Astec Industries, Inc.</u>, 2002-NMCA-084, ¶ 18, 53 P.3d at 403. Other state courts have permitted experts to quantify hedonic damages. <u>See</u> <u>Banks ex rel. Banks v. Sunrise Hosp.</u>, 102 P.3d 52, 62 (Nev. 2004)(upholding the admission of an expert's testimony quantifying "the tangible value of a person's life," and noting that "[o]ther courts permit experts, such as economists, to testify concerning the value of hedonic loss, recognizing that the jury is ultimately responsible for computing damages and that expert testimony will often assist the jury in making its determination." (footnotes omitted)); <u>Lewis v. Alfa Laval Separation, Inc.</u>, 128 Ohio App. 3d 200, 217, 714 N.E.2d 426, 435, 437-38 (1998)(permitting an expert to quantify a plaintiff's hedonic damages); <u>Montalvo v. Lapez</u>, 884 P.2d 345, 366 (Haw. 1994)(noting that a minority of courts permit experts to testify to hedonic damages). In <u>Couch v. Astec Industries, Inc.</u>, the Court of Appeals of New Mexico noted that "if the expert 'offered a specific value for [the p]laintiff's hedonic damages claim, he [(the expert)] would have intruded improperly' on the jury's domain," <u>Couch v. Astec Industries, Inc.</u>, 2002-NMCA-084, ¶ 20, 53 P.3d at 403, but the language is dicta and "the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision," <u>Mosley v. Titus</u>, 762 F. Supp. 2d at 1332. Moreover, despite the Court of Appeals of New Mexico's language in <u>Couch v. Astec Industries, Inc.</u>, the Court of Appeals of New Mexico allowed an expert to quantify hedonic damages. <u>See</u> <u>Gurule v. Ford Motor Co.</u>, 2011 WL 2071701, at *9. The Court, therefore, predicts that the Supreme Court of New Mexico would allow an expert to quantify a party's hedonic damages.

## LAW REGARDING ERIE AND THE RULES ENABLING ACT

"In diversity cases, the <u>Erie</u> doctrine instructs the federal courts must apply state substantive law and federal procedural law." <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d 1152, 1162 (10th Cir. 2017). "If a federal rule of civil procedure answers the question in dispute, that rule governs our decision so long as it does not 'exceed[] statutory authorization or Congress's rulemaking power.'" <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d at 1162 (quoting <u>Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.</u>, 559 U.S. at 398 ("<u>Shady Grove</u>"). "When faced with a choice between a state law and an allegedly conflicting federal rule," the Tenth Circuit "follow[s] the framework described by the Supreme Court in [<u>Shady Grove</u>], as laid out by Justice Stevens in his concurring opinion." <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d at 1162. "First, the court must decide whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law." <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d at 1162 (citations and quotations omitted). There is a conflict between federal and state law if there is a "direct collision" that is "unavoidable," but there is no collision if the state and federal rules "can exist side by side . . . each controlling its own sphere of coverage." <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d at 1163 (citations omitted). If there is no direct collision, "there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under <u>Erie</u>." <u>Racher v. Westlake Nursing Home Ltd. P'ship</u>, 871 F.3d at 1163.

If there is a direct collision, a court must follow the federal rule if it is a valid exercise of the Supreme Court's rulemaking authority under the Rules Enabling Act, 28 U.S.C. § 2072, <u>i.e.</u>, it

must "not abridge, enlarge or modify a substantive right."  28 U.S.C. § 2072(b).  See Racher v.

Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163-64.

> Justice Stevens, in his controlling concurrence in Shady Grove, addressed how, in a diversity case where state substantive law applies, to analyze whether a federal rule of procedure abridges, enlarges or modifies a substantive right.  [Shady Grove, 559 U.S. at 418-21 (Stevens, J., concurring)]; see Gasperini 518 U.S. at 427.  Justice Stevens advised courts not to rely on "whether the state law at issue takes the form of what is traditionally described as substantive or procedural."  Shady Grove, 559 U.S. at 419 (Stevens, J., concurring).  Rather, a more nuanced approach is required.  [Shady Grove, 559 U.S. at 419-20].  Justice Stevens observed that "[a] state procedural rule, though undeniably 'procedural' in the ordinary sense of the term, may exist to influence substantive outcomes, and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy."  [Shady Grove, 559 U.S. at 419-20](citation and internal quotation marks omitted).  One example of such a law is a procedural rule that "may . . . define the amount of recovery."  [Shady Grove, 559 U.S. at 420].  Ultimately, a court must consider whether the federal procedural rule has displaced "a State's definition of its own rights or remedies."  [Shady Grove, 559 U.S. at 418].  If so, the federal rule may be invalid under the Rules Enabling Act because the federal rule abridges, enlarges or modifies a state substantive right.

Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1164 (citations omitted)(alteration in

the original)(quoting Shady Grove, 559 U.S. at 418-20 (Stevens, J., concurring)).  "[W]hen state

law creates a cause of action, it also defines the scope of that cause of action," which includes "the

applicable burdens, defenses, and limitations."  Racher v. Westlake Nursing Home Ltd. P'ship,

871 F.3d at 1164-65.  Consequently, even though burdens of proof, affirmative defenses, and

liability limitations are all legal concepts that savor of procedure, "[f]ailing to enforce such

attendant attributes of a state law would lead to different measures of the substantive rights

enforced in state and federal courts," i.e., would modify substantive rights.  Racher v. Westlake

Nursing Home Ltd. P'ship, 871 F.3d at 1165.

# LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." United States v. Christy, No. CR 10-1534 JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802). Rule 801(c) of the Federal Rules of Evidence provides: "'Hearsay' means a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination." United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999). A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay.").

Hearsay is generally unreliable and untrustworthy. See Chambers v. Mississippi, 410 U.S. 284, 288 (1973)(noting that hearsay is generally untrustworthy and lacks traditional indicia of reliability); United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)("Hearsay is generally inadmissible as evidence because it is considered unreliable." (citing Williamson v. United States, 512 U.S. 594, 598 (1994)); United States v. Console, 13 F.3d 641, 657-58 (3d. Cir. 1993)(stating hearsay is "inherently untrustworthy" because of the lack of an oath, presence in court, and cross examination (quoting United States v. Pelullo, 964, F.2d 193, 203 (3rd Cir. 1992)). Testimonial proof is necessarily based upon the human senses, which can be unreliable. See 5 Jack Weinstein

& Margaret Berger, <u>Weinstein's Federal Evidence</u> § 802.02[1][b], at 802-5 (Joseph McLaughlin ed., 2d ed. 2017)("<u>Weinstein's Federal Evidence</u>").  The Anglo-American tradition uses three devices to illuminate inaccuracies in the testimonial proof: (i) the oath; (ii) personal presence at trial; (iii) and cross examination.  <u>See</u> <u>Weinstein's Federal Evidence</u> § 802.02[2][a], at 802-5.  It is difficult to evaluate the credibility of out-of-court statements when the three safeguards mentioned above are unavailable.  <u>See</u> <u>Weinstein's Federal Evidence</u> § 802.02[3], at 802-6 to -7.  Courts view hearsay evidence as unreliable because it is not subject to an oath, personal presence in court, or cross examination.  <u>See</u>, <u>e.g.</u>, <u>United States v. Console</u>, 13 F.3d at 657-58.

"Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805.  <u>See</u>, <u>e.g.</u>, <u>United States v. DeLeon</u>, 316 F. Supp. 3d 1303, 1306 (D.N.M. 2018)(Browning, J.)(noting that a hearsay within hearsay issue remains after concluding that 803(8) provided an exception for law enforcement reports); <u>Wood v. Millar</u>, No. CIV 13-0923 RB/CG, 2015 WL 12661926, at *4 (D.N.M. Feb. 19, 2015)(Brack, J.)(noting that witness statements in police reports may be admissible under hearsay exclusions other than 803(8)).

## ANALYSIS

The Court will grant the Motion in part.  At the hearing, Walker indicated that she would seek hedonic damages only.  <u>See</u> Tr. at 8:19-24 (A. Ayala).  The Court, therefore, will confine itself to addressing Patterson's proposed testimony on hedonic damages.  First, the Court concludes that federal law governs expert testimony's admissibility.  Second, the Court will grant the alternative request in the Defendants' Reply and will limit Patterson's testimony.  The Court

will permit Patterson to generally explain hedonic damages and the factors to consider in valuing hedonic damages, but the Court will preclude Patterson from quantifying hedonic damages.

Contrary to S. Walker's arguments, federal law governs whether expert testimony is admissible in this case. The Court applies Shady Grove to determine whether federal law or New Mexico law governing expert testimony controls. In Sims v. Great American Life Insurance, the Tenth Circuit explained that Congress enacted the Federal Rules of Evidence and, accordingly, the substance/procedure dichotomy embodied in the Erie doctrine, the Rules Enabling Act, and the Rules of Decision Act, 28 U.S.C. § 1652, do not apply to the Federal Rules of Evidence as originally enacted. See Sims v. Great Am. Life Ins., 469 F.3d at 879-880. See also Upky v. Lindsey, No. CIV 13-0553 JB/GBW, 2015 WL 1918229, at *18 (D.N.M. April 7, 2015)(Browning, J.). Rule 702, however, was amended in 2000, see Fed. R. Evid. 702 advisory committee's note, and "[t]he 2000 Amendments were not adopted as a statute, but were adopted under the Rules Enabling Act." James River Ins. v. Rapid Funding, LLC, 658 F.3d at 1218.

> Thus, the Court must analyze the admissibility of the [rule] under Erie, see Kechi Tp. v. Freightliner, LLC, 592 F. App'x 657, 672-73 (10th Cir. 2014)(unpublished)[14]("We have explained that Rule 701(c) is covered by the *Erie*

---

[14]Kechi Tp. v. Freightliner, LLC is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Kechi Tp. v. Freightliner, LLC has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

doctrine, as it was added to the Rules by amendment under the Rules Enabling Act, 28 U.S.C. § 2072, and was therefore not an act of Congress outside *Erie's* scope."), and, more specifically, the concurring opinion of the Honorable John Paul Stevens, Associate Justice of the Supreme Court, under Shady Grove Orthopedic Assoc. v. Allstate Ins. Co., 559 U.S. 393 (2010) . . . .

Upky v. Lindsey, 2015 WL 1918229, at *20.

The Court follows Justice Stevens' two-step framework outlined in Shady Grove:

> First, the diversity court "determine[s] whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law." Shady Grove, [559 U.S. at 421] (quotations omitted). "In some instances, the plain meaning of a federal rule will not come into direct collision with the state law, and both can operate." Id. (quotations omitted). In other words, the first step is to determine whether the federal rule and state law conflict.

> Second, if applying the federal rule and state law results in a "direct collision, the court must decide whether application of the federal rule represents a valid exercise of the rulemaking authority . . . [under] the Rules Enabling Act." Shady Grove, [559 U.S. at 422] (quotations and citation omitted). "That Act requires, *inter alia,* that federal rules 'not abridge, enlarge or modify *any* substantive right.'" Id. (quoting the Rules Enabling Act, 28 U.S.C. § 2072(b)).

Upky v. Lindsey, 2015 WL 1918229, at *20-21 (quoting James River Ins. v. Rapid Funding, LLC, 658 F.3d at 1218 (emphasis in original)). First, as the Court discussed in the "New Mexico Law Regarding Hedonic Damages" section, the Court predicts that the Supreme Court of New Mexico would allow an expert to quantify a party's hedonic damages. Accordingly, rule 11-702 likely conflicts with rule 702, and the Court proceeds to step two in the Shady Grove analysis.

Second, even if the Supreme Court of New Mexico would allow an expert to quantify hedonic damages, the Court concludes that rule 11-702 is procedural. The Supreme Court of New Mexico has not yet directly addressed whether rule 11-702 is procedural or substantive, and so this Court must endeavor to predict how the Supreme Court of New Mexico would decide the issue.

See TMJ Implants Inc. v. Aetna, Inc., 498 F.3d 1175, 1180 (10th Cir. 2007). The Court anticipates that the Supreme Court of New Mexico would identify rule 11-702 as procedural. The Supreme Court of New Mexico has not identified any substantive purposes to rule 11-702. When the Supreme Court of New Mexico described rule 11-702's purpose, it wrote: "[t]he purpose of Rule 11-702 is 'to assist the trier of fact to understand the evidence and to determine the issues of fact.'" Lee v. Martinez, 2004-NMSC-027, ¶ 15, 96 P.3d 291, 297 (quoting Madrid v. Univ. of Cal., 1987-NMSC-022, ¶ 13, 737 P.2d 74, 77). Whether a jury receives proper assistance is a procedural concern. The Supreme Court of New Mexico has similarly described: "[r]ules 702, 703, 704, and 705 govern the admissibility of expert opinion testimony." State v. Alberico, 1993-NMSC-047, ¶ 33, 861 P.2d at 199 (citing Price v. Foster (In re Estate of Foster), 1985-NMCA-038, ¶ 16, 699 P.2d 638, 642, cert. denied, 700 P.2d 197 (1985)). See also State v. Downey, 2008-NMSC-061, ¶ 25, 195 P.3d 1244, 1250 ("Our inquiry is also to determine the role of the trial judge as gatekeeper . . . ."). Accordingly, the Court concludes that rule 11-702 is procedural. Rule 702, therefore, governs expert testimony's admissibility. See Smith v. Ingersoll-Rand Co., 214 F.3d at 1244 (noting that New Mexico substantive law allows hedonic damages but analyzing expert testimony on hedonic damages under the Federal Rules of Evidence and federal caselaw); Nicholson v. Evangelical Lutheran Good Samaritan Soc'y, Inc., 2017 WL 3127799, at *34 ("[T]he Court must police the admissibility of expert testimony under rules 701 and 702 of the Federal Rules of Evidence."); BNSF Ry. v. LaFarge Sw., Inc., 2009 WL 4279849, at *1 ("[T]he Court applies the Federal Rules of Evidence in determining the admissibility of expert testimony on the subject of hedonic damages.").

Accordingly, following Smith v. Ingersoll-Rand Co., the Court will limit Patterson's testimony. See Smith v. Ingersoll-Rand Co., 214 F.3d at 1246 ("The district court also made an appropriate decision regarding reliability, excluding the quantification which has troubled both courts and academics, but allowing an explanation adequate to insure the jury did not ignore a component of damages allowable under state law."). "Attempts to quantify the value of human life have met considerable criticism in the literature of economics as well as in the federal court system." Smith v. Ingersoll-Rand Co., 214 F.3d at 1245. An expert, however, may explain hedonic damages and their calculation to the jury. See Smith v. Ingersoll-Rand Co., 214 F.3d at 1245-46. The Court agrees with the Tenth Circuit opinion in Smith v. Ingersoll-Rand Co. and with subsequent New Mexico district court opinions that an expert, like Patterson, may provide qualitative testimony defining hedonic damages and describing what factors to consider in making hedonic-damages valuations, but that an expert may not, however, quantify hedonic damages or provide benchmark figures for hedonic damages. See, e.g., Smith v. Ingersoll-Rand Co., 214 F.3d at 1245; Fuller v. Finley Res., Inc., 2016 WL 3854053, at *2; BNSF Ry. v. LaFarge Sw., Inc., 2009 WL 4279849, at *2; Lujan v. Cooper Tire & Rubber Co., 2008 WL 7489095, at *2; Harris v. United States, 2007 WL 4618597, at *2; Raigosa v. Roadtex Transp. Corp., 2005 WL 8164177, at *3. The Court, therefore, will allow Patterson to describe hedonic damages, but not to quantify Walker's hedonic damages, e.g., Patterson may not state that S. Walker's "lost value of the pleasure of life is $102,707" or that she lost $10,000.00 in her value of life, or discuss his worksheet showing his calculations for such figures. Patterson Report at 1. See Patterson Report at 4. The Court notes that it is not the first New Mexico federal district court to limit Patterson's testimony in such a manner. See Fuller v. Finley Res., Inc., 2016 WL 3854053, at *2 (permitting Patterson

"to testify about the concept of hedonic damages and the general method for calculating them");

Fancher v. Barrientos, No. CIV 11-0118 JAP/LAM, 2015 WL 11142939, at *3 (D.N.M. July 1, 2015)(Parker, J.)(permitting Patterson to provide "generalized testimony about the *concept* of hedonic damages" but not testify "to the monetary value of [the plaintiff's] hedonic damages" (emphasis in original)); Martinez v. Caterpillar, Inc., No. CIV 06-0236 RHS/RLP, 2007 WL 5377515, at *2 (D.N.M. Sept. 6, 2007)(Scott, M.J.)(precluding Patterson from testifying to the value of the plaintiff's hedonic damages).

Finally, the Court notes that it will preclude Walker from introducing the Patterson Report at trial. Patterson wrote the report outside of court, and Walker would introduce it for the truth's that Patterson asserts. The Patterson Report, therefore, is inadmissible hearsay. See e.g., Skyline Potato Co. v. Hi-Land Potato Co., No. CIV 10-0698 JB/RHS, 2013 WL 311846, at *15 (D.N.M. Jan. 18, 2013)(Browning, J.)(excluding an expert report because it "is a written document that [the expert] prepared outside of the court and contains statements offered "for the truth of what the statements assert"); Vondrak v. City of Las Cruces, No. CIV 05-0172 JB/LFG, 2007 WL 2219449, at *3 n.4 (D.N.M. May 14, 2007)(Browning, J.), aff'd in part, rev'd in part, dismissed in part, 535 F.3d 1198 (10th Cir. 2008)(excluding the expert report "because rule 703 of the Federal Rules of Evidence allows an expert to rely on inadmissible facts in reaching an opinion or inference, but does not allow the proponent of the expert testimony to use the expert as a conduit for a party to get in otherwise inadmissible evidence"); United States v. Mirabal, No. CR 09-3207 JB, 2010 WL 3834072, at *4 (D.N.M. Aug. 7, 2010)(Browning, J.)(concluding that expert report was inadmissible, and noting that, although inadmissible, "[the expert] could rely upon that report,

because the materials that form the basis of an expert opinion need not, themselves, be admissible . . . .").  Accordingly, the Court grants the Motion in part and denies the Motion in part.

**IT IS ORDERED** that: (i) the Defendants' Motion to Exclude Expert Testimony of William Patterson, filed August 30, 2018 (Doc. 72), is granted in part and denied in part; (ii) William Patterson may not quantify hedonic damages, including testifying to an actual or benchmark figure for Plaintiff Shirley Walker's hedonic damages; and (iii) Patterson may testify generally about hedonic damages, including explaining hedonic damages to the jury and describing what factors are relevant to valuing hedonic damages.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Shavon M. Ayala
Ayala P.C.
Albuquerque, New Mexico

--and--

Anthony James Ayala
Law Offices of Anthony James A. Ayala
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Raul P. Sedillo
Allison M. Beaulieu
Butt Thornton & Baehr PC
Albuquerque, New Mexico

   *Attorneys for the Defendants*